# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### August 7, 2012 Session

## GREGORY ROBINSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**Nos. 97-13179–80     W. Otis Higgs, Jr., Judge**

---

### No. W2011-00967-CCA-R3-PD  - Filed March 20, 2013

---

Petitioner, Gregory Robinson, appeals from the judgment of the Shelby County Criminal Court denying his petition for post-conviction relief.  A Shelby County jury convicted petitioner of premeditated first degree murder and especially aggravated kidnapping.  Petitioner was sentenced to death for first degree murder and twenty-five years for especially aggravated kidnapping to be served consecutively.  The Tennessee Supreme Court affirmed petitioner's convictions and sentences on direct appeal.  *See State v. Robinson*, 146 S.W.3d 469 (Tenn. 2004).  In this appeal of the denial of post-conviction relief, petitioner contends that (1) the State failed to disclose a statement of a witness in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) the State elicited and failed to correct false testimony of a witness at trial; (3) counsel were ineffective in both phases of the trial and on appeal; and (4) the death penalty is unconstitutional.  We conclude that the post-conviction court properly denied post-conviction relief.  Therefore, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROGER A. PAGE  J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.  THOMAS T. WOODALL, J., also filed a concurring opinion.

P. Benjamin Duke, New York, New York; and Donald E. Dawson, Nashville, Tennessee, for the appellant, Gregory Robinson.

Robert E. Cooper, Jr., Attorney General and Reporter; Aaron Winter, Assistant Attorney General; Amy P. Weirich, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

A jury convicted petitioner of the premeditated first degree murder and especially aggravated kidnapping of Vernon Green. During the penalty phase, the jury found two aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and (2) the murder was committed during a kidnapping. Tenn. Code Ann. § 39-13-204(i)(5), (7) (1997). The jury also found that the evidence of these aggravating circumstances outweighed the evidence of the mitigating circumstances beyond a reasonable doubt and imposed a sentence of death. In a separate sentencing hearing, the trial court sentenced petitioner to twenty-five years for the especially aggravated kidnapping conviction to be served consecutively to the death sentence. On direct appeal, this court reversed petitioner's convictions and sentence of death. *See State v. Gregory Robinson*, No. W2001-01299-CCA-R3-DD, 2003 WL 21946735, at *1 (Tenn. Crim. App. Aug. 13, 2003). The Tennessee Supreme Court reversed the judgment of this court and affirmed petitioner's convictions and sentences. *See State v. Robinson*, 146 S.W.3d 469 (Tenn. 2004).

Petitioner filed a pro se petition for post-conviction relief. The post-conviction court appointed counsel, who filed an amended petition. Following an evidentiary hearing, the post-conviction court denied relief. Petitioner filed a timely notice of appeal.

## TRIAL PROCEEDINGS

The Tennessee Supreme Court summarized the evidence presented at trial as follows:

> Proof presented at trial established that on the afternoon of April 30, 1997, a squabble between two small children in the Hurt Village Apartments in North Memphis led to an argument between the mothers of these children, which escalated into a fight, including gunfire, between the women's boyfriends, members of rival Memphis gangs - the Gangster Disciples and the Vice Lords. As a result of this fight, the Hurt Village Gangster Disciples called an "aid and assist" meeting, and Memphis-area Gangster Disciples congregated at an apartment in the Hurt Village complex for this meeting. Although [Vernon Green] was not a gang member and had not been involved in the earlier fight, he was seen near the apartment where the aid and assist meeting was being held. When a gang member accused Green of acting as a lookout for the Vice Lords, the defendant instructed other gang members to "snatch him up" and bring him to the apartment. For one and one-half to two and one-half hours, the defendant, along with other gang members, beat and interrogated Green. Eventually Green was taken from the apartment by six

gang members and shot to death in Jessie Turner Park. Green's body was discovered in the park between 5 and 5:30 a.m., on May 1, 1997, by members of a local walking club, who called the police. When Officer Alvin Peppers arrived at the scene, he found the victim's body lying face down in a prone position. Officer Peppers explained that he could not identify the victim's features, such as eye color, because the "face of the body was so mutilated that there was nothing that we could identify." Officer Peppers found no identifying objects on the body, such as a wallet or jewelry, but he recovered a numbered dry cleaner's tag from inside the victim's clothing that apparently was helpful in identifying the victim. Two live .45 caliber bullets, two .45 caliber bullet casings, and one .20 gauge shotgun shell casing were found within a five foot radius of the victim's body. . . .

Several former gang members testified about the events surrounding Green's kidnapping and murder. Two of these testified for the prosecution. The first, Christopher James, known as "Big Chris," testified for the prosecution. James had been a Gangster Disciple for three or four months on April 30, 1997. Around 5 or 6 p.m. on April 30, 1997, James and fellow Gangster Disciples, Jarvis Shipp, known as "J-Roc," and two other gang members called "Popcorn," and "Steve," witnessed a fight between Shipp's girlfriend and the girlfriend of "Snoop," a Vice Lords gang member. Later, as James, Shipp, and Popcorn were walking toward the apartment of Shipp's girlfriend, Snoop approached them and beg[a]n swinging at Shipp. After Shipp and Snoop began fighting, another Vice Lord drew a gun. At this point, James and Popcorn fled, but a bullet grazed Popcorn's hand as they were running from the scene. They arrived from the fight at the Hurt Village apartment of sisters Natalie, Nichole, and April Black around 8 p.m. Shortly thereafter, Shipp, along with fellow Gangster Disciples Prentiss Phillips, James Lee White Carradine, known as "Thug Life," and "Steve," and "Chuck" arrived at the apartment. Shipp was angry and decided to "call some more Gangsters over there to Hurt Village." An aid and assist meeting was called, and according to James, twenty or thirty additional Gangster Disciples from all over Memphis arrived at the apartment for the meeting.

After their arrival, Phillips came inside the apartment and said that Vernon Green was outside "watching out at the apartment." One of the later arriving Gangster Disciples, whom James identified as the defendant, instructed Shipp and three other Gangster Disciples to "go snatch up" Vernon Green. James said Shipp and the others followed the defendant's instruction

without hesitation. Green arrived at the apartment around 10 p.m., escorted by "two disciples in front [and] two disciples in the back." Green stood in the middle of the floor as the defendant asked Green if he had been outside watching for the Vice Lords. The defendant then hit Green in the face, struck Green numerous times, both with his fists and with a broom stick, and then pushed Green onto the couch. James, who had lived in the Hurt Village apartments and known Green for seven years, described Green as the neighborhood comedian and stated that Green had not been a gang member and had not been involved in the fight earlier in the day.

After Green was beaten, he was taken upstairs by "two other guys." Green remained upstairs for thirty to forty-five minutes. During this time, James was "jumped on" and "beat up" downstairs by six Gangster Disciples because he had not helped "Jarvis and them fight." James testified that Phillips came out of the kitchen, where he had been meeting with Shipp and Kevin Wilkins, known as "Big Folk," "cut on the radio and started picking out six people," who then beat James for fleeing rather than aiding Shipp during the fight with Snoop. James testified that Phillips, not the defendant, selected the gang members who beat James and that the defendant had been upstairs at this time.

Green was escorted downstairs after James was beaten, but a short time later, Green was taken from the apartment. Before Green left the apartment, James saw the defendant, Shipp, and Phillips talking together in the kitchen and overheard the defendant say, "Y'all know what to do." James believed this statement meant "they [were] going to kill [Green]." James recalled that the victim had been held at the apartment two or two and one-half hours. When asked if the victim said anything during this time, James said the victim "told Prentiss [Phillips], 'tell them folks to stop.'" When Green was escorted from the apartment by Shipp, Wilkins, Charles Golden, known as "Fufu," and Antonio Jackson, Green had been wearing a black shirt, black pants, and black shoes. Green's black shirt had been pulled over his head so that Green was unable to see or use his arms to resist. As this group left the apartment, James overheard the defendant again say, "Y'all know what to do." James also testified that the defendant at one point aimed a nine millimeter gun at his face, while threatening that the "same thing" would happen to James if James ever said "something about it." James believed the defendant's comment meant "they going to kill me too." After Green and the other gang members left the apartment, Phillips and "Steve" walked James home in the early morning hours of May 1, 1997.

-4-

James admitted that he had never seen the defendant before April 30, 1997, and that the defendant had not been a member of the Hurt Village Gangster Disciples. James maintained, however, that the defendant had been a member of the Memphis Gangster Disciples and had been present at the Hurt Village apartment on April 30, 1997.

Defense counsel on cross-examination questioned James regarding a statement he made to the police on May 8, 1997, one week after these events occurred. In that statement, James informed the police that "[he] saw Anthony, Jarvis Shipp, Shaun, and a big heavy-set guy that I don't know his name, Antonio Jackson, and Big Folk" kill Green. . . . In his May 8 statement James also said that "Shaun" instructed Shipp and three other gang members to "go snatch Vernon Green up" and that "Shaun" questioned and hit Green at the apartment. In his May 8 statement James provided the following account of the events:

> J-Roc, MacKaos, Shaun, and Low-Down went into the kitchen for a private meeting. And I heard them talking softly to each other for about five minutes. And then J-Roc and Shaun came out of the kitchen. And then MacKaos and Low-Down came out of the kitchen. And MacKaos said, you all need to take care of this and told Jarvis, what you-all do now is personal. Then MacKaos and Low-Down left.

Also in his May 8 statement, James indicated that "Shaun came up to me and said I better not say nothing to nobody, and if you think this was something let us find out that you said something about this." Although on May 8, 1997, James told the police that many gang members beat the victim, James testified at trial that only the defendant beat Green. Finally, in this May 8, 1997, statement James claimed he

> heard three cars start and heard at least six doors close. And after they left-and Prentiss had a gun in his right hand and said, if anyone say anything about this they will be dealt with. And then he said, all the gangsters in here keep this on the 1919. And after that Prentiss and Steve escorted me to my house.

When asked by police on May 8 if he had anything else to add to his statement to aid the investigation, James had replied: "All I can say is that Vernon was a good person and didn't need to be killed by anyone." When defense counsel

-5-

pressed James to explain why he had mentioned the name "Shaun" and had not once mentioned the defendant's name in his May 8, 1997, statement, James replied:

> Man, hold up man. When Vernon was getting beat, man, Vernon the one who called that man Shaun. So I went by what Vernon called him.

James admitted he had not previously provided this information to police and also conceded he had not previously indicated the defendant threatened him while holding a nine millimeter gun to his head. Although James had consistently "given the same name for everybody else that did everything that night," the actions he attributed to the defendant at trial had been attributed to "Shaun" in his May 8 statement. In response to questions from defense counsel, James indicated that Phillips was "coordinator" and Shipp "chief of security" of the Hurt Village Gangster Disciples. James did not attribute a rank to the defendant, however.

On re-direct examination, James clarified his prior testimony and May 8 statement, explaining that many gang members beat the victim, but the defendant hit Green first and no other gang member beat Green at the same time as the defendant. James also explained he had not known the gang members present on April 30, 1997, by their legal names and had referred to them by their street names. James said he had never seen the defendant before that night, had not known the defendant's name, and had referred to the defendant as "Shaun" in his May 8 statement because he heard Green refer to the defendant as "Shaun." James explained that, when the police showed him a photographic array shortly after Green's kidnapping and murder, he selected the defendant's photograph but referred to the person in the photograph as "Shaun."

James maintained the accuracy and truthfulness of his May 8 statement and claimed its only error was his use of the name "Shaun" when describing the defendant's actions. James claimed he had not learned the defendant's correct name until the first day of trial. James reaffirmed his direct testimony and reiterated that the defendant gave the order to "snatch up" Green; that the defendant beat Green; that the defendant met with Phillips, Shipp, and Wilkins in the kitchen; and, that the defendant twice commented, "Ya'll know what to do." On re-cross-examination, defense counsel pointed out that, despite his proclamation to the contrary, James knew the defendant's correct name prior

-6-

to trial and had used the defendant's correct name when previously testifying. Sergeant William Ashton of the Memphis Police Department corroborated James's testimony regarding the photographic array. Sergeant Ashton recalled that James identified the defendant's photograph from the array, but referred to the person in the photograph as "Shaun."

Testifying next for the prosecution, Jarvis Shipp, known also as "J-Roc," admitted he had been a Gangster Disciple and that he had held the "chief of security" rank in the Hurt Village section of the gang. Shipp corroborated James's testimony concerning the squabble between the children that led to the argument between the children's mothers that eventually escalated to the altercation between Shipp and Snoop. Shipp also corroborated James's testimony concerning James and Popcorn fleeing the fight and the gunshot injury to Popcorn.

When he arrived at the Hurt Village apartment of Natalie, Nichole, and April Black at about 9 p.m., Shipp saw James, Popcorn, Phillips, Isiah Triplett, Sepacus Triplett, Steve Hardin, and James Lee White Carradine, all members of the Gangster Disciples. The Black sisters also were present, but Phillips, the "coordinator" of the Hurt Village Gangster Disciples, ordered the Black sisters upstairs. After they complied, Phillips called an aid and assist meeting, stating that the Gangster Disciples were going to "step to another level" and retaliate against the Vice Lords. Shipp believed Phillips meant the Gangster Disciples were going back to hurt all or some of the Vice Lords as revenge for injuring Popcorn.

Shipp explained how the Gangster Disciples were organized into sections throughout Memphis. In addition to the Hurt Village section, where Phillips was the "coordinator" and Shipp the "chief of security," the Gangster Disciples had sections in Mitchell Heights, South Memphis, Scutterfield, Frayser, Watkins Manor, Binghampton, Hyde Park, Douglass, Riverside, Castalia, Whitehaven, Tulane, and Westwood. According to Shipp, "T-Money," who lived in Chicago, was the "head guy over the whole entire city" of Memphis. Kevin Foley, also known as "Kaos," was the number two person over the entire city. However, because "T-Money" was out of town, "Kaos was like the governor" over Memphis. According to Shipp, the defendant was from the Mitchell Heights section of the gang and "at that particular time he was a active chief of security over the entire city of Memphis." As such, the defendant ranked just below Kaos, and because T-Money was out of town, the defendant effectively ranked second in the

-7-

Memphis Gangster Disciples. As chief of security for Memphis, the defendant ensured that all section security chiefs were organized and gave orders when Kaos was not around to do so.

Shipp and Phillips followed the chain of command when calling the aid and assist meeting on April 30, 1997, calling first Kaos then the defendant. After these calls were made, forty to eighty Gangster Disciples from all over Memphis arrived at the apartment, and many of them were armed with handguns. After their arrival, Phillips ordered James Lee White Carradine and another person upstairs to prevent the Black sisters from coming downstairs or leaving the apartment.

Kaos arrived at the apartment about 9:30 or 9:45 p.m. The defendant arrived shortly thereafter and immediately asked Shipp, "Why aren't your guys on point?" Shipp said the defendant meant, "Why aren't your guys on security, watching out, looking?" The defendant directed Shipp, as "the security of Hurt Village" to determine the identity of the "guy peeping around the corner." After escorting the defendant inside the apartment, Shipp left to determine the identity of the person. When Shipp returned a short time later and advised the defendant that the person was Vernon Green, the defendant inquired, "Who is Vernon Green?" Phillips and others "started screaming" that Green was a Vice Lord. The defendant then ordered Shipp and five other gang members to place Green under "GD arrest." According to Shipp, the defendant meant gang members were to detain and hold Green against his will.

After locating Green, Shipp told Green "my brothers, the Gangster Disciples, wanted to speak with him," and escorted Green inside the apartment. After directing Green into the dining room, the defendant asked Green if he was a Vice Lord. When Green replied, "no," the defendant asked Green if he knew where the Vice Lords were located. When Green again replied "no," the defendant, Phillips, and Wilkins began punching, hitting, and physically abusing Green. After Green fell to the ground, Shipp asked the other gang members to "hold up" on beating Green. Shipp then assured Green "we weren't going to do nothing to him, we just wanted to know" the location of the Vice Lords. Green then said the Vice Lords were at a particular location, so the defendant ordered Shipp, and five other gang members to verify Green's information. About halfway to this location, Shipp and the others met a woman "who considered herself a sister of the Gangster Disciples." She told them the Vice Lords were "running down Danny Thomas."

-8-

Shipp and the others returned to the apartment, and when they arrived, the victim was sitting in a corner, away from the couch. According to Shipp, Green had been forced to sit in the corner because Green "had defecated on himself." Shipp and other gang members ridiculed Green for doing so. After learning the Vice Lords had not been at the location Green provided, the defendant ordered Sepacus Triplett and another gang member to take Green upstairs. Shipp went upstairs as well and saw Green lying on the floor of a bedroom with gang members standing around him pointing guns at his head and threatening to kill him. Shipp said the Black sisters were in another upstairs bedroom with a box springs mattress across the door to prevent their departure. When Shipp heard loud music and returned downstairs, Phillips and the defendant were selecting gang members and instructing them to form a circle. Phillips "told James to get in the center of the circle." Shipp said Phillips was in charge of the situation, but the defendant was advising on the proper procedure because Phillips had never before "put a brother in violation." When asked which of the two had the higher rank, Shipp replied: "Basically, you'll say Gregory Robinson." However, Shipp qualified his reply by pointing out that these events occurred in Hurt Village, Phillips's "turf." Shipp agreed that the Gangster Disciples are structured somewhat like the United States, with a national leader and local leaders.

After James moved to the center of the circle, the defendant and Phillips announced James had "six minutes six seconds, no cover up," meaning James would be beaten for six minutes and six seconds by six people. Gangster Disciples referred to this punishment as "a pumpkin head." According to Shipp, James was placed in "retirement" or "on hold" for six months and told not to consider himself a Gangster Disciple. Phillips and another individual, whom Shipp did not know, then escorted James out of the apartment.

After James left, Shipp told "the guys to bring [Green] downstairs." Green arrived downstairs with a t-shirt over his head to obstruct his sight and to restrict his hands so that he could not break away or defend himself. Shipp testified that the defendant, Phillips, and Wilkins each individually spoke to Kaos on a cellular telephone, during "one long continuous conversation." Shipp reported that after hanging up, "they said Kaos said, 'take him fishing.'" Shipp, who was not a part of the conversation with Kaos, understood this meant they were to "take [Green] way out somewhere out of the district, rough him up a little bit by physical abuse, and let him get back the best way he could." Shipp then heard the defendant direct Phillips and Wilkins to select six men to take Green to a destination. Wilkins picked Antonio Jackson, a

man known as "Paris," and another individual Shipp did not know. Phillips selected Shipp, Charles Poole, and a man known as "MacEndo." Shipp testified that Wilkins, Jackson, Paris, and MacEndo were from Mitchell Heights. Shipp was from Hurt Village, and Charles Poole was from Scutterfield.

Wilkins left with the six men selected, and Phillips remained at the apartment. The men drove in two separate cars to Bellevue Park. When Green pulled the shirt from his eyes and realized he was in a dark area, he began pleading with them, saying numerous times, "just let me go, man, I'm not going to say nothing, please, just let me go." Shipp, Paris, Poole, and MacEndo physically carried Green to the top of a hill and dropped him onto the ground. Wilkins "suggested" the other men stand a few feet away from Green. Shipp testified that although Wilkins was not superior in rank to the defendant, Wilkins was the "big head" who was giving directions at the park. Wilkins kicked Green in the side and asked Green if he had any last words. Shipp then heard a gun being cocked and saw Jackson fire the gun. Green was lying face down, and bullets struck his lower back and buttocks. Green began gasping for breath and saying that he had been hit, that he was dead, and that he was not going to say anything. When Jackson remarked to Wilkins that the buckshot were not affecting Green, Wilkins asked Paris for his chrome plated automatic pistol. Wilkins handed the pistol to Jackson, who shot Green in the head. The gun jammed, but Jackson adjusted it and fired again. The gang members then fled the scene and later met at a gas station on South Parkway, where Wilkins advised them to "take the streets, act normal." Wilkins gave them marijuana to "calm us down." They met again at an apartment in the Mitchell Heights area. Shipp later learned this apartment belonged to "Fufu" - Charles Golden.

Two days after the murder, Phillips told Shipp to take a "six day vacation." Phillips called the defendant, and the defendant arrived and drove Shipp, his "baby's mother" and his children to a local motel. The defendant told Shipp not to answer his pager or use the telephone. However, Shipp answered a page from Phillips and learned that the police were looking for him. Shipp then paged the defendant, who immediately returned Shipp's call but reprimanded Shipp for being "a knucklehead" who disobeyed orders not to use the telephone or answer his pager. After again telling Shipp not to answer the telephone or respond to his pager, the defendant assured Shipp that he, or "other brothers," would be dropping by to check on Shipp. Three days

-10-

later, the defendant sent "a guy by the name of Crenshaw and two more younger guys" to pick up Shipp and his family at the motel.

At the conclusion of his direct examination testimony, Shipp claimed that he had been threatened by Gangster Disciples for being a "snitch" and explained that he had sought protective custody because he feared he would be unable to survive in the general jail population, which included many Gangster Disciples. Shipp declared he had given truthful testimony and denied the State had offered any deals, promises, or representations in exchange for his testimony.

On cross-examination, Shipp admitted that he had given a lengthy statement to the police on May 27, 1997, and had not once mentioned the defendant's name, even though he had mentioned numerous Gangster Disciples, including Kaos, Phillips, Jackson, and Wilkins. Shipp admitted he had identified numerous Gangster Disciples when shown photographic arrays, including Kaos, Phillips, Wilkins, Jackson, Carradine, Golden, "Smash," Anthony, Johnny, and Sepacus Triplett, but had failed to identify the defendant when given the opportunity.

Although Shipp indicated in his May 27, 1997, statement that Kaos was the governor of Memphis, contrary to his trial testimony, in this same statement Shipp claimed that Wilkins, from the Mitchell Heights area, was the chief of security for North Memphis, that Phillips outranked Wilkins, and that Jackson was chief of security of Scutterfield. Furthermore, in his May 27, 1997, statement Shipp indicated that Phillips, not the defendant, instructed him to arrest Vernon Green; that Phillips, not the defendant, beat the victim; that Phillips, not the defendant, instructed gang members to take Green upstairs after he had been beaten; and that Phillips, not the defendant, decided Green's fate because Phillips and others assumed Green would "put the law in [Phillips's] business or [Green] would get the Vice Lords to retaliate against us."

On cross-examination, Shipp admitted that Shaun Washington, a Gangster Disciple from Mitchell Heights, had been present at the apartment on April 30, 1997, although he had failed to mention Shaun Washington in his May 27, 1997, statement to the police or in his direct testimony. Shipp testified that some Gangster Disciples have gold teeth, that the Gangster Disciple symbols include the six-point star, the pitchfork, the heart with wings, a crown, a "devil tail," and the world with a sword piercing it. Shipp claimed

-11-

that he had never heard the phrase "take him fishing" before April 30, 1997, but he maintained he had believed the phrase meant they were to drive away and leave Green to make his own way home. Shipp admitted there had been no discussion at the park about whether or not they were to kill Green. Shipp also admitted that he had been acquainted with Green because he had dated Green's sister. Shipp conceded that he had been charged with first degree murder after giving the May 27, 1997, statement, and that the prosecution had filed a notice of intent to seek the death penalty. When asked if he expected any consideration from the prosecution in exchange for his testimony, Shipp responded, "Yes, because the simple fact I'm facing the death penalty." When asked to clarify, Shipp stated, "If it's in the progress. If it's in the will." When defense counsel commented, "You're not up here testifying for your health, are you, sir?" Shipp responded, "I'm up here testifying to tell the truth on my behalf and on behalf of the victim's family."

On re-direct examination, Shipp confirmed that he had identified only one Gangster Disciple, Kaos, who outranked the defendant, and Shipp said he did so because "Kaos had told on" him. Shipp pointed out that the defendant, not Kaos, had taken him to a hotel and advised him how to protect himself. Shipp also claimed he had been afraid to identify the defendant because the defendant was "not playing with a full deck." Shipp maintained he had told the truth at all times, including his May 27, 1997, statement, except for his failure to identify the defendant.

On re-cross examination Shipp emphasized that he had implicated Kaos because "everyone knew that Kaos was a snitch." Shipp conceded he had initially implicated and identified Phillips, even though he had testified that Phillips and the defendant were "kind of on the same level" in terms of authority. Shipp admitted he had never implicated the defendant prior to testifying at trial and acknowledged that he hoped to avoid the death penalty by testifying against the defendant.

Also testifying for the prosecution, Dr. Thomas Deering, the forensic pathologist and assistant Shelby County medical examiner who performed Green's autopsy, explained that Green had a shotgun wound and two gunshot wounds to the right side of his head, a shotgun wound across his upper back, and a shotgun wound to his left buttock. The shotgun wound to the right side of Green's head lacerated his brain and fractured the base of his skull and would have itself been fatal. Gunshot wound B, near Green's right temple, also fractured Green's skull and struck his brain and was alone "a severe if not

-12-

fatal wound." Gunshot wound C began at Green's right temple, fractured his skull, broke his jawbone on the right, traveled through the back part of his tongue, and injured muscles in the right side of his neck. The shotgun wound to Green's upper back caused superficial scraping and would not have produced death in and of itself, although it would have been painful. The shotgun wound to Green's left buttock fractured the lower part of his back bone and his coccyx and also lacerated his rectum and bladder. Dr. Deering opined that the victim was alive when the various wounds were inflicted.

Dr. Deering cleaned and reconstructed the victim's skull to determine the order of the gunshot wounds. After examining the reconstructed skull and considering the level of bleeding at each wound, Dr. Deering determined that the shotgun wound to the right side of Green's head was inflicted first, that gunshot wound B was inflicted second, and gunshot wound C was next inflicted, in almost the same location as gunshot wound B. Although he could not determine if the shotgun wounds to Green's back and buttocks preceded the wounds to his head, Dr. Deering testified that the shotgun wound to Green's buttocks had a great deal of associated bleeding and would have been quite painful. Given the minimal associated bleeding, Dr. Deering opined that Green had very little blood pressure and was "in trouble" at the time Green was shot in the back.

On cross-examination, Dr. Deering agreed that he had reported no physical evidence of a severe beating. On redirect, Dr. Deering acknowledged that Green's head was so severely damaged by the gunshot wounds that physical evidence of any beating about Green's head may not have been visible. Nonetheless, on re-cross-examination, Dr. Deering admitted that "an average-sized guy" striking "hard blows with a closed fist" to a person's head would result in visible injuries. The prosecution then rested its case.

Testifying first for the defense, James Lee White Carradine, known as "Thug Life," admitted he had been present at the Hurt Village apartment on the evening Green was kidnapped and murdered. Carradine maintained, however, that he and Isiah Triplett had remained upstairs with the Black sisters for most of the evening. Although Carradine identified several Gangster Disciples who were at Hurt Village apartment, he maintained the defendant had not been present at the apartment. Carradine said he first met the defendant at the Shelby County jail and did not know whether the defendant was a Gangster Disciple.

-13-

Carradine explained that, although a man known variously as "Greg," "MacGreg," or "Red Greg," had been present at the apartment in Hurt Village on the evening of Green's murder, the defendant was not that man. As to MacGreg's rank, Carradine stated, "I'm just not familiar. You know, he had top rank." Nonetheless, Carradine maintained that Phillips outranked "that MacGreg" and that "Kaos was the dude that was over all of it." Carradine said the person he knew as MacGreg had been present at the apartment and armed with a gun. He described MacGreg as bald, with a light mustache, very light complected, about 5'6" or 5'7" in height, with "a bunch of tattoos," and "twelve gold in his mouth," a "six-point star in the web of his hand," tattoos on his neck, body, and arms, including a "GD" tattoo, a "MacGreg" tattoo on his right forearm, and a "to the world blow" tattoo on his left arm. Carradine confirmed that he had told the police in a May 9, 1997, statement that MacGreg was chief of security and was know as the "Executioner."

On cross-examination, the prosecution pointed out that Carradine had testified similarly at Kevin Wilkins's trial, stating that he knew a person known as "Big Folk" but that Kevin Wilkins was not that person. Carradine reluctantly admitted he had been a Gangster Disciple but maintained that he had no leadership role or rank within the gang. While Carradine denied participating in the physical assault on Green, he recalled seeing the victim kneeling beside the staircase, with Shipp and six others standing around him. Carradine explained that Phillips, along with the men he knew as MacGreg and Big Folk, were "standing behind the six dudes that were around Vernon," talking on the telephone. Carradine recalled Shipp had been walking between the two groups. After Green was moved to an upstairs bedroom, Carradine heard someone telling Green "to shut up before he got killed then." Carradine confirmed that Phillips was the Hurt Village coordinator and Shipp the Hurt Village chief of security and said that MacGreg ranked "somewhere around" two or three in the Memphis Gangster Disciples.

After Carradine testified, the defendant displayed his person to the jury. The record reflects he had no tattoos on his chest, neck, or back, no "MacGreg" or "Greg" tattoo on his right arm, no star tattoos on his hands, and no tattoo of "to the world blow" on his left arm. The record also reflects that the defendant had on his left arm a tattoo of "two heart's intertwined with each other, one with the name Sardie, one with the name Samantha." Also tattooed on his left arm was the word "Red." A tattoo on the defendant's right arm was described as following in the record; "a number one with what appears to be a brick of a wall with Mom and Annie on it." Finally, the record reflects that

-14-

the defendant had six gold teeth on the bottom and four gold teeth on the top, for a total of ten. The letters "G" "R" "E" "G" appeared on his four top gold teeth. The record reflects there were no stars or "pitch forks or anything else on the teeth."

Annie Robinson, the defendant's mother, along with Nichole Robinson and Patricia Anne Robinson, two of the defendant's sisters, testified that the defendant never had tattoos or gold teeth as described by Carradine. The defendant's mother, along with the defendant's friends, Danny Williams and Ronald Dowell, testified that the defendant had never been a gang member.

While admitting he had been at the Hurt Village apartment on April 30, 1997, Sepacus Triplett nonetheless denied being a member of the Gangster Disciples. However, Phillips directed Triplett to "control the door," so Triplett had answered the door for "everybody" and knew "who came in and who didn't come in." Triplett said he had not seen the defendant at the apartment and believed Phillips was "in charge." On cross-examination, Sepacus Triplett admitted he had lied to the police in a statement given on May 8, 1997, and that he had pleaded guilty to facilitation in connection with Green's murder.

Frederico Mason testified that, although he was not a member of the Gangster Disciples, he had been present at the apartment on April 30, 1997. Mason had seen a man known as "MacGreg" a "couple of times at Hurt Village," but Mason did not know if MacGreg was a Gangster Disciple. Mason maintained the defendant and MacGreg were not the same man. Mason did not see the defendant at the apartment on April 30, 1997, had never seen the defendant at the Hurt Village complex, and had first seen the defendant when shown a picture by a police detective. Mason did not know if MacGreg had been at Nichole Black's apartment on April 30, 1997, because he was "going upstairs and downstairs." Mason knew Kaos but said he did not know if Kaos had been at the apartment on April 30, 1997, but Mason had seen Phillips and Shipp discussing Green's fate. When asked if he saw anyone else, Mason replied, "Like I said, them the only peoples that I just knew, you know." On cross-examination, Mason admitted he left the apartment at approximately 10 p.m. and did not return until approximately 3 a.m.

Steven Hardin testified also and admitted he had pleaded guilty to facilitation to especially aggravated kidnapping in connection with Green's kidnapping and murder. Hardin arrived at the apartment between 5:30 and 6 p.m. on April 30, 1997. Hardin said Shipp called the aid and assist meeting

and many people arrived whom Hardin had never before seen. Hardin "vaguely" remembered some of the people who arrived for the meeting, and in particular, he remembered a man known as MacGreg being there that night. Hardin said MacGreg had tattoos on his hand, arms, neck, and shoulder and had a nicely trimmed "blondish beard." Hardin maintained the defendant was not "MacGreg," and said at no time during the evening did Hardin observe the defendant at the apartment. Hardin admitted that he had been "told to go upstairs by Prentiss Phillips and lookout the window and inform them" if anyone, the police, the Vice Lords, "whoever tried to come up to the apartment." Hardin stayed at his upstairs lookout post from 6:30 p.m. until 12 or 1 a.m. On cross-examination, Hardin admitted that, after pleading guilty, he had feared revenge from other Gangster Disciples incarcerated with him and acknowledged that his incarceration with other gang members was a frightening situation.

April Black testified that, on the evening of April 30, 1997, she was held in an upstairs bedroom at gunpoint by members of the Gangster Disciples. Black acknowledged her acquaintance and association with members of the Gangster Disciples, including Kaos, MacGreg, and Phillips. She admitted MacGreg had been at the aid and assist meeting at her apartment, but maintained the defendant is not MacGreg. Black admitted she was serving a ten-year sentence in the Mississippi Department of Correction for armed robbery, but claimed she was not incarcerated with Gangster Disciples from Memphis. On cross-examination Black admitted her brother had been shot by Gangster Disciples in the Shelby County jail, but she denied being afraid of the gang, although admitting she was "concerned."

Horace Black, April Black's brother, admitted he had been a member of the Gangster Disciples for ten years. He also admitted knowing the defendant from jail, but said, to his knowledge, the defendant had never been a member of the Gangster Disciples. Horace Black said he did not know Kaos, despite being a gang member for ten years. On cross-examination, Horace Black admitted that he previously had been convicted of possession of a controlled substance with the intent to sell, manufacture, or deliver, and aggravated robbery.

Sergeant Richard Parker, a Memphis police officer who had been assigned to the Gang Task Force for five years, testified for the defense about gang tattoos. Sergeant Parker described the readily identifiable tattoos often used by Gangster Disciples. He stated the defendant's tattoos could "possibly"

be gang tattoos, but he could not readily identify them as such. He indicated the letter "E" of the defendant's "RED" tattoo resembled a Gangster Disciple trademark, "although it was missing the post under it." He further noted that gang members often "camouflage" their tattoos, and he pointed out that tattoos can be easily changed. Sergeant Parker indicated that gang members had begun to eschew tattoos to avoid detection and explained that gold teeth, common among Gangster Disciples, can be removed and changed. Defense counsel pointed out that when he initially showed Sergeant Parker photographs of the defendant's tattoos, Sergeant Parker opined that the defendant's tattoos were not gang-related. After speaking with the prosecuting attorneys in the hall outside the courtroom, Sergeant Parker "came to the conclusion that the tattoos could possibly be gang-related."

Based upon this proof, the jury convicted the defendant of premeditated first degree murder and especially aggravated kidnapping, finding the defendant criminally responsible for the conduct of another.

The trial proceeded to the penalty phase. To establish the two aggravating circumstances - the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death and the murder was committed during a kidnapping - the prosecution relied upon the proof presented during the guilt phase of the trial and re-called Sergeant Peppers to the stand. Sergeant Peppers identified a photograph of the victim's body as it appeared when discovered in Jessie Turner Park on the morning of May 1, 1997.

A friend of the defendant, his mother, and two of his sisters testified in mitigation. They described him as a "loving father" of seven children, ranging in age from one to six years old, a member of a large, close-knit family, a concerned and caring brother to his five sisters, and the youngest of his mother's six children and her only son. He attended church. Although he had no steady job, the defendant had been trained as a welder. Both the defendant's mother, and Debra McNeese, a mitigation specialist with Probation Management Group, testified that the defendant had a learning disability and had dropped out of school in the ninth grade. After leaving school, the defendant worked with his father at Eagle Iron Work. Testifying in his own behalf, the defendant asked the jury to spare his life so that he could see his children.

-17-

*Robinson*, 146 S.W.3d at 474-85 (footnotes omitted).

## POST-CONVICTION PROCEEDINGS

Paula Wulff, a former assistant district attorney general with the Shelby County District Attorney's Office, assisted Patience "Missy" Branham in prosecuting petitioner. Ms. Wulff testified that she and Ms. Branham were both responsible for providing discovery to trial counsel.[1] Ms. Branham, as lead prosecutor, had an open-file discovery practice in the case whereby defense counsel for every defendant and their investigators were given access to materials related to every defendant. Defense counsel or their representatives were allowed to review the case file at the district attorney's office while someone from the office sat with them. Ms. Wulff explained that supervision was necessary because some defense attorneys and investigators "had helped themselves to materials in the past." The person reviewing the file was allowed to select documents to be copied. Ms. Wulff said that all the defense attorneys involved in this case were given multiple opportunities to access the case file. She did not recall maintaining a list of all documents or other materials in the case file. She was unaware of the district attorney's office's maintaining a log of the documents that each defense attorney requested be copied from the case file.

Ms. Wulff said Jarvis Shipp was also charged with the victim's murder and testified for the State at petitioner's trial. She testified that on November 5, 1998, she, Ms. Branham, and their investigator met with Mr. Shipp and his counsel, Gerald Skahan. The interview with Mr. Shipp was recorded, and Ms. Wulff reduced the recording to writing. Ms. Wulff was unaware of whether the transcript of the meeting was placed in the discovery file. She testified that petitioner's trial counsel were aware of the meeting with Mr. Shipp and knew that the transcript of the meeting would be provided to them. Ms. Wulff said she contacted lead counsel upon completion of the transcript. She also said she met with co-counsel during the week of November 10, 1998, when he came to the courtroom in Division 10 to retrieve the transcript. Ms. Wulff provided the transcript to co-counsel, and they discussed its contents. She recalled the transcript was also available to counsel for the other co-defendants.

Ms. Wulff testified that she consulted with Jerry Kitchen, another prosecutor in the office, regarding the steps he took to ensure the safety of a defendant who had testified for the State but who was also pleading guilty to a criminal offense. Mr. Kitchen informed her that in those situations, he would write a letter to the trial judge indicating that the

---

[1] Because this is a capital case, petitioner had two attorneys at trial. When referring to counsel in general, we use the term "trial counsel." We refer to the primary attorney as "lead counsel" and his "second chair" as "co-counsel."

-18-

witness/defendant had provided beneficial testimony for the State so that the trial judge would be aware of such information in directing where the witness/defendant would be housed. Ms. Wulff said that during the interview with Mr. Shipp on November 5, 1998, he raised concerns about where he ultimately would be housed. Mr. Skahan mentioned Brushy Mountain, and Ms. Wulff stated she had discussed the issue with Mr. Kitchen.

Ms. Wulff conducted the direct examination of Mr. Shipp at petitioner's trial. At the conclusion of her examination, she informed the trial court that she was providing trial counsel with Mr. Shipp's statement from May 27, 1997, as *Jencks*[2] material but that it appeared the statement had previously been provided to trial counsel. Ms. Wulff explained she did not give them any other statements from Mr. Shipp because trial counsel had already been provided with all of his statements.

Ms. Wulff testified that she wrote a note to Ms. Branham on November 11, 1998, in which she questioned Mr. Shipp's refusal to follow a direct order to beat Christopher James. She noted, "Hope he isn't selling us a line on all this. No one refuses." She was also concerned that Mr. Shipp did not mention petitioner's hitting the victim with a broom as noted by other witnesses. Ms. Wulff also identified a note that she had written stating, "How about my letting [lead counsel's] guy read my copies of all statements rather than giving him access to the box of stuff." She did not know when she wrote the note or to what "box of stuff" she referred.

Following petitioner's trial, Mr. Shipp pled guilty to facilitation of first degree murder and facilitation of especially aggravated kidnapping. The State recommended concurrent sentences of fifteen years for the facilitation of first degree murder conviction and twelve years for facilitation of especially aggravated kidnapping to be served as a Range I standard offender. Ms. Wulff acknowledged that according to the transcript of Mr. Shipp's plea hearing, she stated:

> Your Honor, the reason for this negotiated plea is the fact that Mr. Shipp has graciously, through his feeling for a desire to make this right for both his maker and also for the family members, testified on three separate occasions and assisted the state in their convictions of other individuals, one of whom did get the death penalty for this matter; one of whom got life without and several actually—two who got life without parole for the same matter, I would ask you to accept this.

The trial court accepted the plea and sentence.

---

[2] *Jencks v. United States*, 475 U.S. 1068 (1986).

On cross-examination, Ms. Wulff testified that the State maintained one file for all defendants. When the defense attorneys requested to review discovery, they were provided with the entire file. Ms. Wulff did not limit the time the defense attorneys could spend reviewing the file. She recalled meeting with lead counsel, co-counsel, and their investigator on multiple occasions to review the file. They would review the file for three to four hours at a time. Ms. Wulff said the discovery policy continued during trial. She maintained she would have allowed lead counsel to review the State's file during trial if he had requested to do so.

Ms. Wulff recalled that when co-counsel came to court to retrieve the transcript of Mr. Shipp's statement, they discussed co-counsel's feelings regarding the death penalty and the complicated nature of the case. She also recalled that co-counsel had a brown soft shell briefcase that was unusual and unlike the Haliburton or hard shell briefcases that most attorneys carried at that time. They discussed the briefcase, and Ms. Wulff saw co-counsel place the transcript inside that briefcase.

Ms. Wulff testified that although she believed Mr. Shipp was concerned about facing the death penalty, "[t]here was no deal made with Mr. Shipp, period." She believed Ms. Branham had informed Mr. Skahan that if Mr. Shipp testified truthfully, she would take his testimony into consideration in determining whether to offer a plea agreement. Ms. Wulff assumed Mr. Shipp was hoping he would not face the death penalty if he cooperated and testified truthfully. She was unaware of any agreement that Ms. Branham was considering until Ms. Branham informed her of the agreement.

Ms. Wulff described Mr. Shipp as inarticulate and difficult to understand. Mr. Shipp informed the prosecutors that petitioner instructed him and five other individuals to beat Christopher James. Mr. Shipp responded, "[N]o, that's not a good idea." Ms. Wulff expressed concern regarding the truth of this statement in her note in the file because Mr. Shipp had shown defiance and risked being beaten also. Mr. Shipp then told the prosecutors, "So I went in there and I hit Chris at the top of his body."

Ms. Wulff explained that the State's theory was not that petitioner was present when the victim was shot and killed. Rather, the State's theory was petitioner directed Prentiss Phillips and Kevin Wilkins to each select three people to take the victim "fishing." Petitioner's rank in the Gangster Disciples was higher than that of Mr. Phillips, and he had the authority to give such orders.

Ms. Wulff testified that petitioner was "arrogant and threatening" during trial. At one point during the proceedings, he walked past the prosecutor's table, opened his jacket, made

a clicking sound as though he had a weapon inside of his jacket, and referred to Ms. Branham by her first name. Ms. Wulff described petitioner's actions as "a threatening moment" that occurred in the jury's presence. She recalled petitioner wore a different suit each day of the trial, each of which appeared to be expensive.

On redirect examination, Ms. Wulff denied any deal with Mr. Shipp being in place prior to his testimony at petitioner's trial. She also denied any discussion regarding whether Mr. Shipp would go to trial or receive a plea agreement. She said, "There was no discussion with Mr. Shipp or Mr. Skahan as to any terms of any sort as a consequence of Mr. Shipp's testimony."

Ms. Wulff stated that while she considered the transcript of the meeting with Mr. Shipp on November 5, 1998, to be *Jencks* material, she had provided it to trial counsel at an earlier time. She also stated trial counsel were "obviously" aware of the transcript as the cross-examination of Mr. Shipp at trial tracked some of the details of his statement. She acknowledged that trial counsel did not specifically refer to the November 5th meeting or the transcript in their cross-examination.

Lead counsel testified he was appointed to represent petitioner on February 27, 1998. He previously represented defendants in capital cases as co-counsel, and petitioner's case was his first capital case as lead counsel. Within one week of his appointment, he filed a motion requesting *Brady*[3] material from the State, including statements with material variances. He also requested that the State provide him with impeachment evidence.

Lead counsel believed he learned that Mr. Shipp would testify for the State shortly before trial. He did not believe he was aware of a meeting between the prosecutors, Mr. Shipp, and Mr. Shipp's counsel, and he was unaware of any record of the meeting at the time of trial. Lead counsel maintained that he had not seen the transcript of the November 5th meeting until the Post-Conviction Defender's Office showed it to him in preparation for the post-conviction proceedings. He had no recollection of Ms. Wulff's calling him and informing him that a transcript of the meeting was available. He recalled that after Mr. Shipp testified at trial, he requested *Jencks* material from the State, and the prosecutors said all *Jencks* material had previously been provided to him.

Lead counsel testified that the prosecutors had an open-file discovery policy in this case and that he likely went to their office to review the file. He maintained that the prosecutors never advised him that additional discovery was available for review. He said that if the prosecutors ever did so, it was not in relation to the transcript of the November 5th

_____

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

meeting. He explained that because the State had an open-file discovery policy and were under a duty to disclose any additional discovery that he had not reviewed, the prosecutors would not have allowed him access to the State's file during trial. He further explained that regardless of whether he had such access, the prosecutors represented to him that they had provided him with all discovery materials.

Lead counsel did not list a review of the transcript on his fee claim. He said he was more detailed in his fee claims in capital cases due to the nature of the cases and the need to ensure that he was paid on all time spent on the cases. Lead counsel stated that had he been provided with the transcript from the November 5th meeting, he would have mentioned it in his opening statement in support of his contention that Mr. Shipp lacked credibility, as well as during the trial.

Lead counsel stated he received Mr. Shipp's statement to the police on May 27, 1998. He acknowledged that Mr. Shipp told police that Mr. Phillips was one of the primary actors and did not mention petitioner. In contrast, Mr. Shipp told the prosecutors on November 5, 1998, that petitioner was in charge that night. Lead counsel was unaware of Mr. Shipp or any other witness making such assertions prior to petitioner's trial. With regard to Mr. Shipp's statement during the November 5th meeting, lead counsel stated,

> I can't imagine it not being in the opening statement somewhere. I can't imagine not mentioning it there or in closing or in cross. It's just there is no way we had that statement. And so that makes this statement even more significant than the one you just handed me because of the inconsistencies between the two. It's really unbelievable that we didn't have it.

Lead counsel testified that petitioner asserted he was not present at the meeting of the Gangster Disciples. As a result, identification was a large part of the defense. Lead counsel did not recall whether alibi information was available because petitioner was arrested so long after the victim's death. Lead counsel retained David Watson as an investigator and relied on him to locate and interview witnesses. Lead counsel also interviewed the identification witnesses. On more than one occasion, he went to Mississippi to the prison where one of the Black sisters was housed and obtained orders necessary to transport the witness to trial.

Lead counsel acknowledged he informed jurors in his opening statement that they would hear evidence that Mr. Phillips gave the order to kill the victim. He characterized this assertion as an alternative theory of defense in which he would have argued for a lesser-included offense. Lead counsel obtained and reviewed the transcript of the plea hearings of co-defendants Charles Goldman and Charles Poole prior to trial. He acknowledged that Mr. Goldman testified during his plea hearing that since his arrest, he had learned that while

Prentiss Phillips represented that Vernon Green was a member of a rival gang, Mr. Phillips actually had animosity toward Mr. Green because they were rivals for the same woman. Mr. Poole testified during his plea hearing that Mr. Phillips provided them with false information about the victim because he held a grudge against the victim. Lead counsel explained that the focus of the defense was that petitioner was not at the meeting and that as a result, the identity of the person who ordered the victim be killed was not relevant to the defense. He noted that a second defense theory was that even if petitioner was involved, he did not shoot the victim.

Lead counsel did not recall whether he interviewed witnesses regarding Mr. Phillips' personal motives to kill the victim. He believed he received Denise Hurt's statement to the police that Mr. Phillips told her that he had "one of his G's" kill the victim. He said Mr. Watson would have attempted to interview any witnesses identified through discovery. Lead counsel did not remember whether Ms. Hurt was interviewed or would even agree to speak with them. He explained that many witnesses in gang cases refuse to speak to attorneys. He generally did not interview family and friends of a victim as he rarely obtained helpful information from a family member of the victim when defending the person alleged to have killed that victim. He said such witnesses generally complained to the prosecutor that the defense attorneys were harassing them.

Lead counsel testified he retained Debra McNeese Taylor and her probation company to provide mitigation services. The prosecutors sought the death penalty against a number of defendants in the case, and the number of available mitigation specialists was limited as a result. Lead counsel wanted to retain someone from the Memphis area and retained Ms. Taylor due to the lack of adequate providers of mitigation services and his lack of knowledge of other providers. He did not believe he contacted any legal organization to assist him in locating other mitigation specialists.

Lead counsel stated Ms. Taylor did not conduct an adequate mitigation investigation and lacked "just about everything" required of a mitigation specialist. He said that while Ms. Taylor had the skills necessary to interview family members and gather records, she did not know how to utilize the information gathered. Lead counsel acknowledged Ms. Taylor could have provided adequate mitigation services had he provided her with the necessary direction.

Lead counsel said he spoke to petitioner's family members but did not recall whether he reviewed petitioner's medical or school records. He did not know how factors such as drugs, violence, family dysfunction, or a single-parent home affected petitioner. He believed these factors existed for many young African American men from lower income families in Memphis. Lead counsel did not remember whether he discussed the factors with petitioner.

Lead counsel testified that Dr. Marsha Little-Hendren, a psychologist, evaluated petitioner. According to her report, petitioner denied having a substance abuse problem but admitted he was a social drinker and had experimented with marijuana as a teenager. Dr. Little-Hendren reviewed a CT scan of a prior head injury of the petitioner and noted the CT scan was unremarkable. She found no complications from the injury and concluded that no further neurological or neuropsychological assessments were necessary. While lead counsel was unable to recall the extent of Dr. Little-Hendren's evaluation, he believed that her evaluation of petitioner was not limited to competency because she addressed whether a neuropsychological assessment was necessary. Lead counsel did not request that another medical provider review Dr. Little-Hendren's report and petitioner's medical records. Based upon the report, he did not believe he could have established particularized need to obtain approval of funds from the trial court to retain a neuropsychologist.

Lead counsel noted that according to Dr. Little-Hendren's report, petitioner had a verbal I.Q. of 76, a performance I.Q. of 92, and a full scale I.Q. of 80. He acknowledged that a sixteen-point gap between the verbal and performance I.Q. scores could indicate neuropsychological issues. Because Dr. Little-Hendren did not recommend neuropsychological testing, lead counsel assumed she did not believe such testing was necessary based upon the results of her testing. Lead counsel did not tell Dr. Little-Hendren what tests to administer but relied upon her to make that decision. At the time of petitioner's case, he did not know that the variance in I.Q. scores could be an issue. He said that while he understood that the variance could represent a need for further testing, "when my psychologist says they're not recommending that, then I think I would still be hard-pressed to go to a judge and say hey, Judge, there's an IQ difference between verbal and performance."

Lead counsel testified that in determining whether to strike a juror, he always consulted his client and followed his client's wishes regardless of whether he agreed with his client. He did not stereotype jurors based upon their employment because "stereotyping is dangerous." He had tried cases in which a deputy jailer had been on the jury. If a deputy jailer was on the potential jury panel, he would consult with his client before striking the juror and would keep the juror if the client requested he do so.

Lead counsel did not recall whether he was aware, at the time of petitioner's trial, that Mr. Phillips had escaped from the Shelby County Jail. Because lead counsel represented a defendant in a case involving the death of a deputy jailer, he was aware that the jailer was killed in his own driveway shortly before the petitioner's trial. Lead counsel was also aware that the Shelby County Jail was under a federal court order for supervision due to poor conditions at the jail and gang problems. He did not question jurors in voir dire regarding whether they were aware of these events.

Lead counsel testified that he filed a motion for individual and sequestered voir dire in the case, which the trial court denied. He had never had such a motion granted in Shelby County. Rather, the trial courts in Shelby County allowed counsel to question a juror at the bench if an issue arose during voir dire. Lead counsel said this approach was sometimes ineffective because the juror likely would have answered a portion of the question in front of the other jurors. Lead counsel did not consider presenting the testimony of an expert witness regarding the importance of individual or sequestered voir dire and did not believe the trial court would have approved funding to hire the expert. He said that while he may have requested funding for a jury consultant, the trial courts generally denied such requests. He did not recall whether he used a juror questionnaire, and he acknowledged that the use of such questionnaires would be "good practice" in a capital case.

On cross-examination, lead counsel testified that their theory of defense was that the "Greg" whom the State's witnesses identified as present during the meeting of the Gangster Disciples was not petitioner. He said that while one aspect of their defense was that Mr. Phillips gave the orders, the main focus of the defense was that petitioner was not involved in any way. He also said that petitioner "was adamant from day one that he had nothing to do with this, was not present. And quite frankly, I think to a large degree we had some evidence that he may not have been." Petitioner was unable to provide trial counsel with information or witnesses to interview regarding the events. Lead counsel stated that evidence of Mr. Phillips's prior altercations with the victim was not relevant to the defense theory that petitioner was not present and was not involved in the victim's death.

Lead counsel stated that had he been provided with the transcript of the November 5th meeting between prosecutors and Mr. Shipp prior to trial, he would have used it at trial to establish that Mr. Shipp's testimony differed from his original statement to police because he reached an agreement with the State in exchange for his testimony. He maintained he was not able to effectively cross-examine Mr. Shipp without the transcript. He explained that the transcript established that Mr. Shipp was not merely hoping to obtain a better deal by testifying against petitioner but had spoken to the prosecutors and confirmed that he would, in fact, receive a better deal.

Lead counsel noted that in Mr. Shipp's original statement to the police, he did not identify petitioner as a participant in the victim's death. Lead counsel questioned Mr. Shipp at trial regarding the statement and argued to the jury that although Mr. Shipp identified various high-ranking members of the Gangster Disciples in his statement, he did not mention petitioner until his trial. Lead counsel maintained that the transcript of the November 5th meeting supplied a "missing step," explaining:

The missing step is the first time you mention Gregory Robinson is when you decided when you knew Gregory's trial was coming up in a few weeks, you wanted a deal to save your butt so you went with your lawyers to go talk to the State and you brought in Gregory Robinson when you know that's what they needed at the time. And you didn't bring out that meeting because your testimony didn't change today at trial. Your testimony changed when you talked to them . . . because you wanted to solicit yourself a deal and make sure you had it, and now you're here so that's the missing element.

Lead counsel believed the transcript would have been a significant step in establishing that Mr. Shipp testified falsely at petitioner's trial.

Many investigators and experts had been retained by counsel for the multiple co-defendants. Lead counsel was able to retain Mr. Watson as his investigator. Mr. Watson contacted lead counsel on a frequent basis and needed little guidance due to his experience. Lead counsel also retained the services of Dr. Little-Hendren, who began her career performing court-ordered evaluations at Midtown Mental Health. At the time of trial, she had maintained a private practice for many years in both Memphis and Olive Branch, Mississippi, and had performed evaluations in many criminal cases.

Lead counsel did not recall the defense's position regarding mitigation but said that the position was somewhat limited by the process that he employed to prepare for mitigation. He also did not recall the information obtained but said it was not as extensive as the information that he generally obtained in a capital case. According to Dr. Little-Hendren's report, Ms. Taylor obtained school records, employment records, and medical records. The mitigation investigator also interviewed petitioner's family members, and lead counsel met with some family members at his office. Petitioner denied being addicted to drugs, drinking excessively, and having psychological problems.

Lead counsel testified that generally, he would spend a considerable amount of time questioning jurors during voir dire. In determining whether to strike a juror, he considered not only the juror's answers to the questions but also the juror's reaction to him, the way the juror spoke, and the juror's mannerisms. A transcript of voir dire would not reveal body language, tone of voice, and others' reactions to the juror. Lead counsel also considered potential replacements for that particular juror.

Co-counsel testified he had been practicing criminal defense since 1989 and was appointed to represent petitioner on March 2, 1998. Petitioner's case was his first capital case. He viewed his duties as co-counsel as following any instructions given by lead counsel. He said that following trial, petitioner informed trial counsel that he wished to assert a claim

of ineffective assistance of counsel on direct appeal. Both lead counsel and co-counsel withdrew as a result. Two attorneys subsequently retrieved his file, and co-counsel did not know its location.

Co-counsel said the prosecution had an open-file discovery policy in this case. He explained that with open-file discovery, the prosecutor typically gave the file to the attorney and allowed the attorney to review it. In this case, however, the prosecutor maintained control of the file when they met to review discovery. While co-counsel could not recall specific dates, he recalled he and lead counsel met with each prosecutor on separate occasions to review discovery materials. He stated that while his claim for attorney's fees reflected only one discovery session on June 7, 1998, with one prosecutor, he recalled at least one additional discovery session with the other prosecutor. Co-counsel received the statements of the co-defendants and the transcripts of their guilty pleas.

Co-counsel testified that lead counsel retained the services of David Watson as the investigator. He could not recall Mr. Watson's role in the discovery process. According to his claim for attorney's fees, co-counsel met with Mr. Watson on three occasions and reviewed memoranda prepared by Mr. Watson. He did not recall whether he offered any instruction to Mr. Watson or accompanied him during any portion of his investigation. Co-counsel also visited the crime scene and met with petitioner's family.

Co-counsel did not recall meeting with the prosecutors two to four weeks before trial. He said he could not "dispute and would not dispute that [he] met with one or both or one of the other of the prosecutors. But [as for] a specific memory of the meeting for discovery purposes[,][he] just [didn't] have that memory." He did not recall when he and lead counsel learned that Mr. Shipp would be a witness in the case but said that they expected him to testify. He also did not have any recollection of lead counsel's instructing him to go to the prosecutor's office to obtain additional discovery but said it was "not out of the realm of possibilities."

Co-counsel did not recall the prosecution's providing him with a transcript of the November 5, 1998 meeting between the prosecutors and Mr. Shipp. He said the transcript was so significant that he would have remembered receiving it. He explained that the defense's theory was that Mr. Shipp testified in order to avoid the death penalty and not out of concern for the victim's family. He further explained,

We did not know that. Our cross[-]examination, if one read it, centers around the fact that we certainly are suspicious of him having exactly this type of arrangement with the state and we're talking about you're certainly hoping that you will get something out of it. And yes, I am. He admitted that. But he

-27-

withheld that that had already been told to him. Ms. Branham told him that it will save his life. In a death penalty case, that's—that's good information to have.

Co-counsel testified that Mr. Shipp focused on Mr. Phillips in his statement to police but focused on petitioner during the November 5th meeting with prosecutors. Mr. Shipp did not mention petitioner in his statement to police. The police showed Mr. Shipp a photograph array, which included a photograph of petitioner, but he did not identify petitioner. When prosecutors asked Mr. Shipp during the November 5th meeting why he did not identify petitioner from the array, he replied, "I don't know." When questioned at trial as to why he did not identify petitioner, Mr. Shipp testified he was afraid of him. Co-counsel stated that if he and lead counsel had been provided the transcript of the November 5th meeting, they would have challenged Mr. Shipp's explanation for failing to identify a photograph of petitioner and his assertion that he decided to testify due to his concern for the victim's family. They would have also challenged the prosecutor's assertion during closing arguments that because Mr. Shipp did not have a deal with the State, he was very courageous for testifying and was doing so for the benefit of the victim's family.

Co-counsel testified that the defense filed a motion for production of exculpatory evidence and a motion for discovery on March 5, 1998, three days after he was appointed to represent petitioner. The defense filed a second discovery motion on June 24, 1998. Co-counsel maintained he did not receive the transcript of the November 5th meeting as *Jencks* material during petitioner's trial. He did not recall having access to the prosecutor's files during trial.

Co-counsel testified that the defense at trial was that petitioner was not the shooter and was not present. As a "fall back," trial counsel also argued that petitioner did not have the authority to order the shooting. Co-counsel did not recall whether they argued as an alternative defense that petitioner was not in a leadership position and did not have a grudge against the victim. He reviewed the transcripts of the guilty pleas of co-defendants Charles Poole and Charles Golden. He did not recall whether a member of the defense team interviewed friends and family members of the victim, and his attorney's fee claim form did not reflect such an investigation.

Co-counsel said the trial court approved funds for the services of Probation Management Group ("PMG"). He explained that everyone whom they tried to retain to investigate mitigation issues had a conflict. Although co-counsel did not have a specific recollection, he believed he and lead counsel decided to retain someone who was familiar with Memphis and the surrounding areas rather than bring in an "outsider who would have to start from scratch." Co-counsel did not believe the role of PMG extended to sociological

-28-

studies or information regarding the areas of the city where petitioner was raised. He also did not believe their roles included researching the effect of unemployment, female-led households, or income of the neighborhood. Co-counsel acknowledged that petitioner informed them that he had suffered a closed-head injury. Lead counsel contacted Dr. Little-Hendren, who evaluated petitioner.

Co-counsel was unable to recall whether he and lead counsel discussed retaining a jury consultant or whether they prepared a juror questionnaire. He did not remember what information they had about the jurors before voir dire. The trial court denied trial counsel's request to question each juror individually outside the presence of the other jurors. As a result, co-counsel believed he was limited in the questions he was able to ask the jurors.

Co-counsel said that one of the jurors, Gina Boyd, was a deputy jailer at the Shelby County Jail. Before petitioner's trial, he was aware of an ongoing federal lawsuit regarding the conditions of the Shelby County Jail and problems with gangs inside the jail. He was also aware that a deputy jailer had been shot and killed in his own driveway by a gang member a short time before petitioner's trial because co-counsel had represented one of the defendants in that unrelated case. Co-counsel was not aware that two deputies had been shot by a gang member in the jail before trial. He acknowledged that a determination of Ms. Boyd's knowledge of the shootings, the federal lawsuit, and the allegations of gang activity in the jail would have been important in determining whether to use a peremptory challenge to strike her as a juror. Co-counsel believed that he and lead counsel consulted petitioner regarding whether to challenge Ms. Boyd as a juror and that petitioner wanted her to remain on the jury.

Co-counsel testified that petitioner was seated behind him and lead counsel during trial. He believed he had sufficient access to petitioner during trial to discuss any issues and answer any questions that petitioner had. He said petitioner's demeanor did not draw his attention or distract him.

Co-counsel testified that he was "somewhat displeased" with petitioner's conduct when he testified during the penalty phase. While they intended to plead for petitioner's life, petitioner displayed "an inappropriate attitude" and had a "certain swagger that was just dissident with what our message was going to be." He believed that petitioner was attempting to convey an appearance of dignity or pride but that the appearance could have been misunderstood by others.

On cross-examination, co-counsel said the primary issue at trial was whether petitioner was present at the meeting of the Gangster Disciples and ordered the killing of the victim. The defense maintained that petitioner was not a member of the Gangster Disciples

and was not present at the meeting. Further, none of the witnesses ever claimed that petitioner was present at the park where the shooting occurred.

Co-counsel received a copy of the transcript of the trial of co-defendant Kevin Wilkins and also obtained statements of witnesses from Mr. Watson, the defense investigator. Mr. Watson's reports included a combination of summaries of his interviews with witnesses and transcripts of the conversations. Co-counsel did not remember the defense witnesses whom they requested Mr. Watson to interview. He believed that Mr. Watson interviewed the Black sisters and that lead counsel met with April Black.

Co-counsel testified that he and lead counsel met with petitioner on numerous occasions. He described petitioner as cooperative and said that petitioner assisted them in investigating his case. While he did not recall petitioner's position, lead counsel reminded him that petitioner was adamant that he was not present at the Gangster Disciple meeting. He described petitioner as "aloof" at times, but he would "come to life or become very, very agitated or animated" when the discussion implied that he attended the meeting.

Co-counsel recalled that Mr. Shipp told the police officers that a number of individuals were present at the meeting but that he never told the officers that petitioner was there. The police showed Mr. Shipp a photograph array that included petitioner's photograph, but Mr. Shipp did not identify petitioner. While co-counsel did not remember meeting with Mr. Skahan before Mr. Shipp was announced as a witness, he was "almost positive" that he and lead counsel met with him. Co-counsel did not remember whether he knew that Mr. Shipp would be interviewed by the prosecutors before trial or whether he met with Ms. Wulff before trial.

Co-counsel testified that lead counsel located a police officer who was an expert on gang tattoos. He was present during a telephone conversation in which the officer assured them that petitioner's tattoos were not gang-related. The officer confirmed his opinion to lead counsel outside of the courtroom before the officer testified at trial. The prosecutors then requested to speak with the officer. After the prosecutors spoke to the officer, lead counsel called him to testify. Co-counsel said the officer's testimony was "completely opposite" of what they expected him to say. The officer testified that at least one of petitioner's tattoos may have been altered to hide gang symbols. Co-counsel maintained that he and lead counsel did not know the officer would offer this opinion until he testified.

Co-counsel testified that because petitioner previously suffered a closed-head injury, he and lead counsel retained Dr. Little-Hendren to evaluate petitioner to determine whether he had organic brain damage. Dr. Little-Hendren did not find any evidence of organic brain damage. Trial counsel expected that Dr. Little-Hendren's findings would be otherwise and

were disappointed in the results. Co-counsel said that petitioner did not present any other mental health issues. He explained that in hindsight, he believed that "more mental health work" should have been completed and that their reliance upon Dr. Little-Hendren may have been misplaced. He acknowledged that he could not "go buy the expert opinion."

Co-counsel said that Ms. Taylor and her company, PMG, generally prepared presentence reports and probation reports and monitored individuals on probation. Her company obtained petitioner's records and investigated his background. A number of witnesses, including some of petitioner's sisters, testified during the penalty phase regarding his background. Trial counsel attempted to establish that petitioner was loved by his family, was a good father to his children, and had a life worth saving.

Co-counsel testified that during the penalty phase, a defendant should not "lock horns with the prosecutor [by] getting into a one-up-manship." Rather, the defendant should be humble and beg for forgiveness. Co-counsel believed petitioner's "bravado or his swagger" was a "desperate attempt of saying 'y'all may have taken away my liberty and all of that and I disagree with that, but at least I still got this.'" Co-counsel was concerned with petitioner's attitude because the jury had also heard evidence that petitioner was a high-ranking member of the Gangster Disciples.

On redirect examination, co-counsel testified that trial counsel relied upon Dr. Little-Hendren regarding the testing to be administered. He said that if lead counsel had informed him that Mr. Shipp was given a deal to testify and that a transcript of the meeting had been prepared, it would have been a "seminal" event in the case. He explained that conventional wisdom was that the first defendant to the prosecutor would receive the best deal and that the prosecutors would offer a deal at a later time. The transcript from the November 5th meeting was unusual because it included a deal prior to trial. Mr. Shipp was the only co-defendant who identified petitioner at trial.

Co-counsel could not recall whether he met with Ms. Wulff approximately one week prior to trial. He said he carried an unusual brief case that was very old and had belonged to his grandfather. Many of his colleagues commented on the briefcase.

Lead appellate counsel testified that he was recruited by the Post-Conviction Defender's Office to represent petitioner in 2000 while a motion for new trial was pending. The trial court appointed him and appellate co-counsel to represent petitioner for the remainder of the motion for new trial and on appeal. A "skeletal" motion for new trial had been filed before they were appointed, and the trial court allowed them to supplement the motion. They were involved in a series of evidentiary hearings on the motion for new trial that spanned over a few years. Appellate counsel were equally responsible for drafting the

motion for new trial, while lead appellate counsel questioned the witnesses, presented argument in the trial court, and drafted the appellate briefs.

Lead appellate counsel said he and appellate co-counsel met with petitioner on multiple occasions. Initially, petitioner was convinced that a claim of ineffective assistance of counsel should be presented on direct appeal. Based upon the advice of appellate counsel, petitioner agreed that while such a claim could be presented on direct appeal, it was unwise to do so.

Lead appellate counsel explained that they alleged in the motion for new trial that Mr. Shipp's testimony at petitioner's trial differed from his testimony at the trials of co-defendants Antonio Jackson and Prentiss Phillips, both of which occurred after petitioner's trial. He found discrepancies between Mr. Shipp's testimony in petitioner's trial and his testimony in the two co-defendants' subsequent trials. Lead appellate counsel recalled that before Mr. Shipp testified in petitioner's trial, Gerald Skahan, Mr. Shipp's attorney, questioned him during a hearing outside the jury's presence. Mr. Skahan asked Mr. Shipp whether the State had made any deal, offer, or promise in exchange for his testimony, and Mr. Shipp replied, "No." Similar testimony was elicited by the prosecutor during her direct examination of Mr. Shipp. Lead appellate counsel said that the prosecutor also elicited testimony from Mr. Shipp that he understood he was facing the death penalty but wished to testify despite that risk. During the subsequent trials of Mr. Jackson and Mr. Phillips, Mr. Shipp testified that he understood the State would not seek the death penalty against him.

Lead appellate counsel testified that appellate co-counsel met with Mr. Skahan regarding Mr. Skahan's recollection of any discussion with prosecutors. Mr. Skahan told appellate counsel that he had a clear understanding that the State would not seek the death penalty against Mr. Shipp and testified accordingly during the hearing on petitioner's motion for new trial. Mr. Skahan said that while no written agreement with the prosecutors existed, there was a "wink and a nod" agreement. Lead appellate counsel said that Mr. Skahan described to them "a tacit but real understanding, informal though it may have been[,] between the prosecutors and the defense counsel." Mr. Skahan testified during the hearing on the motion for new trial. On cross-examination by the State, Mr. Skahan agreed with the prosecution that no agreement existed. On redirect examination, Mr. Skahan testified that although he expected the State would not seek the death penalty against Mr. Shipp if he testified, his expectation was based upon his past experiences with the district attorney general's office. He acknowledged that he likely advised Mr. Shipp that if he testified, the State would not seek the death penalty against him.

Appellate counsel raised the prosecution's failure to provide trial counsel with the transcript of Mr. Shipp's suppression hearing and inform them of the "wink and a nod"

agreement as issues on appeal. Lead appellate counsel stated that the prosecution's failure to provide trial counsel with such evidence was also relevant to the issue of prosecutorial misconduct for the improper vouching of witnesses. He said that Mr. Shipp indicated his principal, if not exclusive, motive for testifying for the State was his remorse and desire to "do right" by the victim's family. The prosecutors repeated this to the jury on multiple occasions in their argument. Lead appellate counsel explained that the "wink and a nod" agreement that the prosecution would not seek the death penalty against Mr. Shipp contradicted the assertions of Mr. Shipp and the prosecution as to his motive for testifying.

Lead appellate counsel testified that after his representation of petitioner had ended, he learned Mr. Shipp had made a statement to prosecutors on November 5, 1998, before petitioner's trial. He received a call from the Post-Conviction Defender's Office and learned that a document of the meeting had been discovered. Lead appellate counsel maintained that this conversation was the first time he became aware of the existence of the document. He stated that Mr. Shipp's statement from November 5th was not included in trial counsel's file.

Lead appellate counsel explained that according to the transcript of the meeting between the prosecutors and Mr. Shipp on November 5th, the prosecutor informed Mr. Shipp that his testimony would help save his life and that they would take into consideration any assistance he provided to them in convicting petitioner and Mr. Phillips. The prosecutors also discussed housing him in a facility separate from the co-defendants where he would not be at risk for harm. Lead appellate counsel said that had he possessed the transcript from the November 5th meeting, he would not have presented the agreement as a "wink and nod" but as an "explicit agreement" between the prosecutors and Mr. Shipp. He said that the prosecutors had knowledge of the existence of the transcripts and its contents less than two weeks before petitioner's trial. He described the issue as not simply the non-disclosure of an expressed agreement but as a positive misrepresentation to the court of inaccurate, untruthful information that no deal existed when such a deal did exist. Lead appellate counsel testified that the transcript from the November 5th meeting changed the issue regarding the improper vouching by the prosecutors to a positive misrepresentation of the facts. According to the transcript, Mr. Shipp never mentioned a desire to help the victim's family as his reason for testifying. Rather, when the prosecutor asked him if he would testify, Mr. Shipp only asked if it would help save his life.

Lead appellate counsel recalled that when Mr. Shipp was first arrested, he was shown several photograph arrays, including an array with a photograph of petitioner. Mr. Shipp identified several members of the Gangster Disciples but did not identify petitioner. At trial, Mr. Shipp testified that he did not identify petitioner because he was afraid of him. During the meeting with prosecutors on November 5th, Mr. Shipp identified a photograph of petitioner and said he did not recall seeing petitioner in the array previously shown to him

by police. During the meeting, one of the prosecutors asked Mr. Shipp if he would have identified petitioner had he seen his photograph in the array, and Mr. Shipp said he would have done so. While Mr. Shipp admitted he was afraid, he said he was in fear of Antonio Jackson. Lead appellate counsel stated that the transcript from the meeting could have been used to rebut Mr. Shipp's explanation for not identifying a photograph of petitioner and would have had a substantial effect on the trial.

Lead appellate counsel testified that the transcript of the November 5th meeting would have also been pertinent to the recurring issue throughout the trial and on appeal of Mr. Shipp's different descriptions of who was in charge on the night of the victim's death. At the trials of petitioner and Mr. Phillips, emphasis was placed upon who was giving orders and had higher rank. At petitioner's trial, Mr. Shipp stated that Hurt Village was the territory over which Mr. Phillips was in charge. Lead appellate counsel noted that trial counsel did not cross-examine Mr. Shipp regarding this statement. He said he believed that had trial counsel possessed the transcript of the meeting, they could have used it in cross-examining Mr. Shipp on the issue. He described the issue as "quite critical in terms of sentencing in particular."

Lead appellate counsel noted that during the meeting with prosecutors, Mr. Shipp described where he was when he saw Mr. Jackson shoot the victim. Lead appellate counsel said that trial counsel could have used the transcript to explore or expose potential inconsistencies in Mr. Shipp's testimony at trial and call into question whether he fabricated the account of who shot the victim. Lead appellate counsel noted that ballistics showed that two different firearms were used, while Mr. Shipp testified the same person fired both weapons.

On cross-examination, lead appellate counsel testified the trial judge allowed him to develop a number of issues during the hearing on the motion for new trial. He called Mr. Skahan as a witness, as well as a juror to testify as to whether she knew petitioner while he was in jail. He raised these issues on appeal.

Appellate co-counsel developed evidentiary issues in the motion for new trial regarding tattoos. He located an expert to testify about tattoos and the removal of tattoos and a dentist to testify regarding the removal of gold teeth. He presented both issues in the hearing as a proffer.

Appellate co-counsel did not believe he had seen a transcript of the November 5th meeting between Mr. Shipp and prosecutors prior to his testimony at the post-conviction hearing. He said the transcript showed an explicit agreement, rather than a "wink and a nod"

agreement, between the State and Mr. Shipp. He described the transcript as "dynamite for a trial" and said he would have "hammered on this mercilessly in closing argument."

On cross-examination, appellate co-counsel stated that he had little recollection of the appeal. He did not recall trial counsel's cross-examination of Mr. Shipp at trial.

Jeffery Chambers testified that he knew both the victim and Prentiss Phillips. He said that Mr. Phillips and the victim did not get along and that the victim would tease Mr. Phillips. Mr. Chambers was not interviewed by trial counsel or their investigator regarding the victim's death.

Denise Hurt lived in Hurt Village in 1996 and 1997 and was best friends with the victim. She said that Mr. Phillips was "obsessed" with her and did not want anyone else to be around her. She recalled that on the night before the victim was killed, Mr. Phillips told her and one of her friends that he would kill them if they did not stop seeing the victim. Following the victim's death, Mr. Phillips told her that he and "his G's" took the victim to a park and "did what they was [sic] supposed to did [sic] to him." Ms. Hurt did not know what happened on the night of the victim's death. She was interviewed by police officers, but no one else interviewed her.

Randy Rogers, who lived in Hurt Village in April and May of 1997, testified that he knew both the victim and Mr. Phillips and that the victim was his best friend. He said that the victim and Mr. Phillips did not get along. Their animosity was the result of a woman who lived in Hurt Village. Mr. Rogers recalled that Mr. Phillips threatened the victim approximately one week before his death. Although Mr. Rogers believed he spoke to the police after the victim's death, he did not speak to an investigator or an attorney.

Nicole Banks testified that she was dating the victim in May of 1997. Two days prior to the victim's death, the victim called Ms. Banks and seemed upset. He was cursing Mr. Phillips and said that Mr. Phillips was "messing with" his family. Ms. Banks had never heard the victim speak about anyone in that manner. The victim was supposed to meet Ms. Banks at a club on the night of his death. The victim did not show up and did not answer her pages. She never saw the victim on that night and did not know what had occurred. She did not speak to an investigator or an attorney following the victim's death.

Lieutenant Richard Parker was assigned to the organized crime and gang unit of the Memphis Police Department in November 1998 and testified for the defense during the guilt phase. At the time of petitioner's trial, he was in the field preparing to execute a search warrant when he was informed that his supervisor had received a subpoena on his behalf for

a hearing that was already in session. He said he was "rushed in" to the courthouse, and no one explained why his presence was necessary.

Lieutenant Parker said he first met with trial counsel when he came to court to testify. Prior to testifying, trial counsel showed him a photograph of a tattoo, and Lieutenant Parker stated that at first glance, the tattoo appeared to be an homage to the person's mother because it was a collage of words spelling out "Mom." He maintained that trial counsel did not inform him that the case was a capital case involving Gangster Disciples. He further maintained that trial counsel did not question him regarding the meaning of the tattoo in relation to the Gangster Disciples. Lieutenant Parker then met with the prosecutors who informed him that the case involved capital murder and questioned him regarding the meaning of the tattoo in relation to the Gangster Disciples. He was not prepared to testify and did not understand that trial counsel planned to present him as an expert witness.

Sergeant Gina Boyd Lee, a jailer with the Shelby County Sheriff's Department, was a juror in petitioner's trial and testified at a hearing on the case a few years later. At the time of the trial, she, her husband, her mother, and her sister worked at the jail. Sergeant Lee began working at the jail in 1989 and was working in intake at the time of trial. Intake did not involve the classification of inmates to units, and she had never made such a classification.

Sergeant Lee did not recall being questioned about gangs and gang members during voir dire. She testified that some gang members claim to engage in good activities while other gang members claim to engage in bad activities. She was aware of fights between gang members in the jail. She was not assigned to the "floor" and only heard conversations regarding gang members when she was on breaks. She was aware of some gang members who were confrontational and some gang members who were not. She had never been involved in a confrontation with a male inmate.

Sergeant Lee knew Sergeant Deadrick Taylor and was aware that he was killed by gang members outside of his carport. She did not recall why he was killed and said, "I just know . . . something supposedly was said on the clock and a gang member didn't like it." Sergeant Lee had attended training sessions on gangs but did not know whether the training began after Sergeant Taylor's death. She testified that had she been asked about Sergeant Taylor in voir dire, she would have stated that she knew him.

Sergeant Lee said that sometime prior to petitioner's trial, two officers were shot inside the jail. She understood that the weapon had been brought into the jail and said that she and other officers were instructed not to bring such contraband into the jail. She believed

that as a result of the shooting, she had a heightened awareness of gang members and possibly had some apprehension when gang members were present.

Sergeant Lee testified that she was aware of a federal lawsuit filed in the mid-1990s involving conditions at the jail. She learned about the lawsuit during training but did not recall when the training occurred. The officers were instructed to be more observant of inmates to ensure that rapes and beatings would not occur. They were also informed that the issue involved gang members. Sergeant Lee stated that had she been questioned in voir dire regarding the lawsuit, she would have stated that she was aware of it.

Sergeant Lee said she was questioned in voir dire regarding the identification of gang members by their tattoos. She understood that various tattoos represented membership in different gangs. She stated she could have learned about the tattoos from jail, television programs, or training as a deputy jailer.

On cross-examination, Sergeant Lee testified that she was truthful when she informed attorneys during voir dire that she could be fair and impartial. She stated she based her decision in the case upon the evidence presented and the law as instructed by the trial judge.

Debra McNeese Taylor, who performed mitigation services for petitioner, testified that she held a Bachelor's Degree in sociology with a minor in psychology. She had worked for the State Department of Probation and Parole as a probation and parole officer and with Probation Services, a private agency. In May 1997, she started PMG, a company that prepared presentence reports, supervised clients on probation, and completed pretrial monitoring.

Ms. Taylor stated that she had a basic understanding of psychiatric, psychological, and neurological problems and was able to identify behavior such as inappropriate anger, crying, and poor decision-making or coping skills. She could review medical records and social histories and determine whether a potential for various types of brain damage and other developmental issues existed "[i]f it's fairly obvious." While Ms. Taylor was in college, she learned to identify effects of parental modeling on the development of a child. She explained that when people are exposed to violence as children, they often raise their children in a violent environment. Ms. Taylor noted that learning disabilities could also hinder psychological and emotional development. She examined these factors when performing mitigation services in petitioner's case.

Petitioner's case was the only capital case in which Ms. Taylor had been involved. She had not been involved in any other cases in which she assisted defense counsel in preparing for a sentencing hearing in state or federal court. She believed her function as a

mitigation specialist was to research petitioner's history throughout his life from his birth and to present information portraying him as an individual and not just as someone who was charged with murder.

Ms. Taylor testified that lead counsel gave her a copy of a mitigation report, which she used to determine the kinds of records that needed to be obtained and how the investigation needed to be conducted and presented at trial. She said that while trial counsel were supportive, she did not remember them providing her with any guidance. Ms. Taylor knew she needed to obtain all possible records regarding petitioner's educational, medical, employment, military, and criminal history. She stated that while she obtained the criminal histories of petitioner's parents, trial counsel did not discuss the need to obtain records of other family members. She was unaware of any requirement to obtain multi-generational information on petitioner's family.

Ms. Taylor interviewed petitioner on multiple occasions. She obtained his medical records, birth records, school records, school health records, and criminal history records. Ms. Taylor was unable to obtain records of petitioner's employment history because the places where he worked had closed, and his employment was not otherwise documented.

Ms. Taylor testified that she interviewed petitioner's mother and sisters, some of his friends, and the minister at the jail. She visited Annie Robinson, petitioner's mother, at her home and described her as organized and religious. During the interview, children came to Mrs. Robinson's house to be tutored. Ms. Taylor found it odd that Mrs. Robinson was tutoring other children when petitioner's school records established that he never performed well in school. Ms. Taylor interviewed some witnesses on multiple occasions and interviewed other witnesses only once. When she encountered difficulties in contacting witnesses, she requested help from Mrs. Robinson. Through her help, Ms. Taylor was able to contact and interview three of petitioner's sisters the day before her report was due.

Ms. Taylor stated that according to petitioner's medical records, he had suffered two injuries to his left frontal lobe. In November 1991, petitioner was hospitalized after being robbed and beaten in the head with a bat. He failed to return to the hospital for a follow-up examination. He was subsequently involved in an automobile accident and injured the same side of his head. While in jail, petitioner complained of headaches and confused thoughts. Ms. Taylor researched the effects of left frontal lobe injuries and learned that such injuries could affect thought process, memory, and decision-making ability.

Ms. Taylor asked Dr. Neal Edwards, a psychiatrist and the head of the psychiatry department at the University of Tennessee Medical Center, to review the records. Dr. Edwards informed her that testing was needed, and she provided an affidavit to trial counsel

requesting neuropsychological testing. Trial counsel had Dr. Little-Hendren conduct a psychological evaluation of petitioner. Ms. Taylor never discussed petitioner's test results with Dr. Little-Hendren and did not receive her report until after she had completed the mitigation report. Ms. Taylor stated that she expected the report to address whether petitioner's brain injuries were sufficient to cause confusion, headaches, disoriented thinking, and impulsive decision-making. Rather, Dr. Little-Hendren's report addressed petitioner's competency to stand trial.

Ms. Taylor testified that trial counsel never discussed with her the need to explain to the jury the risk factors present in petitioner's social history. She noted the risk factors included socioeconomic status and lack of education. In the second grade, petitioner began performing poorly in school and dropped out of school in the ninth grade. Petitioner's father went to jail when petitioner was in the fourth grade, after which petitioner failed the grade. Mrs. Robinson told Ms. Taylor that petitioner was disturbed by the loss of his father. When petitioner was fifteen years old, school officials performed psychological testing and determined he needed additional instruction in math, writing, and language. The records did not indicate that any follow-up was performed or that petitioner was enrolled in special education classes. He began selling drugs to support his family, just as his father did.

Ms. Taylor stated that she and trial counsel did not discuss the development of themes for the penalty phase. She found the development of themes difficult due to petitioner's insistence that he was not involved in the victim's death. She maintained that trial counsel did not prepare her for her testimony during the penalty phase and that she did not know what information they were seeking from her.

On cross-examination, Ms. Taylor testified that part of her responsibilities as a probation officer was to examine a person's family life and educational background and to enroll the person in programs that would help the person be a productive member of society. She had knowledge of bad homes, bad neighborhoods, drug problems, and drug dealers. She acknowledged that the majority of those in jail sold drugs, used drugs, or did both. Petitioner denied abusing drugs or alcohol. Rather, both he and his father sold drugs to make money. Ms. Taylor outlined petitioner's involvement in drugs in her report and provided it to lead counsel.

Ms. Taylor said that petitioner's family portrayed themselves as a "very close-knit[,] happy family" and described petitioner as smart and concerned about his children. She referred to petitioner's family as the "Ozzie and Harriet family because everybody pictured it as being just fine." His parents were still married to each other, and his sisters admitted spoiling him. Ms. Taylor stated she visited Mrs. Robinson without first making an appointment so that she would have an unvarnished view of the family's home life. She

described Mrs. Robinson's home as very neat. She was unable to interview petitioner's father who was suffering from colon cancer. Petitioner had seven or eight children by different women. Ms. Taylor found no evidence in juvenile court that petitioner supported his children. Petitioner's family also believed that he did well in school and told her that petitioner was a good student. Ms. Taylor recalled that before she interviewed any witnesses, they had to obtain approval from petitioner.

Ms. Taylor stated that petitioner's family and friends did not report him as having any mental difficulties. Other than headaches, petitioner did not report any mental problems and never sought treatment. She did not find any records where petitioner had been referred to a mental health provider. She said that because petitioner denied any involvement in the case, they were not attempting to determine whether he had mental difficulties that caused his behavior.

Ms. Taylor was denied access to petitioner's juvenile records. She reviewed presentence reports from prior convictions, which stated that petitioner was charged with trespassing and reckless driving as a juvenile. Both charges were adjudicated non-judicially. He was also charged with receiving stolen property, which was dismissed. Ms. Taylor described petitioner's juvenile record as minuscule and petitioner as someone who had not been delinquent for his entire life. She was not surprised that petitioner had a criminal history. She explained that the inability to complete an assignment at school can be embarrassing and that the child tries to compensate in some other way. That need for compensation could result in the child acting out or engaging in criminal activity.

Ms. Taylor said that petitioner reported previous employment at Eagle Iron Works with his father and "the old Zales," which was "off the record." Other places at which petitioner reportedly worked had since closed. The presentence reports for his other convictions stated that verification of employment could not be obtained.

On redirect examination, Ms. Taylor testified that her report was completed on November 3 or November 4, 1998, that Dr. Little-Hendren's report was dated November 5, 1998, and that the trial began on November 23, 1998. She testified at trial that petitioner performed poorly in school. A few members of petitioner's family said he enjoyed the Junior R.O.T.C. program, but school records established he failed the class. Ms. Taylor did not know whether petitioner had informed his family that he was enjoying the classes or that his performance had improved. She said this could have been one of the ways in which petitioner was trying to compensate for his poor school performance.

Ms. Taylor described petitioner as cooperative, and she believed he was trying to help his defense team. However, she felt that he was slightly controlling.

Margaret Hill, a probation officer with PMG, assisted Ms. Taylor in performing the mitigation services in petitioner's case. She had a high school diploma. At PMG, she prepared presentence reports, supervised clients on probation, identified areas in which clients needed treatment, and attempted to locate appropriate treatment programs. Petitioner's case was the only capital case in which Ms. Hill had been involved. At the time, she believed she had all necessary information and skills to develop petitioner's social history. She had since determined that she did not have all materials necessary to adequately conduct the mitigation investigation. She was provided with a mitigation report and was informed that a mitigation report was an enhanced presentence report. Ms. Hill had no interaction with trial counsel.

Ms. Hill stated that she and Ms. Taylor worked together in obtaining and reviewing records and determining information that needed to be gathered. Ms. Hill conducted all of the interviews. She interviewed three witnesses over the telephone and six witnesses in person. Five of the in-person interviews occurred at Ms. Hill's office, and the other interview occurred at the witness's home. All witnesses were only interviewed once.

Ms. Hill testified that she conducted internet research regarding mental health issues and noted that petitioner had suffered a prior injury to the left frontal lobe of his brain. She asked Dr. Neal Edwards to review petitioner's medical records. She and Ms. Taylor believed a neuropsychological evaluation would be beneficial. She also believed that Ms. Taylor made the recommendation to lead counsel. They did not have Dr. Little-Hendren's report before they prepared the mitigation report.

Ms. Hill noted that petitioner's school records indicated that he was referred to special resource classes. The records did not indicate that he attended the classes. Ms. Hill attempted to locate petitioner's teachers. Only one of his teachers was still employed at the school, and the teacher did not remember him. Ms. Hill said no one ever suggested that multi-generational information about petitioner's family history would be needed. She believed a genogram could have been used in his case to determine behaviors.

On cross-examination, Ms. Hill testified that she believed she had a good relationship with petitioner and that he was cooperative. Petitioner identified people whom he wanted Ms. Hill to interview. He maintained his innocence regarding the victim's death. Ms. Hill said that as a result, they could not pursue the issue of whether he committed a crime based upon impulse.

Ms. Hill said she had difficulty contacting witnesses and persuading them to cooperate. She also said that while Mrs. Robinson was cooperative, petitioner's sisters were reluctant to be interviewed, and the mothers of petitioner's children refused to be

interviewed. Due to the reluctance of witnesses to cooperate, six of the interviews were conducted in the last week before the mitigation report was prepared.

Ms. Hill testified that petitioner's family described him in a positive way. He was the youngest child and had five sisters. His family said he was a loved child and was spoiled. His parents were still married. Ms. Hill understood that both petitioner and his father had sold drugs but did not use drugs. Petitioner's family did not mention that he had a mental illness. Ms. Hill saw no evidence of mental health issues in his school mental health records. She found no records in juvenile court showing that petitioner supported his children even though he maintained he supported them and purchased shoes for them.

On redirect examination, Ms. Hill testified she was aware of various community risk factors for delinquency and other problems that may arise later. She said that the picture of petitioner's family painted by his mother and sisters was not consistent with the community risk factors that surrounded his life. She also said that the family's perception of the way petitioner was coping in the community did not appear to be based upon reality. Ms. Hill believed the entire overview of the family would have been unusual in the setting in which they lived. She did not attempt to find witnesses in the community where petitioner lived and did not follow up with those who missed appointments for interviews.

Pamela Blume Leonard, the Executive Director of The Council for Restorative Justice at Georgia State University, was accepted by the post-conviction court as an expert in the area of capital case defense mitigation development and presentation. She testified that a mitigation specialist is responsible for investigating, gathering, and assisting in the presentation of mitigation evidence at trial. A mitigation specialist should conduct a thorough investigation of the defendant's multi-generational life history and gather all life history records. The specialist should organize the records and learn and understand the significant events of the defendant's life to put them into the context of the criminal offense. Ms. Leonard explained that multi-generational records enable the specialist to learn about mental health issues that were often predicted by earlier generations and are evidence of the milieu of the family. The specialist should also interview as many people who knew the defendant at different times in his life as possible. Those people should be interviewed more than once.

In preparing for her testimony, Ms. Leonard reviewed the file of PMG and the social history report prepared by Jannine Barrett, the post-conviction mitigation specialist, in preparation for post-conviction proceedings. Ms. Leonard noted that PMG began its investigation less than six months before trial. She said that an investigation ordinarily takes a great deal longer to complete. She also said that while PMG gathered many records, the

material was not presented in such a way as to develop themes or a chronology that would help the jury understand the progression of the life history of petitioner and his family.

Ms. Leonard stated that in a capital case, defense counsel should retain a mitigation specialist who is experienced and has a track record about which counsel can inquire. She also stated that lead counsel could have contacted a number of capital defenders in Tennessee to obtain references for a mitigation specialist. If counsel retains an inexperienced mitigation specialist, counsel should instruct and supervise the specialist. She described PMG's report as a "convolution of records and notes" and not a cohesive narrative. She believed that when this situation occurs, counsel should instruct the specialist to organize the material into a form that gives counsel an idea of the multi-generational social history of the client. Ms. Leonard testified that using many of the same records, additional records, and many more interviews, Ms. Barrett was able to make a cohesive narrative of petitioner's life that helped in understanding the case.

Ms. Leonard explained that more than one interview of each witness is required because relatives initially respond in a positive way when questioned about family members. The specialist must build a relationship to obtain deeper information. The specialist should also explain the capital trial process to family members and inform them that both good and bad things about the client and the family are important. A mitigation specialist's work continues throughout the trial. The specialist should assist counsel in preparing witnesses and ensure that counsel has material supporting the witnesses' testimony. The specialist should also assist the witnesses in resolving contradictions with other documents, in procuring their presence at trial, and in feeling confident about their testimony.

Ms. Leonard testified that in reviewing the transcript of the penalty phase, she was unable to identify the defense's theory or a consistency in the evidence. The testimony of the witnesses contradicted each other. Trial counsel did not present evidence of petitioner's psychological vulnerabilities as revealed in the records gathered. Ms. Leonard noted that petitioner's school records, including the psychological evaluation at school, established he had a learning disability and deficits in his capacity to understand his situation and to react to his surroundings in a way that was developmentally appropriate for his age. The psychological evaluation also referred to petitioner as dependent and not self-sufficient.

Ms. Leonard testified that a mitigation specialist generally spends several hundred hours on a case. PMG billed seventy-five hours on petitioner's case, which Ms. Leonard believed was insufficient to conduct multiple interviews and collect and organize records. She noted that Ms. Barrett spent between 350 and 400 hours in conducting her mitigation investigation.

Ms. Leonard said that the records provided insight into the family's poverty, the background of the parents' interaction over time, and the influence of those factors on petitioner. She understood that petitioner's paternal grandmother had a mental illness. She did not review any records of her illness and believed that they no longer existed. Ms. Leonard stated that the implications of petitioner's head injury was not fully developed. She explained that symptoms petitioner had in early 1992 as a result of a head injury in late 1991 indicated that the injury was not resolved and affected his frontal lobe.

Ms. Leonard testified that a review of the records and experiences of petitioner's siblings was also necessary because they were a part of his support system. Any difficulties faced by the siblings would also affect petitioner. Each sibling was born one year after the other, and Mrs. Robinson had six children by the age of twenty-three. They did not have a great deal of money or resources. As a result, Mrs. Robinson found it difficult to attend to the needs of all of the children, especially because Mr. Robinson was abusive and later incarcerated.

Ms. Leonard said that she reviewed the school records of all of petitioner's siblings and found that they all had difficulties in school. Stacy Robinson was placed in special education classes. The other children were making poor grades by the third or fourth grade, and many of them ranked in the lower percentile of their grade level. Because the family moved often, the children attended many different schools. Ms. Leonard stated that the parents would have been very stressed in responding to six children who were having difficulty in school. Out of the six siblings, only one, Patricia Robinson, graduated from high school.

Ms. Leonard testified that she would want to complete her investigation more than two weeks prior to trial to allow any experts sufficient time to review the information and complete their evaluation. She understood that Dr. Little-Hendren evaluated petitioner for competency and insanity and did not know whether Dr. Little-Hendren was familiar with any mitigating psychological issues.

Ms. Leonard understood that petitioner maintained his innocence at trial. She said that mitigation evidence could assist the jury in understanding the circumstances that led to the accusation against petitioner. She noted that residual doubt was also a strong mitigator. She explained that the argument to the jury could have been, "You may have been certain enough to convict him but are you certain enough to sentence this person to death[?]" Ms. Leonard did not recall the defense using residual doubt as a mitigating circumstance.

Ms. Leonard testified that census maps of the neighborhood in which petitioner lived could have assisted the jury in understanding the neighborhood. She noted that the number

of household moves affected the stability of the neighborhood in terms of resources and social capacity. Poor neighborhoods also have a higher crime rate and less sense of community. Ms. Leonard testified that such circumstances were often risk factors for delinquency or criminal behavior.

On cross-examination, Ms. Leonard acknowledged that responsibility is relevant in some way during the penalty phase. Mitigation evidence could include mental health issues that do not rise to the level of an affirmative defense but are relevant to whether the defendant is totally responsible for his actions. Ms. Leonard understood that petitioner maintained he was not present when the murder was planned or when it occurred. She did not speak to Ms. Taylor or Ms. Hill.

Mary Messenger, petitioner's aunt and Mrs. Robinson's sister, testified that she was the oldest of six children and that Mrs. Robinson was the fourth sibling. Mrs. Robinson met Homorris Robinson, petitioner's father, when she was a teenager and Mr. Robinson was in his twenties. Mrs. Robinson became pregnant a short time after they met, and her mother insisted they marry.

Ms. Messenger recalled that when Mrs. Robinson was pregnant with her third child, Mr. Robinson hit her. Mrs. Robinson was bruised and appeared to have been struck with a switch or thin belt. Mrs. Robinson had Mr. Robinson take her to her mother's house. Her mother, however, made her return to Mr. Robinson because he was her husband.

Ms. Messenger moved to St. Paul, Minnesota, when Mrs. Robinson was pregnant with petitioner. She returned to Memphis to visit on two occasions and saw petitioner when he was four or five years old. At some point, Ms. Messenger's mother became ill and moved to Minnesota to live with her. Her mother had a stroke and was hospitalized. Ms. Messenger contacted Mrs. Robinson and asked her to come to Minnesota. Mrs. Robinson refused to visit, stating that Mr. Robinson had said they were attempting to take her away from him.

Ms. Messenger testified that she lived in Las Vegas at the time of petitioner's trial but that her husband lived in Memphis. One of her relatives sent her a newspaper clipping of the charges, and she maintained regular contact with her relatives. She said that no one from the defense team contacted her and that she would have attended the trial had she been contacted.

Petitioner's five sisters, Patricia Robinson, Anita McCook, Angela Rochelle Robinson, Stacy Robinson, and Nicole Robinson, testified at the post-conviction hearing regarding their childhood, their family, and petitioner. Both parents were deceased at the time of the hearing. Although their parents remained married until Mr. Robinson's death, Mr. Robinson had affairs with other women, one of which resulted in a daughter. Because

he spent so much time with his father, petitioner learned of his half-sister before his five other sisters learned about her. Angela[4] testified that Mr. Robinson also had an affair with one of her mother's friends and propositioned the friend's daughter. Patricia said that as petitioner grew older, he did not get along with Mr. Robinson and disapproved of the affairs. She also said that as a result of the affairs, petitioner learned to distrust women.

When petitioner and his sisters were young, Mr. Robinson sold marijuana. Petitioner and his sisters helped Mr. Robinson plant and harvest the marijuana in a field in Somerville, Tennessee. Mr. Robinson was jailed twice for selling drugs. Angela testified that when Mr. Robinson went to jail the second time, police officers searched their home and car and found drugs in the car. Angela recalled a news report that twenty-six pounds of marijuana had been seized from the car. Following Mr. Robinson's arrest, Angela became depressed and attempted suicide.

Anita testified that her mother never worked outside the home until her father went to jail the second time. Anita and Mrs. Robinson found jobs at a corner grocery store located down the street from their home. Anita also worked as a store clerk and at a Church's Chicken. She had to attend summer school to graduate from high school. After completing summer school, Anita's guidance counselor helped her obtain employment at Cleo Wrap.

Mr. Robinson stopped selling drugs after he was released from jail. He was not able to find steady employment and earned money as a street vendor. As a result, money was scarce. Mr. Robinson had a gambling problem that also contributed to the family's money issues. The family moved often, and petitioner and his sisters attended many different schools.

Anita testified that after Mr. Robinson was released from jail following his second arrest, he began reading and discussing the Bible with her and her siblings. They would discuss the Bible for approximately one hour per day up to five days each week. Mr. Robinson encouraged them to attend church.

Anita and Nicole testified that their parents spanked them with belts as children. When their parents were away, Anita, as the oldest, was responsible for her siblings. Anita stated that she would "fuss" at her siblings, while Nicole maintained that Anita would spank them with a belt. Anita said she was not allowed to have friends visit their home when she was a child. Angela said that she and her sisters were not allowed to play outside but that petitioner was treated differently.

---

[4] Because many of the witness have the same last name, we refer to them by their first name for clarity. By doing so, we mean no disrespect.

Angela recalled that drugs and violence were prevalent in their neighborhood. When she was eighteen, she was raped while in the neighborhood. She did not tell her parents because she feared that Mr. Robinson would hurt her rapist and go to jail.

Patricia testified that at the age of eighteen, petitioner began selling drugs because it was "[e]asy money." He, along with other members of his family, also gambled. Patricia maintained that petitioner never lived independently or paid his own bills. Rather, he lived with girlfriends or his sisters. Both Stacy and Nicole testified that petitioner had his own apartment at one point and allowed Nicole to move in with him.

Patricia stated that when petitioner was in his twenties, he was hospitalized for five to seven days after he was robbed and struck in the head with a baseball bat. Following the injury, petitioner complained of headaches but refused to see a doctor. Patricia said petitioner became distant following the attack and would not visit as often. Angela said that following the robbery, petitioner became angry easily.

Stacy testified that she did not graduate from high school and that she quit school after she was suspended for fighting. During the fight, petitioner attempted to help her but fell, hitting his head. Stacy also became pregnant her senior year of high school. At the time of the post-conviction hearing, she had seven children, some of whom she did not have custody. Nicole also became pregnant in high school. At the time of the hearing, she had eleven children, five of whom were enrolled in resource classes at school.

Patricia said that she attended petitioner's trial and testified on his behalf. She also said that prior to trial, she was interviewed by Mr. Watson but never spoke to trial counsel. She maintained that no one discussed her testimony with her prior to trial or asked her about her childhood and problems in the family. On cross-examination, Patricia acknowledged that she testified at trial that she loved her brother, that petitioner loved his family, that he was a good person, that he was a bit distant, and that he had a number of children by different women.

Anita testified that she did not recall speaking with any member of the defense team prior to trial. She attended the trial, but trial counsel did not speak to her. She did not testify at trial. Angela said that she attended portions of petitioner's trial. She also said that no one spoke to her about petitioner prior to trial and that she would have testified had she been asked.

Stacy said that Mr. Watson interviewed her prior to trial but that she did not speak to trial counsel before she testified. She did not know what questions they would ask and did not understand why they were calling her to testify. She stated that she tried to make

petitioner look as good as possible and that "Greg really ain't got really no [sic] bad things about him." On cross-examination, Stacy said that she told the jury that she loved petitioner, that he was good with his children, and that he did well in school. She also asked the jury not to sentence petitioner to death.

Nicole stated someone spoke to her before trial, but she was unable to identify the person and did not know the number of times she was interviewed. She said that she learned that trial counsel wanted her to testify at the "spur of the moment." She also said that trial counsel called a group meeting and that they likely reviewed the questions they planned on asking her. She could not recall whether they questioned her about her family and her background.

Jerry Childs, a friend of petitioner, met petitioner in the early to mid-1980s, when petitioner accompanied a friend to work. At the time, petitioner was installing railroad cross ties and pouring concrete around swimming pools. Mr. Childs and petitioner lived in the same neighborhood. He described the neighborhood as "kind of rough." Young men in the neighborhood commonly sold drugs, and many of the men were either arrested or killed. Mr. Childs stopped selling drugs after he was jailed and entered a program while in jail.

Mr. Childs said that gambling was also common in their neighborhood. Petitioner's family struggled financially and relied upon gambling proceeds. Mr. Childs stated that although he lived in the same neighborhood in 1998, no member of the defense team contacted him. He maintained that he would have been willing to testify on petitioner's behalf.

Jack Stepter dated Anita for thirteen to fifteen years and knew petitioner "vaguely." When Mr. Stepter met Anita, she was living in a two-bedroom apartment with nine people, including her parents. The apartment was in Anita's name. When he and Anita moved into their own apartment, Mrs. Robinson became angry because Anita had been paying their rent. Mr. Stepter said that the Robinson family appeared to have a sufficient amount of money with which to survive. When Mr. Stepter knew the family, Mr. Robinson had steady employment as a vendor on a street corner.

Mr. Stepter stated that petitioner's family enjoyed playing cards and gambling. Petitioner was not there often. He would stop by when he was passing through and play a few hands. Mr. Stepter never knew any of the family to attend church, but Mr. Robinson read the Bible. Mr. Stepter said that no one from the defense team contacted him prior to trial and that he would have testified on petitioner's behalf.

-48-

Dr. Marsha Little-Hendren, a clinical psychologist, testified that she evaluated petitioner prior to trial in 1998 at lead counsel's request. She said that lead counsel contacted her less than one month prior to trial and requested that she evaluate petitioner for competency and insanity. She maintained that lead counsel did not request she evaluate petitioner for purposes of mitigation.

Dr. Little-Hendren administered two tests to petitioner: the Wechsler Adult Intelligence Scale Revised, a standard I.Q. test; and the Wide Range Achievement Test, Third Revision, a standard test for academic achievement. These tests were psychological tests and not neuropsychological tests. Dr. Little-Hendren said that neuropsychological testing was not necessary for the issues of competency and insanity. She stated that she would not have had time to perform neuropsychological testing prior to trial and did not have the equipment to perform such testing. Had trial counsel requested neuropsychological testing, she would have referred them to a mental health professional who had the necessary equipment.

Dr. Little-Hendren said that she reviewed the mitigation report but never saw the medical records from petitioner's head injury. She explained that as a result, she did not have information that petitioner suffered more than one head injury. She said that based upon the medical records she had since reviewed, she "probably" would have recommended neuropsychological testing.

On cross-examination, Dr. Little-Hendren testified that in evaluating a defendant, she relied upon that defendant to provide her information. She had reviewed the mitigation report, knew petitioner had suffered a prior head injury, and questioned him about it. Petitioner told her that he only lost consciousness for a short time and did not attend his follow-up appointment at the hospital. He did not tell her that he had suffered a second head injury.

Dr. Little-Hendren acknowledged that in her report, she opined that petitioner did not suffer any long term effects from the head injury. She said that her opinion was based upon her review of the mitigation report and her interview with petitioner. She did not find a need for further evaluation based upon her interview with petitioner and the test results. She would have recommended further evaluation if she believed it to be necessary.

Dr. Little-Hendren stated that petitioner denied any prior treatment for a mental illness and that the mitigation report provided no indication of mental illness. She also concluded that he did not have a mental illness. According to the test results, petitioner functioned at a low average level.

Dr. Little-Hendren was unable to recall whether she reviewed information in addition to the mitigation report. While she stated in her report that she reviewed the mitigation report, she could not recall any additional information or documents attached to the report. She also met with lead counsel on two occasions.

On redirect examination, Dr. Little-Hendren again testified that had she known of the second head injury, she "probably" would have recommended neuropsychological testing. She said that the information she had regarding the first head injury and the results of the I.Q. test would not have "push[ed]" her to recommend neuropsychological testing. She explained that while the results of the I.Q. testing showed "scatter," such "scatter" could have been explained by attention deficit disorder. The doctor said, "If I had known that there were more than one head injuries, [sic] then I may—I may have looked at that differently and asked for more testing."

Dr. Pamela Auble, a clinical neuropsychologist, was accepted by the post-conviction court as an expert in neuropsychology. She explained that the results of a neuropsychological evaluation are typically presented as mitigation evidence during the penalty phase. She further explained that evidence of impairments assists in explaining poor decisions and relationships and the difficulties that some defendants experienced prior to the offense.

Dr. Auble interviewed and administered testing to petitioner on July 14, 15, and 17 of 2008. She reviewed medical records from the Memphis Regional Medical Center, records from Memphis City Schools, Dr. Little-Hendren's records, and a transcript of the testimony of petitioner and Ms. Taylor from trial. After preparing her report, she reviewed the reports of Dr. Richard Dudley, a psychiatrist, and Jeanine Barrett, the post-conviction mitigation specialist. She administered multiple tests and determined petitioner was not malingering.

From the post-conviction mitigation report, Dr. Auble learned more about the unfaithfulness of petitioner's father, the use of corporal punishment in the home, and his father's abuse of his mother. She also learned of his father's inability to support the family, the impact of his father's absence due to imprisonment, the family's frequent moves, and the intellectual limitations of other family members. Finally, she learned of the poverty, delinquency, drugs, and firearms present in petitioner's neighborhood. Dr. Auble noted that cognitive problems tended to be present in other family members and that family members tended to overstate the cognitive abilities of themselves and their relatives.

Dr. Auble testified that she administered the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III) and that petitioner had a full scale I.Q. of 88, a verbal I.Q. of 85, and a performance I.Q. of 92. She said that petitioner fell within the low average range. Petitioner's I.Q. was 81 at the age of fifteen and 80 at the age of twenty-eight. Dr. Auble

noted a significant variance between petitioner's verbal I.Q. and performance I.Q. in previous testing, which suggested his verbal abilities were not good when compared to his spatial abilities. She said that the variance could be affected by lack of schooling. The Wechsler Intelligence Scale for Children, Revised (WISC-R) was "normed" in 1972 and administered to petitioner in 1985. The WAIS-R was "normed" in 1978 and administered to petitioner in 1998. The WAIS-III, the test Dr. Auble administered in 2008, was "normed" in 1995. Dr. Auble said that when the "Flynn Effect" was applied, petitioner's I.Q. would have been 77 in 1985, 74 in 1998, and 84 in 2008. She also said that petitioner's I.Q. scores in 1985 and 1998 placed him in the borderline range.

Dr. Auble noted that petitioner did not perform well in school. Petitioner received D's in math and spelling and failed the fourth grade. He received C's and D's in the fifth and sixth grades. The mitigation report noted that petitioner received resource assistance in the fifth grade, which meant that he was identified as slow or behind his classmates. Petitioner failed the seventh grade. When he repeated the seventh grade, he made C's and D's and failed English. In the eighth grade, he made C's, D's, and F's. He failed the ninth grade. During his second year in the ninth grade, petitioner failed all subjects except English and physical science. At age fifteen, testing revealed a learning disability in math. His test scores fell within the fourth percentile in math and the fourteenth percentile in reading. Petitioner was placed in resource classes the following year. He eventually dropped out of school without ever passing the ninth grade.

Petitioner was admitted to the hospital on November 29, 1991, after he had been struck in the head with a baseball bat. Dr. Auble noted that petitioner apparently lost consciousness, which is a sign of a significant head injury. A brain scan revealed a collection of blood on the left side of his head above his forehead and either blood or a bruise closer to his brain. A follow-up CT scan on November 30, 1991, continued to show blood in the frontal lobes. Petitioner remained in the hospital until December 3, 1991.

Dr. Auble stated that petitioner was admitted to the hospital on March 6, 1992, with a second head injury following a car accident. She said that although the second injury was not as severe as the first injury, there was a cumulative effect of the head injuries. Petitioner reported that he continued to suffer headaches following his first head injury but that the headaches worsened following the second injury. Dr. Auble said the CT scan was normal, meaning no bleeding was present from the second injury. Petitioner was treated and released.

Dr. Auble testified that based upon petitioner's I.Q. and medical history, she believed a neuropsychological evaluation would have been warranted prior to trial. She noted that evidence indicated the left side of petitioner's brain was not functioning well when he was

a child. He had a left hemisphere brain injury in 1991, which could have resulted in some mental dysfunction and should have been tested.

Dr. Auble stated that while the majority of petitioner's scores from the I.Q. subtests were similar over the three evaluations, the scores for two subtests increased. One of the subtests that increased was information, which is the ability to answer general questions about the world such as the color of the American flag. In mental arithmetic, his subtest score increased from the 9th percentile to the 37th percentile. Dr. Auble believed the increase resulted from petitioner's imprisonment, where he had the opportunity to learn school-related skills.

Dr. Auble administered the Wide Range Achievement Test, which tests reading, arithmetic, and spelling. His word reading fell within the 8th percentile, and his reading and sentence comprehension was at the 9th percentile. Petitioner was reading at the sixth to eighth grade level. His spelling was at the 18th percentile or grade 8.3, and his math was at the 8th percentile or grade 5.4. The doctor said that the improvement in reading and spelling since taking the test in 1998 was consistent with the conclusion that he had learned more school-related skills during his imprisonment.

Dr. Auble administered the Wechsler Memory Scale, Third Edition to test petitioner's memory. Petitioner received a score of 77 on both his auditory immediate memory and his auditory delayed memory. These scores fell within the sixth percentile in his age group. Petitioner's scores were significantly below the scores that Dr. Auble expected of someone with petitioner's I.Q.

Dr. Auble also administered tests for executive functioning or the ability to adapt to change. Petitioner received normal scores in the structured tests in which he was instructed to switch between two ideas. One such structured test was the "trail-making" test in which he was instructed to alternate between counting and saying the alphabet. Petitioner did not receive normal scores on the Booklet Category Test or the Wisconsin Card Sort, both of which are open-minded tests. In open-minded tests, an event occurs, and the subject is instructed to determine how to address the event and change his behavior in a way that would adapt to the event. Dr. Auble said that petitioner scored below the first percentile for his age and education on the Wisconsin Card Sort. Dr. Auble explained that his test scores suggested he had particular difficulty in open-ended situations where he was not told the rules and did not know what actions to take. She said that when petitioner must determine solutions to the situations, "he falls apart."

Dr. Auble testified that Dr. Dudley provided many examples of petitioner's behavior in his report that were consistent with her test results. When petitioner was living at home,

his father told him that he needed to help with expenses and pay for room and board. Petitioner decided to move in with his sisters and was shocked to learn that they also expected him to help pay expenses. Dr. Auble said that petitioner did not appreciate the consequences of his actions. Dr. Dudley discussed how petitioner continued to have children even though he could not support them. His driver's license was revoked because he did not realize he was required to obtain insurance. Dr. Auble said that these real world examples "of the kind of behavior you might expect from someone who is impaired on open-ended tests that involve him figuring out how to do things that are effective in getting along in the world."

Dr. Auble also administered the Rorschach test, an ink blot test. In this test, petitioner was required to identify images that the ink blots could represent. The average number of responses that a person provides is twenty-two. Petitioner only gave six responses. Dr. Auble needed a minimum of fourteen responses to score or interpret the test. Petitioner did not provide responses to many of the ink blots. On one card, petitioner said he did not have any idea what the image could be and laughed nervously. Dr. Auble stated that the testing further demonstrated petitioner's difficulties in open-ended situations.

Dr. Auble reviewed Dr. Little-Hendren's report and spoke with her. Prior to trial, Dr. Little-Hendren administered the Wechsler Intelligent Scale Revised and the Wide Range Achievement Test. She informed Dr. Auble that she did not have a sufficient amount of time to administer additional tests. Dr. Auble stated that while the tests administered by Dr. Little-Hendren could have shown neuropsychological impairment, petitioner was impaired in mental flexibility and verbal memory, neither of which the tests measured.

Dr. Auble noted that petitioner lost brain cells due to the bleeding and bruising from a head injury. His injury was on the left frontal lobe of his brain. Dr. Auble explained that the left hemisphere of the brain relates to a person's verbal abilities and memory and that the frontal lobes are associated with the ability to adapt to situations. Petitioner experienced difficulties with verbal skills and memory prior to the head injury, and the head injury increased these difficulties. Dr. Auble expected that the injury to the left frontal lobe also affected his ability to adapt to change.

Dr. Auble diagnosed petitioner with dementia due to head trauma. She defined dementia as difficulties with memory and one other cognitive impairment, which in petitioner's case, was executive functioning. Dr. Auble testified that due to petitioner's impairments, he had difficulty planning, organizing, managing, and coping with complex situations, all of which would impact his ability to manage an organization.

Dr. Auble believed petitioner would also have difficulty in assisting trial counsel. She did not believe he was incompetent but believed he had problems seeing the future in a complex way. He also had problems connecting different pieces of information and determining the significance of the information. Dr. Auble explained that one of petitioner's coping mechanisms was to keep negative information out of his mind and pretend the negative acts were not occurring. She said that these difficulties would impact his capacity to assist in his defense. She also said that her findings were consistent with the findings of Dr. Dudley.

Dr. Auble recalled that during the clinical interview, petitioner expressed opinions about groups he believed were very powerful such as the Masons. He initially refused to discuss the Masons, stating that the guard sitting outside the room was a Mason. He discussed his belief about the Masons the next day when a different guard was outside the room. Petitioner told Dr. Auble that a member of the Masons could resolve any problem behind the scenes, including a criminal conviction. He maintained that if a Mason was on a jury, he would recognize a defendant who was also a Mason and would never convict him. He said that an inmate gave him a passage to recite to avoid conviction on a charge. Petitioner told Dr. Auble that he recited the passage to the clerk, who acknowledged him. He believed he omitted a portion of the passage because he was not released. Petitioner said that another man told him that a thirty-third degree Mason could stand in traffic and make traffic stop through hand signals. Dr. Auble stated that petitioner's theory about the Masons was a simple explanation of why some people do well in life and the result of his feelings of vulnerability and powerlessness.

On cross-examination, Dr. Auble testified that petitioner did not put forth effort in school and did not do well when he did put forth effort. He also had problems with tardiness and absenteeism. While petitioner's I.Q. had improved in the structured environment of prison, his vocabulary and reasoning skills had not improved.

Dr. Auble acknowledged that petitioner supported himself by selling drugs and did not abuse drugs. Petitioner did not tell her about the gambling or abuse in his family. Dr. Auble noted that petitioner's father was the disciplinarian and wanted his children to "to[e] the line." Petitioner's father sent his children mixed messages by his cheating, gambling, and selling drugs. Dr. Auble noted that petitioner's family was intact and that his sisters cared strongly for him.

On redirect examination, Dr. Auble testified that many patients do not speak poorly of their family because their family generally is their primary support. She explained that one of petitioner's coping mechanisms was to push negative things aside. She believed that as a result, petitioner did not want to address the issues.

-54-

Dr. Auble said that due to petitioner's impairments, he had difficulty with ambiguity and required clear direction. She did not know whether he had quite as much difficulty as a child as he did following the head injury. She noted that petitioner modeled some of his behavior after his father's behavior.

Dr. Richard Dudley, a psychiatrist with a private practice in New York, was accepted by the post-conviction court as an expert in psychiatry. Psychiatry addresses major mental illnesses and the impact of various biological factors on psychological, emotional, and behavioral functioning. Neurology addresses injuries affecting the neurological system. While both psychiatrists and neurologists examine damage to the brain, psychiatrists address the behavioral and emotional impact of those injuries, and neurologists address the physical impact of those injuries and the therapeutic interventions. As a psychiatrist, Dr. Dudley typically worked with both psychologists and neurologists. He said that the referral question presented by an attorney was critical because it directed the evaluation and that an evaluation for competency was different from an evaluation for mitigation purposes.

Dr. Dudley's evaluation of petitioner included a psychiatric examination and a review of his medical records, his school records, a mitigation report, and results of neuropsychological testing. He spent six hours per day for two days with petitioner. The doctor gathered as much information as possible from petitioner and made an assessment of his cognitive functioning from a clinical standpoint.

Dr. Dudley explained that the accuracy of the social history that he receives from a client or patient varies from case to case and that the client or patient often does not remember information or events. As a result, the availability of social history from a variety of other sources is critical. The information obtained from other sources may confirm the information supplied by the patient or reveal information that should be explored further. In capital cases, Dr. Dudley obtains the social history from mitigation specialists. He said that knowledge of the history of the patient's parents and extended family aids in establishing the presence of genetic vulnerability of psychiatric difficulties. Non-genetic, psychological behavior problems may also exist in families due to the impact of one generation on the next generation. After spending two days with petitioner, Dr. Dudley returned for another session after additional information had been gathered.

Dr. Dudley said that according to the school records, petitioner had a long history of academic difficulties that were not evaluated until he was in the eighth grade. The assessment of petitioner was performed "in a vacuum" but showed he had specific learning disabilities. At the time of the evaluation by Dr. Dudley, petitioner continued to emotionally reject the testing and the diagnosis of a learning disability. The doctor stated that it was

difficult for petitioner to discuss the testing and placement in special education and that petitioner believed he was tested randomly.

Dr. Dudley stated that according to the medical records, petitioner suffered two head injuries in a short period of time. Petitioner first was hit in the head with a baseball bat and subsequently injured his head in an automobile accident. Neuropsychological testing was completed before Dr. Dudley interviewed petitioner. The results of the testing showed petitioner had damage to the frontal lobe area and specific cognitive deficits. Dr. Dudley believed that the nature of petitioner's injury described in the medical records and the nature of the difficulties that surfaced during neuropsychological testing were "pretty consistent." He believed that petitioner had deficits in decision making, problem solving, the ability to consider consequences, and memory. Dr. Dudley testified that the cognitive deficits were observable and describable during clinical interviews and significantly impacted petitioner's ability to function over the course of his life. He said that these cognitive difficulties were long-standing and were made more severe by the head injury that petitioner suffered in his early twenties.

Dr. Dudley testified that Dr. Auble's report alone would have suggested that further evaluation by a psychiatrist or mental health professional was necessary to obtain a full picture of petitioner. Neuropsychological testing established whether cognitive deficits were present. The determination of the impact of the cognitive deficits on a person's life required additional testing.

Dr. Dudley noted that petitioner was raised in a neighborhood that placed him at risk for several difficulties as they related to violence, the exposure to drugs, and the use and sale of drugs. He explained that while many children who were exposed to these risks functioned well if they had strong families to support them, petitioner did not have such support. Petitioner felt abandoned at times, such as when his father was incarcerated. He was the only son and was at the age where his relationship with his father was particularly important. He also did not have a real understanding of the reason for his father's absence.

Dr. Dudley stated that petitioner was also subject to conflicting messages about the right thing to do and the right way to live his life. For example, while Mr. Robinson was teaching his children the Bible, he was also selling drugs and having affairs with other women. The doctor explained that in raising young children, any message to them must be consistent as they do not have the brain's capacity or life experience to sort out confusing or conflicting messages. As children approach adolescence, the frontal lobe begins to develop, as well as the brain capacity to consider consequences. Dr. Dudley testified that when impairment in that area of the brain exists, such development does not occur, and the adolescent continues to be unable to resolve confusing messages.

Dr. Dudley believed that petitioner's cognitive deficits made it difficult for him to determine, cope with, and address all of the other problems. The doctor explained that petitioner's

> inability to figure out these problems and make choices and think about consequences and the impact of things on his life, and even to make better choices and pursue other options, was significantly impaired by the combination of these cognitive deficits[,] and the other forces that impacted on his psychological and emotional development.

He said that as a result, petitioner was prone to making the same choices as others around him without being able to consider the consequences of those choices. Dr. Dudley believed that petitioner's position as the youngest in the family also impacted his ability to understand what was occurring. The cognitive deficits made petitioner's navigation of the conflicting messages more difficult for him than for his sisters who did not have such deficits.

Dr. Dudley testified that petitioner had difficulties "hustling on the street." Petitioner chose to sell drugs because he was impressed by others in the neighborhood who seemed to be successful doing so. He did not consider the consequences of selling drugs and was not prepared to address the consequences when they arose. Dr. Dudley explained that petitioner discouraged women with children from using drugs, which was bad for his business. It took some time for him to determine that some of the dealers with whom he was working were also users. Those dealers were able to use quite a bit of the drugs that petitioner was selling. Dr. Dudley was not aware of any evidence that petitioner was ever a drug abuser and acknowledged that many dealers are also users.

Dr. Dudley stated that petitioner had difficulties assuming adult responsibilities such as living independently and caring for his children. He never lived on his own and never seemed to have the capacity to pay his own rent. Dr. Dudley recalled that petitioner had relationships with numerous women and had a number of children, all of whom he described as unplanned. Dr. Dudley believed those relationships were attempts to compensate for feelings of being unable to function in other areas. The relationships also represented conflicting messages that he had received about the treatment of women. He further believed that petitioner had difficulty establishing a clear sense of his role as a man in the context of a relationship with a woman. During petitioner's first real relationship, he fell in love, and the woman ended the relationship. Dr. Dudley stated that petitioner was unable to move on from the relationship and did not want to allow himself to be in that type of relationship again.

Dr. Dudley recalled that petitioner had a confrontation with his father after his father said that petitioner needed to find a job and contribute to the home. Petitioner moved out of his parents' home and into his sisters' residence without first thinking that they would want him to contribute also. As a result, petitioner found himself in a less desirable situation.

Dr. Dudley testified that petitioner's cognitive deficits impaired his ability to negotiate and make decisions, which would have compromised his ability to be a leader. He noted that petitioner did not seem to fully grasp the seriousness of his charges until the penalty phase. He stressed the importance of trial counsel's ability to understand petitioner's difficulties and his reactions to information. Some of petitioner's behavior could have been misinterpreted as uncooperative. An understanding of his difficulties would have also aided in trial counsel's consultation with a mental health expert. Dr. Dudley said that petitioner's attempt to present himself in the most favorable light was consistent with his deficits.

On cross-examination, Dr. Dudley agreed that petitioner's family was very close and loved each other. He believed that petitioner's inability to function was facilitated by others caring for him. He moved in with different women or family members, had a place to sleep and food to eat without paying for them, remained in the relationship for a short period of time, and then moved somewhere else. He also had a number of children, none of whom he supported to a great degree. The doctor believed petitioner's actions in not considering birth control or sexually transmitted diseases while engaging in sexual relationships with multiple women could be misinterpreted as reckless behavior. Dr. Dudley, however, disagreed that petitioner's behavior was reckless.

Dr. Dudley acknowledged that gambling, drugs, and violence were common in many of the neighborhoods similar to the one in which petitioner was raised. Both petitioner and his father sold drugs but were not drug users. The doctor also acknowledged that petitioner was able to sell a sufficient amount of drugs to satisfy his suppliers. He was unsure whether petitioner made enough money selling drugs to support himself as he did not live independently, did not pay rent, and did not drive a nice vehicle. Petitioner told the doctor that he had attempted to stop selling drugs at some point before he was arrested for the victim's murder. Dr. Dudley said that while petitioner appeared to be capable of obtaining employment, he was unsure of petitioner's capability of sustaining employment.

Dr. Dudley said that he did not review the transcript of the trial. He discussed the allegations and the defense in the case with petitioner. At trial, petitioner maintained his innocence and continued to do so with Dr. Dudley.

Dr. Dudley testified that petitioner had cognitive brain deficits that interacted with other difficulties and resulted in "really kind of a mixed pattern of personality difficulties."

He described petitioner as having a "[m]ixed type" personality disorder. The doctor said that petitioner's cognitive difficulties affected his decision making. When petitioner was confronted about a bad decision, he did not make an excuse for the decision. When Dr. Dudley questioned petitioner regarding a specific alternative to the decision he had made, petitioner appeared to have never previously considered the alternative. Petitioner never considered the impact on the lives of the women with whom he was involved by having children with them and not supporting them. According to the doctor, petitioner was "not even capable of going through the process required to—to make those considerations." Dr. Dudley testified that while petitioner's condition would be misunderstood as antisocial personality disorder, he did not believe petitioner fit within that diagnosis.

When questioned by the post-conviction court regarding how petitioner differed from others who led the same lifestyle of "hustling," Dr. Dudley testified that petitioner's "difficulties that he has within the brain" distinguished him from others involved in "hustling." On redirect examination, Dr. Dudley said that petitioner's mental health issues did not create an affirmative defense but were relevant to sentencing. He also said that petitioner's substantial history of academic difficulties suggested broader cognitive deficits as a child, which were never addressed.

Dr. Dudley agreed that petitioner's family, including his father, told him he should not be selling drugs and needed to work. He explained that for a child with cognitive deficits, moving past his father's punishing him for actions that his father was also doing was difficult. As a result, petitioner found it more difficult to identify and pursue more productive alternatives.

Dr. Dudley clarified that he did not believe a person's refusal to accept responsibility for his children was acceptable. He explained that petitioner's cognitive deficits prevented him from understanding and having the capacity to assume responsibility for his children. Petitioner did not have contact with some of his children because either the mother had moved or the children had been removed from the mother's care. He had contact with his other children. Dr. Dudley believed that petitioner was connected to, involved with, and loved his children.

Dr. Dudley testified that the situation with petitioner's family was more harsh than what they testified to at trial. Their situation was not unlike many other situations in which the siblings still loved their parents despite the difficulties. The doctor said that the family's continued love for each other did not mean that they were unharmed by what occurred in the home.

Dr. Bernadette Grant, a litigation, research, and trial consultant, was accepted by the post-conviction court as an expert in the area of trial consultation. In preparation for her testimony, Dr. Grant reviewed the transcript of voir dire, a summary transcript of the post-conviction hearing,[5] the mitigation report prepared for trial, the mitigation report prepared for the post-conviction hearing, the mental health expert's reports from the post-conviction proceedings, the appellate courts' opinions on direct appeal, and the amended post-conviction relief petition.

Dr. Grant testified that a trial consultant for a capital case should be retained "way before the trial." A trial consultant could assist counsel before trial in developing the theme of the case and the defense theories, in determining how to best present the theories of defense, and in drafting voir dire questions that would identify jurors who would accept mitigating circumstances and jurors with potential bias or prejudice. Dr. Grant said that the investigation of the case should be completed before a strategy for jury selection is determined. She explained that if a psychologist evaluated the defendant only days before trial, integration of the psychologist's findings into the case would be difficult. Consultation with the mitigation specialist or review of the mitigation report is necessary in developing strategies and questions for voir dire.

Dr. Grant explained that during voir dire, a trial consultant would write down each juror's answers to the questions, interpret the juror's body language, and draft follow-up questions. She said that while body language is an important factor to consider in selecting a jury, the most important factor is the jurors' answers to the questions. The trial consultant also would consult with trial counsel regarding how the witnesses could progress the theme of the case. The trial consultant would ensure the witnesses were properly attired, had the proper demeanor for trial, understood the trial process and the questions that the prosecutor may ask, and did not become anxious or upset if someone made an untruthful statement. The trial consultant also would ensure the defendant was properly attired, review testimony with the defendant, advise the defendant on how to best present his testimony to the jury, and discuss proper demeanor in court.

Dr. Grant testified that individual and sequestered voir dire would have been helpful in petitioner's case. The trial judge limited the questions that counsel could ask the jurors regarding their last names, where they lived and worked, and where their children attended school. Dr. Grant said that as a result, the jurors were apprehensive and were likely afraid to answer all questions candidly and honestly. She believed the jurors were reluctant to be honest due to the issue of gang involvement. She also believed that if counsel had conducted

---

[5] Because the post-conviction hearing transpired over several court dates, Dr. Grant had reviewed portions of the post-conviction hearing before she testified.

individual and sequestered voir dire, the jurors would have likely been more candid. She noted that trial counsel did not use all of their peremptory challenges and stated that she had never seen that occur in a capital case.

Dr. Grant acknowledged that the trial court denied trial counsel's motion for individual and sequestered voir dire. She could have testified at a hearing regarding the need for individual and sequestered voir dire. If the trial court still denied the motion, a supplemental jury questionnaire could have been used. The voir dire questions could have been reduced to writing through the supplemental jury questionnaire, and counsel would have only asked follow-up questions of the jurors in court. Dr. Grant explained that jurors were more likely to be honest about their feelings in answering a questionnaire. Counsel could have included sensitive questions regarding gangs and race on the questionnaire that would have resulted in answers that could have tainted the entire jury pool if asked in open court. Dr. Grant believed requiring the jurors to approach the bench with sensitive information would not be sufficient because the jurors may have been intimidated by the trial judge and may have been less candid in their answers. Trial counsel did not use a supplemental juror questionnaire.

Dr. Grant believed that the defendant should be minimally involved in jury selection. She explained that the defendant would be helpful during jury selection only if he knew a juror or knew that a juror was related to someone involved in the case.

Dr. Grant did not believe that trial counsel employed a particular strategy during voir dire. Trial counsel did not develop or explain mitigation to the jurors. The only question that trial counsel asked relating to mitigation issues was whether the jurors could accept that a person would exchange his or her testimony to receive favorable treatment from the prosecutor. She did not believe that residual doubt was mentioned in voir dire. She believed that the lack of specific mitigation questions suggested "a total lack of preparation; they didn't have a full defense and their mitigation was incomplete."

Dr. Grant stated that trial counsel's questions to the jury regarding gangs were "[t]otally inadequate." She noted that if a juror said that he or she "probably" could be fair or "maybe" open-minded, counsel asked no additional questions regarding what the juror meant by "probably" or "maybe." The majority of the jurors knew very little about gangs, and Dr. Grant believed that the structure of gang and the leadership qualities of the members were important for a jury to understand. She noted that some jurors stated that they had seen gangs on television but that trial counsel failed to ask any follow-up questions. She also noted that one juror believed that a person had to commit a crime to join a gang but that trial counsel failed to follow up on the statement even though the juror demonstrated an "assumption of guilt."

-61-

Dr. Grant said that trial counsel failed to distinguish between petitioner's being present for the meeting and not being present for the shooting. She believed the distinction to be important given the aggravating circumstances alleged by the State. She also believed that trial counsel should have explained the difference between the role that the State alleged petitioner played in the victim's death and the roles that the State alleged the other co-defendants played. During voir dire, trial counsel could have also raised the issue of whether petitioner had a position of authority in the gang to give such an order and whether the order given was open for interpretation.

Dr. Grant believed information that a co-defendant had a personal motive to kill the victim should have been part of the defense as it would have given the "why" to the jury. Trial counsel could have also used the information to question the jurors regarding motive. She explained that the issue would have been important to both phases of the trial. She also would want to question jurors regarding the role of the governor of the Gangster Disciples in the offense.

Dr. Grant testified that she was "appalled" that a jailer was on the jury. She noted that the jailer worked in the same jail where petitioner was incarcerated, would have had knowledge of his prior convictions, and may have been involved in altercations with petitioner. She also noted that it was later learned that the juror's mother had copied records of petitioner's prior convictions for petitioner. Dr. Grant said that as a result, the juror was allowed to "introduce information to that deliberation process that was not from the witness chair" and became a "jury of one." She also said that trial counsel could have asked questions during voir dire that would have divulged that information. She did not believe that trial counsel's questions about gang members in the jail were sufficient. The juror was not questioned about her training on gangs or about a sergeant that was killed by gang members in an unrelated case prior to petitioner's trial. She was also not questioned regarding whether she would accredit the testimony of a police officer based upon her status as an officer. Dr. Grant noted that because both the juror's mother and husband worked at the jail, there could have been informal pressure from the family to convict petitioner.

Dr. Grant testified that trial counsel should have objected to the State's listing of all aggravating circumstances during voir dire when the State only sought to apply two aggravating circumstances. She believed the State's actions gave the jury the wrong impression that all aggravating circumstances applied in petitioner's case.

Dr. Grant also identified mitigating circumstances about which she believed trial counsel should have questioned the jurors in voir dire. These mitigating circumstances included petitioner's prior head injury and its effect, his father's behavior, and his school

performance. She said that some jurors would have been unable to consider these mitigators and give them weight and would have been removed for cause as a result.

On cross-examination, Dr. Grant acknowledged that she never spoke to trial counsel, the investigator, or the mitigation specialist at trial. She had been a jury consultant in only one gang-related case. She did not know whether the jurors were affiliated with gangs or had knowledge of gangs. Dr. Grant said that she would want to question the jurors about the reasons a person would want to join a gang. She was aware that many people joined gangs in search of an alternative family.

Dr. Grant testified that the decision to keep or strike a juror should be made by trial counsel regardless of the client's feelings. She acknowledged that she was at a disadvantage because she was not present at trial and could only review the transcript of voir dire. She did not observe the jurors' reactions to the questions, petitioner, trial counsel, and the prosecutors. She did not observe those jurors who would replace any jurors who were stricken.

James Simmons, a criminal defense attorney in Nashville and Hendersonville, Tennessee, testified as an expert in capital defense. He testified that in a capital case, trial counsel must assume and prepare for the likelihood of a penalty phase. He explained that the theory of defense should be consistent in both the guilt and penalty phases of the trial and should be prepared in consultation with experts. Trial counsel should begin presenting the theory of defense in voir dire.

Mr. Simmons stated that trial counsel should obtain as much information from the jurors as possible to make an intelligent decision regarding peremptory challenges and challenges for cause. In a capital case, there may be sensitive issues that jurors are reluctant to discuss candidly in an open forum. Mr. Simmons explained that individual sequestered voir dire is useful in obtaining truthful information from jurors without tainting the entire jury pool. Trial counsel should file a pretrial motion requesting individual sequestered voir dire. During a hearing, trial counsel should present the testimony of attorneys and jury consultants regarding the need for sequestered voir dire in a capital case. If the trial court denied the motion when sensitive issues arise in voir dire, trial counsel should approach the trial court in a bench conference and request to question the juror outside the presence of the other jurors and continue to renew the request for individual sequestered voir dire. If trial counsel's request for individual sequestered voir dire is denied, trial counsel should perfect the issue for appeal, which includes exhausting all peremptory challenges.

Mr. Simmons was aware that one of the jurors in petitioner's trial was a deputy jailer at the Shelby County Jail. He was also aware that at the time of petitioner's trial, the Shelby

County Jail was either under a federal court order or involved in an investigation regarding jail conditions and gang activity in the jail. Mr. Simmons said that the jailer "perhaps" would have known that petitioner was housed on a particular floor where only gang members were incarcerated or would have formed opinions or had knowledge of gang signs or symbols. He questioned the impartiality of a jailer in the same jail where petitioner was housed. He would not have wanted to ask the jailer such questions in front of the rest of the venire due to the risk that the jailer would share her knowledge of gangs with others in the jury pool.

Mr. Simmons testified that he had used a jury questionnaire in every capital case in which he had been involved. He explained that trial counsel generally obtains better information from questionnaires because the jurors are able to reflect on the questions. It also speeds up the jury selection process as trial counsel may eliminate particular jurors based upon their answers in the questionnaires. Mr. Simmons said that jury questionnaires can also be used in conjunction with individual sequestered voir dire because the answers in the questionnaires provide trial counsel with jurors' prior knowledge of and attitudes toward the death penalty, knowledge of the case, and specific mental health issues present in the jurors' families that can then be explored in a private setting. The use of questionnaires also provides anonymity to potential jurors. Mr. Simmons did not ask the same questions in both the questionnaire and during voir dire. He acknowledged, however, that he utilized a questionnaire in a capital, gang-related case in federal court in Virginia and that the defendant was convicted and sentenced to death. He had also used a jury consultant to assist in choosing a jury in a capital case.

Mr. Simmons said that while he had been involved in capital cases during which he did not use all peremptory challenges, the practice was unusual because trial counsel must exercise all challenges to preserve issues relating to voir dire for appeal. He acknowledged, "[T]here are certainly specific cases where you wouldn't burn all of your challenges and you would go with the jury that you had selected." Before making this decision, Mr. Simmons reviewed a complete jury questionnaire for every juror in the pool, conducted individual voir dire of each juror, and utilized a jury consultant. He used the information to rate the jurors and knew who would replace each juror if he chose to exercise a challenge. He said that he would not have been able to decide against exercising all peremptory challenges without the juror questionnaire, individual voir dire, and the jury consultant. He also said that while trial counsel has an obligation to consult with the client regarding the particular use of a peremptory challenge, trial counsel must ultimately decide which jurors to challenge and which jurors to leave on the panel.

A juror must be willing to listen to and give consideration to mitigation evidence. Mr. Simmons explained that while no set parameters for mitigation exist, the United States Supreme Court requires a life history investigation of at least three generations. Mitigation

encompasses any reason that a juror would decide that a sentence of death is inappropriate. A mitigation investigation generally begins with the defendant and the defendant's immediate family and expands through the grandparents and great grandparents. The need for other experts may be identified during the course of the mitigation investigation. Mr. Simmons said that "red flags" indicating that further investigation and testing may be warranted include poor grades in school, excessive absences, enrollment in special education classes, and a history of head injuries.

Mr. Simmons testified that petitioner's defense that he was not present and not involved in the victim's murder created unique problems in developing a theory of mitigation. He said that while it is more difficult to have a consistent theme in the guilt and penalty phases when the defense theory in the guilt phase is denial, it is still possible to do so. Trial counsel may argue residual or lingering doubt as mitigating evidence after a jury has found the defendant guilty of premeditated murder when he had denied guilt. Trial counsel may also "front load" mitigation during the guilt phase by presenting any evidence establishing that the defendant was not the "worst of the worst." According to Mr. Simmons, such evidence would include proof supporting residual doubt and proof that "he was present but because of his personality, because of some mental health issues or whatever, that he is not the person who's capable of giving the order that someone be killed." He stated that by introducing such evidence, trial counsel can maintain credibility with the jury while also arguing in the penalty phase that the defendant is not guilty.

Mr. Simmons testified that he did not believe that gang tattoos were at issue before Sergeant Parker testified at petitioner's trial. Had trial counsel interviewed Sergeant Parker, trial counsel would have realized that he would not be a favorable witness and that his testimony was unnecessary.

On cross-examination, Mr. Simmons said that the decision regarding whether to challenge a juror should be based upon all information gathered. Such information includes trial counsel's observations of that juror during questioning and the juror's interaction with other jurors. Mr. Simmons acknowledged that the trial court ultimately determines how voir dire will be conducted. If the trial judge denies any of trial counsel's requests, trial counsel is left with preserving the record for later review.

Petitioner also presented affidavits of multiple witnesses at the post-conviction hearing. Kathryn Tate, a former investigator with the Post-Conviction Defender's Office, stated that her research did not reveal a familial link between petitioner and Mr. Shipp or Mr. Poole. Elizabeth A. Sykes, the Director of the Administrative Office of the Courts, submitted an affidavit stating that there was no record of payment to Dr. Little-Hendren for services rendered in petitioner's trial. David J. Keefe, the Chief Counsel for the Capital Division of

the Tennessee District Public Defender's Conference at the time of petitioner's trial, stated in an affidavit that had trial counsel contacted the Capital Division, they would have assisted them in obtaining the services of qualified experts, including a qualified mitigation specialist.

Lorean Justice Batchlor submitted an affidavit stating that she had an affair with Hormorris Robinson that resulted in the birth of her daughter, Deena Batchlor. Mr. Robinson would give Ms. Batchlor small amounts of money from his paycheck, which she saved and used to purchase a Cadillac. At one point, Ms. Batchlor saw a news report of Mr. Robinson's arrest for selling drugs. He was growing marijuana in a field near Collierville, Tennessee.

Ms. Batchlor stated that Mr. Robinson had a bad temper and would shake her if she was just a few minutes late to their meetings. On one occasion, he hit her so hard that he left a handprint on her face. Ms. Batchlor later ended the relationship. However, they would meet every other weekend with Deena and petitioner, and the children would play together.

Ms. Batchlor said that in the 1990s, Mr. Robinson called and informed her that he had been diagnosed with cancer. He arranged to meet with Deena to give her and her children food. During the meeting, he took Deena to meet petitioner's sisters for the first time. Ms. Batchlor maintained that she was not contacted by trial counsel and would have been willing to testify on petitioner's behalf.

The post-conviction court subsequently entered a 124-page order denying petitioner's post-conviction relief petition. This appeal followed.

## ANALYSIS

### STANDARD OF REVIEW

Petitioner's post-conviction petition is governed by the Post-Conviction Procedure Act. *See* Tenn. Code Ann. §§ 40-30-101 to -122. To obtain post-conviction relief, petitioner must show that his conviction or sentence is void or voidable because of the abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. Petitioner must establish the factual allegations contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against them. *State v. Nichols*, 90 S.W.3d 576, 586 (Tenn. 2002) (citing *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999)); *Cooper v. State*, 849 S.W.2d 744,

746 (Tenn. 1993). Petitioner has the burden of establishing that the evidence preponderates against the post-conviction court's findings. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court may not reweigh or reevaluate the evidence or substitute our inferences for those drawn by the post-conviction court. *Nichols*, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

Petitioner contends that he received ineffective assistance of counsel at trial. Claims of ineffective assistance of counsel are mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *Burns*, 6 S.W.3d at 461. Thus, the post-conviction court's findings underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard with a presumption that the findings are correct unless the preponderance of the evidence is otherwise. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d)). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard, with no presumption of correctness. *Id.*

## I. NOVEMBER 5, 1998 STATEMENT OF JARVIS SHIPP

Petitioner has raised multiple claims relating to the prosecutors' interview with Mr. Shipp on November 5, 1998. He maintains that (1) the prosecutors failed to disclose Mr. Shipp's statement in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) the post-conviction court erred in excluding evidence that counsel for the co-defendants never received the statement from the prosecutors; and (3) the prosecution elicited and failed to correct Mr. Shipp's false testimony regarding the State's promise for consideration.

According to the transcript of the November 5th interview, Mr. Shipp told prosecutors that petitioner was the Gangster Disciples' chief of security over the entire city of Memphis. Mr. Shipp believed that petitioner was from the Mitchell Heights area and had an apartment in Frayser. He said that petitioner had a higher rank than Mr. Phillips "but because he was on [Phillips'] territory, I think [Phillips] was over, but he was actually over [Phillips]." Mr. Shipp identified petitioner in a photograph. The prosecutor questioned him regarding his identification of petitioner:

[Missy Branham] :  Ok, now do you remember that you were shown a photo spread by the police.

[Jarvis Shipp]:  Yes [Ma'am].

MB:  Do you remember seeing him in the photo spread.

JS:     Not at the time.

MB:     Well, if you would have seen him would you have told them who he was.

JS:     Yeah.

MB:     Now, when you gave these statements to the police, were you scared?

JS:     Yes, because I did not want to give it on (inaudible).

MB:     Who is that?

JS:     That is Antonio Jackson.

The prosecutor later questioned Mr. Shipp again regarding the photograph:

MB:     Ok, this is your statement. That you gave May 27th. Back in '97. Now, Gregory Robinson's picture was in "GG" in the photospread "GG." Do you know why you did not pick him out?

JS:     I don't know.

MB:     But this is the same person?

JS:     Yes [Ma'am].

MB:     This is the right guy.

JS:     Yes [Ma'am].

Mr. Shipp told the prosecutors that he and "Snoop," a Vice Lord, got into a fight following an argument between their girlfriends. "Chris" and "Popcorn" were with him. Mr. Shipp denied hearing shots fired during the fight. Rather, he looked outside while "Snoop" and other Vice Lords were fleeing and saw "Fred" with a gun. Mr. Shipp said that "Fred" appeared to have been attempting to fire the gun but that the trigger was stuck. Mr. Shipp called 9-1-1 and then ran up the hill where others had gathered, including "Popcorn," who was "screaming."

Mr. Shipp said that he reported the events to Mr. Phillips, who then contacted petitioner. Several people began to arrive, including petitioner, Kevin Wilkins, Antonio Jackson, and "Fufu." When petitioner arrived, he asked why no one was "on point" or "on security." Petitioner saw a man peering around the corner of the building and instructed Mr. Shipp to determine the man's identity. Mr. Shipp identified the man as the victim, returned to the apartment, and reported this to petitioner. Petitioner asked who the victim was, and Mr. Shipp responded, "He ain't nobody." Mr. Phillips then said, "Man, that ain't right."

When the prosecutor asked whether the victim was a member of a gang, Mr. Shipp responded,

> From the understanding that I know of, all I know is that he was affiliated with, but everytime we see him, he had on some red, he had on some white and black, he had his hat cocked to the left. I assumed that by him standing out like that he was in a gang. And then to be honest, I couldn't say.

Mr. Shipp reiterated that petitioner was the person who wanted to know who was peering around the corner and the person to whom Mr. Shipp reported the victim's identity. Petitioner instructed Mr. Shipp to retrieve the victim, and Mr. Shipp did as instructed. Mr. Shipp said that petitioner organized and participated in the victim's beating.

Mr. Shipp told the prosecutors that while he was upstairs with the Black sisters, he heard the radio playing downstairs. He went downstairs and saw petitioner, Mr. Phillips, and Mr. Wilkins standing against the wall. "Chris" was standing in the middle of the room surrounded by a group of men. Mr. Shipp explained that "Chris" received a "pumpkin head" for failing to assist "Popcorn." Six people began beating "Chris." Petitioner said that they were not doing anything to "Chris" and that he needed six more people. Petitioner chose six people, including Mr. Shipp. Mr. Shipp said, "No, that's not a good idea." However, he participated in the beating, hitting "Chris" on top of his body. Petitioner stopped Mr. Shipp and instructed him to hit "Chris" on his head. Following the beating, "Chris" had a knot on his forehead, and his eyes were swollen. The victim was upstairs while "Chris" was beaten.

Mr. Shipp told the prosecutors that Mr. Phillips, Mr. Wilkins, and "Kaos" went into the kitchen to talk. When they exited the kitchen, "Kaos" said, "You all need to take care of this." As "Kaos" was leaving, he said, "The first person to get caught is the person who is going to have to take the charge." Petitioner instructed Mr. Phillips and Mr. Wilkins to each choose three people. Mr. Shipp maintained that he understood they were going to take the victim somewhere, beat him, and leave him there. Mr. Shipp, Mr. Jackson, Mr. Wilkins, Charles Poole, Paris Hill, and "Endo" took the victim to the park. Petitioner remained at the apartment.

Mr. Shipp informed the prosecutors that he was the "lookout" while at the park. Mr. Wilkins provided the guns, and Mr. Hill had a .45 caliber gun with him. Mr. Wilkins was standing between Mr. Jackson and Mr. Hill. Mr. Shipp was standing on the right side of the victim facing Mr. Wilkins. Mr. Shipp said he had a clear view of the events. He maintained that Mr. Jackson first shot the victim with the shotgun. Mr. Hill then gave his gun to Mr. Jackson, who shot the victim with it.

Following the victim's death, Mr. Phillips told Mr. Shipp that he needed to "take a vacation." Mr. Phillips paged petitioner, and Mr. Shipp overheard them talking about contacting "Low Down." Mr. Shipp said that "Low Down" or "Lorenzo" instructed him to stay at a hotel for six days. Mr. Shipp denied that anyone instructed him as to what to say or not say about the victim's death. He said that Mr. Jackson offered him and Charles Poole $5,000 to "cut him loose."

After Mr. Shipp told prosecutors of the events, the following conversation occurred:

MB:   Ok, now, we probably will want you to testify at this thing.

JS:   Yes [Ma'am].

MB:   Are you up for it?

JS:   Is it going to help me save my life?

MB:   Yeah, it will. I can't make any deals right now but we will certainly take into consideration whatever you do to help us get Gregory and Prentiss.

They also discussed Mr. Shipp's fear of retaliation at the jail and where he would be housed:

MB:   Mmmmm, well we'll do everything we can, the problem is, you know, that after a case is disposed of, we really don't have, all we can do is write it all on there, you know.

GERALD SKAHAN: The problem is that everywhere he goes there will be someone.

PW:   I talked to Kitchen and he told me what he did for those other people he helped.

-70-

## A.  *Brady* Claim

Petitioner contends the State failed to produce the transcript of Mr. Shipp's statement to the prosecutors on November 5, 1998, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  He asserts that the transcript could have been used to impeach Mr. Shipp's testimony at trial.

In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  "Evidence 'favorable to the accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001).  Favorable evidence has also been defined as "'evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.'" *Id.* at 56-57 (quoting *Commonwealth v. Ellison*, 379 N.E.2d 560, 571 (Mass. 1978)).  The duty to disclose exculpatory evidence includes all "favorable information" regardless of whether the evidence is admissible at trial. *Id.* at 56.

A defendant must prove the following four prerequisites to establish a violation of due process under *Brady*:

1.  The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
2.  The State must have suppressed the information;
3.  The information must have been favorable to the accused; and
4.  The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995).  Evidence is considered material and its non-disclosure a violation of due process "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quotations omitted).  In determining materiality,

[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of

confidence. A "reasonably probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id.* at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

The post-conviction court accredited the testimony of Ms. Wulff that she gave co-counsel a copy of the transcript of the prosecutors' November 5th meeting with Mr. Shipp. The court found that Ms. Wulff's testimony "was very persuasive and the details with which she recalled the meeting between herself and [co-counsel], in which the transcript at issue was turned over, lends credibility to her testimony." The post-conviction court also accredited the testimony of lead counsel, finding that "[i]t appears he may never have received the transcript." The court, however, refused to accredit the testimony of co-counsel finding that his recollection of the events "were not as clear." Thus, the post-conviction court essentially found that Ms. Wulff gave the transcript of the meeting to co-counsel but that co-counsel failed to share the transcript with lead counsel.

Petitioner argues that the post-conviction court's finding that the State disclosed the transcript to trial counsel is contrary to the evidence presented at the hearing. He identifies testimony from lead counsel and appellate counsel in which they deny ever seeing the transcript. Their testimony, however, was consistent with the post-conviction court's finding that the State provided co-counsel with the transcript but that co-counsel failed to provide it to the defense team. The evidence does not preponderate against the post-conviction court's finding.

The post-conviction court also found that the transcript of the November 5th meeting was not material. Petitioner contests the correctness of this finding, arguing that the transcript could have been used at trial to establish an agreement between the State and Mr. Shipp and to impeach Mr. Shipp's testimony regarding his failure to identify petitioner in a photograph array at the police station, his fear of petitioner, petitioner's rank in the Gangster Disciples, and the location of petitioner's residence.

At trial, lead counsel's cross-examination of Mr. Shipp established that the State was seeking the death penalty against Mr. Shipp and that he hoped the prosecutors would take his testimony into consideration and withdraw the death penalty as a result. Further, Mr. Shipp's statements to the prosecutors regarding petitioner's rank and "directing orders, actually telling everyone what to do" were consistent with his testimony at trial. With regard to petitioner's residence, Mr. Shipp told prosecutors that he believed petitioner was "from Mitchell Heights" and testified at trial that petitioner was "a gangster from Mitchell Heights" and "dwells in the Mitchell Heights area." While Mr. Shipp told prosecutors that petitioner

-72-

also may have had an apartment in Frayser, we cannot conclude that this information was material.

Lead counsel also cross-examined Mr. Shipp extensively regarding his failure to identify petitioner in a photograph array shown to him by the police and his failure to mention petitioner in his statement to the police. We note that during the November 5th meeting, Mr. Shipp told prosecutors that he did not know why he did not identify petitioner in the photograph array, but he testified at trial that he did not mention or identify petitioner to the police because he was afraid of petitioner. Based upon lead counsel's extensive cross-examination of Mr. Shipp at trial regarding his prior statement to the police and Mr. Shipp's concession that he hoped to save his life by testifying, we cannot conclude that there was a reasonable probability that the outcome of the trial would have been different had lead counsel utilized the transcript at trial. Because the State did not suppress the transcript and the transcript was not material, petitioner is not entitled to relief regarding this issue.

## B. Evidence That the State Failed to Provide the Transcript of the Statement to Co-Defendants' Counsel

Petitioner maintains that the post-conviction court erred in excluding testimony from counsel of the other co-defendants that the State did not provide them with the transcript of Mr. Shipp's November 5th statement. According to petitioner, the evidence was relevant to the issue of whether the State withheld the transcript from trial counsel. The post-conviction court excluded the testimony as irrelevant but allowed petitioner to present a proffer of the evidence.

Petitioner proffered the testimony of Howard Wagerman, trial counsel for Antonio Jackson, who said that based upon his review of the transcript of Mr. Jackson's trial, the prosecution did not provide the transcript of the November 5th statement to him when they provided him with *Jencks* material. Mr. Wagerman said that if he had been provided with the statement, he would have used it in his cross-examination of Mr. Shipp.

Juni Ganguli, who represented both Mr. Jackson and Mr. Phillips in post-conviction proceedings, testified that he did not recall seeing the transcript of Mr. Shipp's November 5th statement during his representation of both co-defendants. He said, "I don't remember seeing it. But I did not review my file." He also said that if he had the transcript during post-conviction proceedings, he would have raised additional issues.

William Johnson, Mr. Phillips' trial counsel, testified that he did not recall receiving the transcript of Mr. Shipp's November 5th statement but that he did not review his file to

determine whether he received the transcript. He said that he received Mr. Shipp's initial five-page statement to the police, which he used in cross-examining Mr. Shipp.

Questions regarding the admissibility of evidence rest within the sound discretion of the post-conviction court. *Pylant v. State*, 263 S.W.3d 854, 870 (Tenn. 2008). This court will not interfere in the post-conviction court's ruling in the absence an abuse of discretion appearing on the face of the record. *See id.*; *State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008). The post-conviction court abuses its discretion when the court applies an incorrect legal standard or reaches a conclusion that is "'illogical or unreasonable and causes an injustice to the party complaining.'" *Plyant*, 263 S.W.3d at 870 (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Ms. Wulff testified that she personally gave a copy of Mr. Shipp's November 5th statement to co-counsel during a private meeting. Testimony from counsel of co-defendants, who were tried separately from petitioner, that they did not recall receiving the transcript of the November 5th meeting did not have a tendency to make Ms. Wulff's testimony that she personally gave a copy of the transcript to co-counsel more or less probable. The post-conviction court did not abuse its discretion in finding that the evidence was irrelevant and in refusing to admit the evidence.

## C. Claim of False Testimony by Mr. Shipp

Petitioner contends that the prosecution elicited and failed to correct Mr. Shipp's false testimony that he did not receive any promises from the prosecution in exchange for his testimony. He submits that the prosecution's actions violated his due process rights as provided in *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The State maintains that petitioner waived the issue by failing to raise it in his post-conviction relief petition.

Petitioner did not raise the issue in either his initial post-conviction relief petition filed in September 2005 or his amended petition filed in June 2008. Rather, on October 20, 2009, less than one month prior to the evidentiary hearing on November 9, 2009, petitioner filed a motion to supplement the amended petition and an amended petition in which he sought to raise the issue. On the first day of the post-conviction hearing, post-conviction counsel requested that the post-conviction court accept the supplement. The State did not object, and the post-conviction court granted the motion. Therefore, we will address the issue.

In *Napue*, the United State Supreme Court held that "a conviction obtained through the use of false evidence, known to be such by representatives of the State," deprives a

defendant of due process. *Napue*, 360 U.S. at 269; *see State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). "The same result occurs when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269. Therefore, when a witness testifies falsely, either on direct or cross-examination, the State has an affirmative duty to correct the false testimony. *Spurlock*, 874 S.W.2d at 617. To prevail on his claim that the State knowingly presented false testimony, petitioner must establish by a preponderance of the evidence "(a) that false or perjured testimony was admitted at trial, (b) that the state either knowingly used such testimony or knowingly allowed it to go uncorrected, and (c) that the testimony was material and deprived him of a fair trial." *Roger Morris Bell v. State*, No. 03C01-9210-CR-00364, 1995 WL 113420, at *8 (Tenn. Crim. App., Mar. 15, 1995), *perm. app. denied* (Tenn. Aug. 28, 1995).

The State asserts that no agreement between Mr. Shipp and the prosecutors existed when Mr. Shipp testified at petitioner's trial and that as a result, Mr. Shipp's testimony in which he denied the existence of an agreement was not false. During the November 5th meeting, the prosecutor told Mr. Shipp that she could not "make any deals right now." However, she also told Mr. Shipp that his testimony at petitioner's trial would help save his life and that they would take into consideration his actions in helping them "get" petitioner and Mr. Phillips. While no formal agreement between the State and Mr. Shipp existed before he testified, the transcript of the November 5th meeting reflects an assurance from the prosecutor that Mr. Shipp's testimony would "help [him] save [his] life." This assurance was contrary to the testimony of Mr. Shipp that was elicited by the State at trial. The State also argued during closing arguments that Mr. Shipp did not receive a deal in exchange for his testimony.

Nevertheless, we cannot conclude that the challenged testimony was material and deprived petitioner of a fair trial. Lead counsel's cross-examination of Mr. Shipp regarding his expectations of an agreement with the State based on his trial testimony was extensive. Mr. Shipp admitted that he hoped the prosecutors would withdraw the death penalty based upon his testimony against petitioner. Based upon Mr. Shipp's admissions, we cannot conclude that a reasonable probability exists that the outcome of the trial would have been different but for the State's conduct and the use of the challenged testimony. Petitioner is not entitled to relief regarding this issue.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner claims trial counsel were ineffective in selecting the jury, during the guilt and penalty phases of the trial, and on appeal. In pertinent part, the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "'so

fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment.'" *Gideon v. Wainwright*, 372 U.S. 335, 340 (1963) (quoting *Betts v. Brady*, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to the effective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

The United States Supreme Court adopted a two-prong test to evaluate a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. The performance prong of the *Strickland* test requires a showing that counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." *Id.* at 690. "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000) (quoting *Strickland*, 466 U.S. at 689).

Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, we note that criminal defendants are "not entitled to perfect representation, only constitutionally adequate representation." *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 655 n.38 (1984)).

Notwithstanding, we recognize that "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Id.* at 785.

If petitioner shows that counsel's representation fell below a reasonable standard, then he must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The reasonable probability standard "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1403 (2011) (quoting *Harrington v. Richter*, 131 S.Ct. 770, 791 (2011)). In evaluating whether a petitioner satisfied the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citing *Strickland*, 466 U.S. at 687). In other words, "a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the [petitioner] of a fair trial and called into question the reliability of the outcome." *Nichols*, 90 S.W.3d at 587. That is, "the evidence stemming from the failure to prepare a sound defense or [to] present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal." *State v. Zimmerman*, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in *Strickland*." *Id.* When challenging a death sentence, petitioner must show that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.'" *Henley*, 960 S.W.2d at 579-80 (quoting *Strickland*, 466 U.S. at 695); *see Cullen*, 131 S.Ct. at 1408.

## A. Jury Selection

Petitioner maintains that trial counsel were ineffective during jury selection in failing to (1) adequately examine and seek to exclude a deputy jailer from the jury; (2) conduct a constitutionally adequate voir dire; (3) object to improper jury instructions and information given to the jury during voir dire; and (4) use jury questionnaires and retain a jury consultant.

### 1. Failure to Exclude a Deputy Jailer from the Jury

Petitioner argues that trial counsel's failure to either seek to strike for cause Juror Gina Boyd, a deputy jailer at the Shelby County jail, or use one of their peremptory challenges to remove her constitutes ineffective assistance of counsel. According to petitioner, Juror Boyd could not be fair and impartial because she was employed at the jail and had worked in the pod where petitioner was housed pending trial; her mother, husband, and sister also worked

at the jail; there were problems with gangs at the jail; a co-worker was killed by a gang member prior to petitioner's trial; two co-workers had been shot by inmates; and Juror Boyd had a negative view of gang members.

Juror Boyd testified regarding her duties at the jail during both the hearing on petitioner's motion for new trial and the post-conviction hearing. On direct appeal, petitioner challenged Juror Boyd's impartiality. This court summarized Juror Boyd's testimony as follows:

> During voir dire, Boyd stated she worked "intake" as a deputy jailer in Shelby County. She denied knowing the defendant or anything else about the case. Boyd stated she would be able to be fair and impartial in hearing all the evidence. During the motion for new trial, Boyd testified that although there were times when she was in different areas of the jail, she did not recall seeing the defendant in jail.
>
> Boyd stated that during the trial, she noticed an arm band on the defendant's wrist and realized he was an inmate, although she did not know where he was housed. She did not return to the jail until after the conclusion of the trial. Boyd maintained she never had supervisory authority over the defendant at the Shelby County Jail.
>
> Defense counsel subsequently presented jail records which established that on October 8, 1998, Boyd was temporarily assigned to work in the pod where the defendant was housed for a period of three hours. Although the duty log sheet reflects that a head count may have been taken while Boyd was working in the pod, there is no indication as to who took the head count.

*Gregory Robinson*, 2003 WL 21946735, at *40. This court agreed with the trial court's findings that there was no evidence of a "nexus" between petitioner and Juror Boyd and no indication that Juror Boyd recognized petitioner. *Id.* at *41.

Thus, this court has previously rejected petitioner's claims based upon Juror Boyd's employment and her brief assignment to the pod where petitioner was housed. During voir dire, Juror Boyd agreed that her work experience was "kind of neutral as far as gang people are concerned." She denied that her "overall experience" in monitoring gang members would influence her. She also stated that she could be fair and impartial at trial. At the post-conviction hearing, Juror Boyd testified that she based her decision at trial upon the evidence presented and the law as instructed by the trial judge.

-78-

Moreover, lead counsel testified that the determination of whether to challenge a juror was not based solely upon the juror's answers to questions posed during voir dire but was also based upon the juror's body language, tone of voice, others' reactions of the juror, and potential replacement jurors. *See State v. Odom*, 336 S.W.3d 541, 559 (Tenn. 2011) (noting that an assessment of a juror's ability to adhere to her oath is based upon the answers to questions posed by counsel, as well as nonverbal responses). Accordingly, we conclude that trial counsel were not deficient in failing to challenge Juror Boyd for cause or exercising a peremptory challenge to remove her from the jury. Petitioner has also failed to demonstrate that the jury was not "fair and impartial." As a result, any deficiency did not result in prejudice. *See State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993).

## 2. Failure to Conduct Adequate Voir Dire

Petitioner submits that trial counsel's voir dire was inadequate. He further submits that as a result, trial counsel did not elicit information that would have given rise to challenges for cause and would have aided counsel in making meaningful peremptory challenges. The ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial. *See State v. Mann*, 959 S.W.2d 503, 533 (Tenn. 1997). There is no constitutional right to have questions posed to the venire specifically directed to matters that conceivably might prejudice veniremen against him. *Ristanio v. Ross*, 424 U.S. 589, 594 (1976) (citing *Ham v. South Carolina*, 409 U.S. 524, 527-28 (1973)). Where the jury in the penalty phase must choose between life and death, several courts have held that failing to question whether a prospective juror can fairly consider a life sentence does not necessarily constitute deficient performance. *Hartman v. State*, 896 S.W.2d 94, 105 (Tenn. 1995); *see Stanford v. Parker*, 266 F.3d 442, 453-54 (6th Cir. 2001); *Commonwealth v. Morris*, 684 A.2d 1037, 1042-43 (Pa. 1996).

The failure to make certain inquiries to determine how receptive the jury would be to specific mitigating factors during voir dire does not necessarily constitute ineffective assistance of counsel. *See generally State v. Goodwin*, 703 N.E.2d 1251, 1257 (Ohio 1999). The scope of voir dire is a tactical decision. *See Butler v. State*, 789 S.W.2d 898, 901 (Tenn. 1990). It is not within the court's province to second-guess strategic or tactical choices made by trial counsel. *Id.* at 900.

The record reflects that the jurors were questioned as to their ability to follow the law and that the trial court instructed the jury on the legal burdens and mitigating circumstances. "Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the [d]efendant to show that a juror is in some way biased or prejudiced." *State v. Caughron*, 855 S.W.2d 526, 539 (Tenn. 1993). Petitioner has not presented evidence establishing that the jury was prejudiced or unfair. Thus, he is not entitled to relief on this issue.

Petitioner submits that trial counsel "failed to inquire of the venire whether the prospective members of the jury would automatically sentence the defendant to death upon a guilty verdict" in violation of *Morgan v. Illinois*, 504 U.S. 719 (1992). The record does not support petitioner's claim. Rather, the record reflects that trial counsel and the prosecution questioned jurors about whether they could consider death, life without parole, and life imprisonment. This issue is without merit.

### 3. Failure to Object to Improper Jury Instructions Given During Voir Dire

Petitioner maintains that the trial court improperly instructed the jury during voir dire and that trial counsel were ineffective in failing to object to these instructions. He faults trial counsel for failing to object to the trial court's reading of all possible aggravating circumstances to the jury rather than reading only the two aggravating circumstances upon which the State intended to rely. Prior to deliberations in the penalty phase, however, the trial court instructed the jury as to the two aggravating circumstances upon which the State relied in seeking the death penalty. Trial counsel were not ineffective in not objecting to the instruction.

Petitioner maintains that the trial court erred in instructing the jury during voir dire that "[m]itigating circumstances are any circumstances which you as a jury find from the proof or anything that you can glean from the proof wherever it comes from that is a mitigator and that would mitigate or weigh against the aggravating circumstances involved." According to petitioner, the instruction was "incoherent and circular," provided little guidance to the jury, and "was directly juxtaposed against a list of specific aggravating factors, which suggested that there was a presumption in favor of the death penalty." The trial court's explanation of mitigating circumstances was "incoherent and circular" only if the jury had no understanding of the word "mitigating." At the conclusion of the penalty phase, the trial court explained mitigating circumstances and identified those circumstances that could be considered mitigating. Trial counsel were not ineffective in not objecting to the instruction.

Finally, petitioner avers that the trial court improperly instructed the jury that it may consider the death penalty if it found that an aggravating circumstance outweighed "any mitigating *circumstance*" beyond a reasonable doubt. (Emphasis added.) He further avers that the trial court's instruction implied that mitigating circumstances should not be considered cumulatively. The context in which this instruction was given did not imply that mitigating circumstances should not be considered cumulatively. Moreover, the trial court instructed the jury during the penalty phase that if it determined that the State did not prove that the aggravating circumstances outweighed "any mitigating *circumstances*" beyond a

reasonable doubt, it shall sentence petitioner to life or life without parole. (Emphasis added.) Therefore, petitioner is not entitled to relief on this issue.

### 4. Failure to Utilize Jury Questionnaires and Retain a Jury Consultant

Petitioner submits that trial counsel's failure to utilize jury questionnaires and retain a jury consultant constituted ineffective assistance of counsel. According to petitioner, prospective jurors would have provided more honest and reliable answers on a jury questionnaire about sensitive subjects such as gang membership and race. During voir dire, prospective jurors responded to the attorneys' questions about these subjects. Petitioner has presented no evidence to support his claim that the prospective jurors' responses would have differed had a jury questionnaire been utilized. Moreover, the record reflects that the prospective jurors were examined privately at the bench regarding sensitive issues on a number of occasions. No proof was presented at the post-conviction hearing to support petitioner's claim that the prospective jurors were less candid in their responses during the bench conference than they would have been in responding to a jury questionnaire.

Petitioner asserts that absent a jury consultant, trial counsel failed to conduct adequate voir dire and failed to select a fair and impartial jury. Lead counsel, however, testified that he did not believe the trial court would have approved funding to retain a jury consultant and that the trial courts generally denied such requests. Furthermore, petitioner failed to present evidence supporting his claim that the jury was not fair and impartial. Petitioner is not entitled to relief on this issue.

### B. Guilt Phase

Petitioner submits that trial counsel were ineffective with regard to the guilt phase of the trial in failing to (1) use the transcript of Mr. Shipp's November 5th statement and object to his false testimony at trial; (2) adequately cross-examine Sergeant Ashton; (3) object to testimony of Mr. James and Mr. Shipp for lack of foundation; (4) object to evidence of the crime scene and the victim's body; (5) identify and interview witnesses; (6) fully interview Officer Parker prior to his testimony; (7) adequately present evidence that petitioner did not flee and challenge the trial court's ruling on relevance; (8) adequately prepare for the suppression hearing; (9) request that petitioner be allowed to sit at counsel table and challenge the local rule; (10) object to the State's vouching for Mr. James and Mr. Shipp during closing arguments; (11) object to the prosecutor's references to petitioner's decision not to testify; (12) object to the prosecutor's references to facts not in evidence; (13) object to the accomplice instruction that did not include Shaun Washington and Mr. Shipp; and (14) object to a jury instruction regarding whether petitioner's witnesses were accomplices.

-81-

## 1. Failure to Use Mr. Shipp's November 5th Statement or Object to His False Testimony

The post-conviction court found that Ms. Wulff gave a transcript of Mr. Shipp's November 5, 1998 statement to co-counsel but that lead counsel never received the transcript. Petitioner maintains that if this court accepts these findings, his conviction still must be overturned. He submits that co-counsel was ineffective in failing to use the transcript or advise lead counsel of its existence. He further submits that the failure to use the transcript of the statement deprived him of "a critical source of cross-examination material and proof that the State's key witnesses had testified falsely, in response to direct questions by the prosecutor, concerning the absence of consideration for his testimony."

In accrediting the testimony of Ms. Wulff and lead counsel and refusing to accredit the testimony of co-counsel, the post-conviction court essentially found that Ms. Wulff gave a copy of the transcript of the November 5th meeting to co-counsel but that co-counsel failed to provide the transcript to lead counsel to use in his cross-examination of Mr. Shipp. We conclude co-counsel was deficient in failing to provide lead counsel with the transcript. We, however, cannot conclude that co-counsel's deficiency resulted in prejudice. Petitioner relies upon the same argument with regard to his claim of prejudice that he relied upon with regard to materiality in the *Brady* and *Napue* issues. For the same reasons that the transcript was not material under *Brady* and *Napue*, co-counsel's failure to provide lead counsel with the transcript was not prejudicial. Due to lead counsel's extensive cross-examination of Mr. Shipp and Mr. Shipp's acknowledgment that he hoped to save his life by testifying against petitioner, we cannot conclude that a reasonable probability exists that but for co-counsel's deficiency, the result of the proceedings would have been different.

## 2. Failure to Adequately Cross-Examine Sergeant Ashton

Petitioner avers that trial counsel were ineffective in cross-examining Sergeant Ashton by opening the door to allow him to testify about the identification of petitioner's photograph by other non-testifying witnesses. Sergeant Ashton testified on direct examination that he compiled approximately thirty-five photographic spreads with regard to the victim's murder. He showed photographic spread "GG," which included a photograph of petitioner, to Mr. James, who identified petitioner and referred to him as "Shaun." Sergeant Ashton also testified regarding the large number of witnesses involved and the months required to investigate the victim's death.

On cross-examination, lead counsel questioned Sergeant Ashton regarding whether anyone else made an identification from photographic spread "GG." Sergeant Ashton responded that he would need to review his file to answer the question. The trial court

recessed for the evening, and when cross-examination resumed the next day, the following exchange occurred between trial counsel and Sergeant Ashton:

> Q. And the last question I left on was who else identified someone out of the photo spread "GG." Have you had an opportunity to check your records on that?
>
> A. The best I could determine it was Christopher Lewis and Shaun Washington.
>
> Q. Okay. So out of all the people that –when they were shown this photo spread by officers in your department that identified Gregory Robinson during the course of your investigation the only two were Christopher James and Shaun Lewis, correct–Shaun Lewis James?
>
> A. That's what we've got in their statements, correct.
>
> Q. Okay. And, again, good police work would require that you try to show this to all of the witnesses, correct?
>
> A. That's sounds reasonable to me.
>
> Q. Okay. And that's in an effort to ensure that you have the right person, right?
>
> A. That sounds reasonable.

On redirect examination, Sergeant Ashton testified that thirteen to fifteen people were arrested for the victim's murder. Once a person was charged with the offense, Sergeant Ashton was prohibited from contacting the person and showing the person the photo spread. He explained that photo spread "GG" was the last photo spread compiled because he had difficulty matching petitioner's street name with his legal name. By that time, other individuals had been charged with the victim's murder, and he was prohibited from showing those individuals photo spread "GG" unless those individuals or their counsel initiated the contact. Sergeant Ashton acknowledged that he "didn't have a large number of people" to whom he could show photo spread "GG."

Sergeant Ashton testified that on June 13, 1997, Shaun Washington examined photo spread "GG" and identified petitioner as "MacGreg." The officer said that Mr. Washington was "very sure of himself." Trial counsel did not object to this testimony.

On direct appeal, petitioner, relying upon *Crawford v. Washington*, 541 U.S. 36 (2004), argued that the testimony regarding Mr. Washington's identification of petitioner constituted inadmissible hearsay and violated his constitutional right to confront the witnesses against him. The Tennessee Supreme Court held that petitioner was not entitled to relief because trial counsel both elicited and opened the door to the testimony. *Robinson*, 146 S.W.3d at 493.

The post-conviction court found that trial counsel were deficient in eliciting the testimony regarding Mr. Washington's identification of petitioner but that the deficiency did not result in prejudice. Upon reviewing the record, however, we conclude that trial counsel's decision to elicit the testimony was reasonable. Evidence had already been presented regarding the large number of people who were present at the apartment on the night of the victim's murder, and the complication and length of the investigation was based, in part, upon the numerous witnesses whom the police officers interviewed. Through the cross-examination of Sergeant Ashton, trial counsel demonstrated that although multiple witnesses had viewed the photograph array, only two witnesses identified petitioner as being present at the apartment on the night of the victim's murder. The State attempted to lessen the impact of this evidence on redirect examination through testimony that the number of those who viewed the photographic array was limited due to the unavailability of those individuals who had already been charged and through testimony regarding Mr. Washington's confidence in his identification of petitioner. The State, however, was unable to dispel proof presented on cross-examination that other witnesses examined the photo spread but were unable to identify petitioner as being present at the apartment on the night of the victim's murder. Evidence that others were unable to identify petitioner from the photo spread also supported the defense theory that petitioner did not attend the meeting and was not involved in the victim's murder. Accordingly, petitioner is not entitled to relief with regard to this issue.

### 3. Failure to Object to Testimony by Mr. Shipp and Mr. James for Lack of Foundation

Petitioner submits that trial counsel were ineffective in failing to object to portions of the testimony of Mr. James and Mr. Shipp as lacking foundation. Rule 602 of the Tennessee Rules of Evidence provides in pertinent part that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony." While Rule 602 does not define "knowledge," the rules do not require "absolute certainty." *State v. Land*, 34 S.W.3d 516, 529 (Tenn. Crim. App. 2000). Non-expert witnesses giving testimony in the form of an opinion are limited to opinions that are "rationally based on the perception of the witness" and are "helpful to a

clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a).

Petitioner faults trial counsel for failing to move to strike Mr. James' testimony that when petitioner said, "Y'all know what to do," he was instructing Mr. Wilkins and Mr. Shipp to kill the victim. He also claims that Mr. James' testimony that petitioner was a member of the Gangster Disciples lacked foundation. Mr. James, a member of the Gangster Disciples, was present at the apartment and witnessed the kidnapping and beating of the victim. Mr. James observed petitioner giving orders, which were followed by members of the Gangster Disciples. Around the time that petitioner told the gang members, "Y'all know what to do," regarding the victim, petitioner pointed a gun at Mr. James' face and told him that "the same thing" would happen to Mr. James if he said "something about it." We conclude that Mr. James' testimony established personal knowledge of petitioner's membership in the Gangster Disciples. *See* Tenn. R. Evid. 602. We also conclude that Mr. James' opinion that petitioner ordered that the victim be killed when he said, "Y'all know what to do," was rationally based upon Mr. James' own perceptions. *See* Tenn. R. Evid. 701. Therefore, trial counsel were not ineffective in failing to object to the testimony as the objections would have been overruled.

Petitioner contends that trial counsel should have objected to Mr. Shipp's testimony regarding petitioner's position in the Gangster Disciples. Mr. Shipp's testimony established that he gained personal knowledge of the structure of the Gangster Disciples, including petitioner's rank, through his experience as a member. His testimony regarding petitioner's rank was properly admitted pursuant to Rule 602 of the Tennessee Rules of Evidence. Trial counsel, therefore, were not ineffective in failing to object to the testimony.

According to petitioner, evidence was available to undermine testimony about his rank in the Gangster Disciples and faults trial counsel for failing to present such evidence. He cites to this court's opinion in *State v. Terrance Heard*, No. W2001-02605-CCA-R3-CD, 2003 WL 22718439, at *2-3 (Tenn. Crim. App. Nov. 6, 2003), *perm. app. denied* (Tenn. Mar. 22, 2004), in which this court noted that Robert Walker, a witness for the State, testified that he was the chief of security for the Gangster Disciples in Memphis in 1997.

The post-conviction court found no authority requiring trial counsel to monitor all subsequent gang-related cases in Shelby County to determine if others had identified themselves as the chief of security of the Gangster Disciples. We likewise find no such authority. Furthermore, Mr. Walker did not testify in the *Heard* case until August 6, 2001, nearly three years after petitioner's trial and after trial counsel had withdrawn from petitioner's case. Mr. Walker did not testify at petitioner's post-conviction hearing, and no proof was presented that Mr. Walker's testimony was available at the time of petitioner's

trial. Accordingly, petitioner has failed to establish that trial counsel were ineffective in not discovering this testimony.

### 4. Failure to Object to Evidence of the Crime Scene and the Victim's Body

Petitioner argues that trial counsel were ineffective in failing to object to the testimony "of at least some" witnesses regarding the discovery of the victim's body and appearance of the crime scene, as such testimony was "largely redundant." He further argues that the repeated display of photographs of the victim's body and his actual skull were irrelevant and highly inflammatory.

At trial, the State presented testimony from Raymond Pearson and Coria Williams regarding the discovery of the victim's body, Officer Alvin Peppers regarding the investigation at the scene, and Dr. Thomas Deering, the Shelby County Medical Examiner. The post-conviction court found that trial counsel were not ineffective in failing to challenge the testimony of these witnesses. As noted by the post-conviction court, trial counsel objected to Dr. Deering's testimony, and the trial court overruled the objection. The post-conviction court found that the testimony of the two witnesses regarding the discovery of the victim's body demonstrated "when, where[,] and how the body was discovered and when and how the murder investigation began." The court also found that the testimony of the responding officer was offered to explain "how the investigation progressed, the position and location of the victim's body[,] and the nature of his injuries." The evidence does not preponderate against the post-conviction court's findings. Had trial counsel objected to the testimony of these witnesses, the trial court would have overruled the objections. Accordingly, petitioner is not entitled to relief on this claim of error.

With regard to the admission of the photographs and the display of the victim's skull, the Tennessee Supreme Court held on direct appeal that the photographs were properly admitted and that the display of the victim's skull was proper. *See Robinson*, 146 S.W.3d at 489-92. Petitioner is not entitled to relief with regard to this issue.

Petitioner avers that trial counsel were ineffective in not objecting to testimony from Christina Green, the victim's sister, that she had a photograph placed on the victim's tombstone and that she missed him. He describes the testimony as irrelevant victim impact testimony that was inadmissible in the guilt phase of the trial. During the guilt phase of the trial, the prosecution presented the testimony of Ms. Green. Ms. Green described her relationship with the victim as "real close." She said that she attended the victim's funeral and that it was a "closed casket." Trial counsel objected, and the trial court sustained the objection, finding that evidence regarding the casket was not probative of the State's case-in-

chief. Ms. Green then testified that she placed a photograph on the victim's tombstone and that she missed her brother.

Petitioner challenged the admissibility of Ms. Green's testimony on direct appeal. This court noted that petitioner did not contemporaneously object to Ms. Green's testimony, other than her testimony regarding the victim's casket, which the trial court sustained. *Gregory Robinson*, 2003 WL 21946735, at *43-44. This court held that as a result, the issue was waived. *Id.*

Like evidence regarding the casket, evidence that the victim's sister missed him and placed a photograph on his tombstone was not relevant to the State's case-in-chief. Even if trial counsel should have objected to the testimony, however, we cannot conclude that the testimony was inflammatory or otherwise prejudicial. Petitioner is not entitled to relief with regard to this issue.

### 5. Failure to Identify and Interview Witnesses

Petitioner maintains that trial counsel were ineffective in failing to interview witnesses and present evidence regarding Prentiss Phillips and his relationship with the victim. He also maintains that such an investigation would have revealed that Mr. Phillips held a grudge against the victim, was in charge of the meeting, and gave the orders.

Contrary to petitioner's assertions, trial counsel presented evidence at trial that Mr. Phillips, and not petitioner, was in charge of the meeting and was giving orders. James Lee White Carradine, Sepacus Triplett, Frederico Mason, and Steven Hardin each testified for the defense that petitioner was not present at the apartment on the night of the victim's death. Mr. Carradine identified Mr. Phillips as the ranking Gangster Disciple, and Mr. Triplett said that Mr. Phillips was in charge of the meeting. Mr. Mason overheard Mr. Phillips and Mr. Shipp discussing what should be done with the victim, and Mr. Hardin admitted to following an order given by Mr. Phillips.

With regard to evidence of Mr. Phillips' motive for ordering the victim's death, lead counsel said that he reviewed the transcripts of the guilty plea hearings of Charles Goldman and Charles Poole, both of whom testified concerning Mr. Phillips' grudge against the victim. Lead counsel also believed he received Denise Hurt's statement to the police in discovery. While lead counsel could not recall whether Ms. Hurt was interviewed by the defense, the post-conviction court accredited lead counsel's testimony that his investigator would have attempted to interview any witnesses identified through discovery. Lead counsel explained that many witnesses in gang cases refuse to speak to defense counsel. He generally did not interview a victim's relatives and friends because he rarely obtained helpful

information from such people when defending the person charged with killing that victim. Furthermore, lead counsel did not believe that Mr. Phillips' motivation for ordering the victim's death was relevant to the theory of defense that petitioner was not present at the apartment. We conclude that trial counsel conducted an adequate investigation of Mr. Phillips' role in the victim's murder and presented evidence that Mr. Phillips was in charge of the meeting and gave the orders resulting in the victim's death. The post-conviction court properly found that trial counsel were not deficient in this regard.

Petitioner next claims that trial counsel relied almost exclusively upon an investigator to identify, locate, and interview witnesses without providing guidance. He also claims that trial counsel failed to interview all of the State's witnesses and meet with petitioner regularly. The post-conviction court, however, accredited lead counsel's testimony that Mr. Watson was an experienced investigator who assisted lead counsel in interviewing witnesses. The court found that trial counsel had several meetings with Mr. Watson and provided him with direction as to the type of investigation that needed to be performed. Lead counsel personally interviewed those witnesses necessary to support petitioner's theory of defense. The post-conviction court rejected petitioner's assertion that trial counsel were ineffective in not interviewing all of the State's witnesses before trial. The court cited lead counsel's testimony that certain witnesses were uncooperative and that it was not unusual for police officers and the victim's family and friends to refuse to be interviewed by defense counsel before trial.

The post-conviction court also rejected petitioner's claim that trial counsel failed to regularly meet with him. Co-counsel testified that trial counsel met with petitioner on a continuous basis whenever new developments arose. He described petitioner as cooperative, and trial counsel both testified that they believed they had a good relationship with petitioner. The evidence does not preponderate against the post-conviction court's findings.

### 6. Decision to Call Officer Richard Parker to Testify Regarding Tattoos

Petitioner submits that trial counsel called Officer Parker as a witness without conducting an adequate investigation of his opinions and testimony. He maintains that Officer Parker's testimony that petitioner's tattoos could have been gang-related and that petitioner's tattoos and gold teeth could have been altered negated his misidentification defense. Petitioner further maintains that trial counsel opened the door to allow Officer Parker to testify that the Gangster Disciples' motto was "money making[,] murder, manipulation, and mayhem."

Petitioner relies upon Officer Parker's testimony that the only time that he discussed the photographs of petitioner's tattoos with trial counsel was immediately before he testified at trial. The post-conviction court, however, accredited the testimony of co-counsel and

noted that according to co-counsel, "[C]ounsel thoroughly vetted the witness' testimony, including conferring with Parker immediately prior to his testimony that he would be testifying in the manner previously discussed with counsel." Co-counsel said he was present when lead counsel discussed the photographs with Officer Parker during a telephone conference. Co-counsel heard Officer Parker assure them that petitioner's tattoos were not gang-related. Officer Parker confirmed his opinion to trial counsel outside the courtroom before he testified at trial.

The facts, as found by the post-conviction court, demonstrate that trial counsel met with Officer Parker on two separate occasions during which the officer confirmed that the tattoos in the photographs were not gang-related. Based upon the information that trial counsel had at the time, their decision to call Officer Parker as a witness at trial was not unreasonable. Under these circumstances, trial counsel were not deficient in failing to anticipate that Officer Parker would change his testimony following a brief conversation with the prosecutors.

Furthermore, as noted by the trial court in denying trial counsel's request for a continuance following Officer Parker's testimony at trial, the officer's testimony, "at most, indicated a mere possibility of an alteration." *See Gregory Robinson*, 2003 WL 21946735, at *27. The officer acknowledged that he was not an expert on the alteration of tattoos and that his testimony regarding the alterations of petitioner's tattoos was based upon "pure speculation." Sergeant Parker also acknowledged that his prior assertions that the tattoos were not gang-related changed only after he met with the prosecution. Based upon the speculative nature of the officer's testimony, we conclude that even if trial counsel were deficient in calling the officer to testify at trial, any deficiency did not prejudice the petitioner.

### 7. Failure to Adequately Present Evidence that Petitioner Did Not Flee and To Challenge the Trial Court's Ruling

Petitioner contends that trial counsel failed to keep their promise made to the jury in their opening statement that they would present evidence that following the victim's death, petitioner voluntarily came to the Shelby County Justice Center and, therefore, did not fear arrest for any crime. He further contends that trial counsel were unprepared to present such evidence because they failed to subpoena the correct clerk to testify to petitioner's presence in court on May 7 and September 9, 1997, after the victim's death and before petitioner's arrest for murder. According to petitioner, trial counsel undermined the jury's confidence by failing to deliver on their promise to present such evidence.

During opening statements, lead counsel told the jury:

We also think that we're going to show you other indications that Mr. Robinson was not involved in this crime. Particularly, we're going to show that while this offense occurred May 1, 1997, on or about that date, we think we're going to show you that Mr. Robinson was not arrested for this offense until February of 1998, almost nine months after the offense occurred.

We're going to show to you that Mr. Robinson was readily available, that he was not hiding, that he had not disappeared from the planet, and in fact that he had even been down to this very justice center with no concern about being charged with anything, about being accused of anything[,] or anything of that nature.

And then nine months later when Mr. Robinson was arrested[,] he's asked to answer to these charges. How many of you remember where you were on a given day nine months ago? And how hard would that be to show where you were nine months ago on a given day?

During a jury-out hearing at trial, lead counsel informed the trial court that following the victim's death on May 1, 1997, petitioner had a case set in another division on May 7 and September 9, 1997. On September 9, petitioner pleaded guilty to simple possession and was placed on probation. Lead counsel argued that evidence that petitioner appeared in court on those dates was relevant to show lack of flight. The court clerk whom trial counsel subpoenaed to testify regarding the documents in the court jacket was not assigned to the division where petitioner entered the plea in September 1997. Lead counsel argued that nevertheless, the clerk whom he subpoenaed was competent to testify to the records. The trial court refused to admit the evidence, finding that it was not relevant. The trial court also found that petitioner failed to present any witness who could authenticate the documents.

Petitioner asserts that had trial counsel issued a subpoena for the correct clerk, the trial court would have had the benefit of the actual witness before ruling on the relevancy of the evidence. As noted by the post-conviction court, however, petitioner did not call any witness at the post-conviction hearing, such as the clerk from the division where he entered the plea, to establish that testimony from the clerk in the correct division would have caused the trial court to render a different ruling on the relevancy of petitioner's court appearances following the victim's murder. Moreover, the trial court permitted lead counsel to make an offer of proof regarding what the testimony of the appropriate clerk would have been, and the trial court still found the evidence to be irrelevant. Petitioner has failed to establish what, if any, additional testimony the appropriate clerk would have presented.

Contrary to petitioner's assertions, trial counsel presented evidence at trial to support lack of flight. Trial counsel presented the testimony of Danny Dewayne Williams, who was with petitioner when he was arrested in February 1998. They were stopped at a roadblock where officers checked whether the two men had any outstanding warrants issued against them. The officers were speaking to one another, and petitioner wondered about whom the officers were talking. The officers then arrested petitioner.

During closing arguments, lead counsel told the jury:

Now, one thing interesting that I believe Ronald Dowell testified to—it was either Ronald or Danny. . . . [H]e sat up here and said that when they got pulled over at this roadblock[,] they weren't doing anything wrong. There's no crime here being committed.

When they got pulled over at this roadblock[,] apparently there weren't any drugs in the vehicle or anything. They just got pulled over at a roadblock—checking licenses and stuff, checking people for warrants. . . .

And the warrant comes up on Gregory Robinson in February 1998, eight or nine months after this incident of May of 1997 happened.

Gregory Robinson's in Memphis, Tennessee, in February 1998 with his friend. And they check Mr. Robinson's ID. They check him for warrants. And they arrest him. And he was surprised—his demeanor. He was surprised. He didn't understand why.

I believe there was some testimony that, you know, didn't quite know what was going on[,] just they kept Greg. So Gregory Robinson got arrested eight or nine months after this murder.

While evidence that petitioner actually came to the "very justice center" might have been stronger evidence of lack of flight, trial counsel presented evidence of lack of flight in that petitioner was still in Memphis when he was arrested nine months after the victim's murder. Accordingly, trial counsel were not deficient in this regard. Even if trial counsel were deficient in failing to subpoena the appropriate clerk, the deficiency did not result in prejudice as the trial court excluded the proffered evidence as irrelevant.

**8. Failure to Adequately Prepare for the Suppression Hearing**

Petitioner submits that trial counsel were ineffective in failing to adequately prepare for the suppression hearing and in failing to present expert testimony that "might have helped them suppress" Mr. James' identification of petitioner in photo spread "GG." The evidence presented at the suppression hearing was summarized by this court on direct appeal as follows:

> During the suppression hearing, the defendant presented the testimony of Charles Poole, who stated he was also arrested and charged with the murder of Green. Poole testified that after he was arrested, Sergeant Ashton questioned him and showed him a photograph array. Poole testified that when he did not identify anyone, Sergeant Ashton pointed toward the photograph of the defendant. Poole stated that although he did not identify anyone in the array, he believed the officer wanted him to identify the defendant's photograph. Upon viewing the photograph array, Poole stated the array depicted five "dark-skinned" African-Americans and one "light[-]skinned" African-American. He stated the defendant, who was depicted in photograph six, was the person with the light skin tone.
>
> Sergeant William Ashton, the case coordinator, testified he prepared a photograph array and showed it to witnesses. He stated he arranged the array by using the defendant's photograph and other photographs of those who resembled the defendant. The officer then presented the array to various witnesses and asked them if they could identify anyone in the array. Sergeant Ashton testified he never suggested to witnesses whom they were to identify.
>
> Sergeant Ashton described the defendant's skin tone as "light" and opined that all of the men depicted in the photograph array had light skin tones. He stated he showed the array to Shaun Washington and Christopher James, both of whom identified the defendant's photograph.

*Gregory Robinson*, 2003 WL 21946735, at *24-25.

In denying the motion to suppress, the trial court found that that Mr. Poole's credibility was "about as narrow as it can get." The court concluded that the photograph array was not overly suggestive, that the officer's actions were not suggestive, and that the witnesses did not rely upon anything suggestive in making their identifications. This court affirmed the trial court's denial of the motion to suppress, holding that "[a]lthough the

-92-

complexion of the defendant is somewhat lighter than the complexion of other persons in the array, it was not impermissibly suggestive." *Id.* at *26.

Petitioner faults trial counsel for presenting the testimony of a lay witness, who was also a co-defendant, rather than expert testimony to demonstrate that the skin tones in the photographs were unduly suggestive. Petitioner, however, failed to present such expert testimony at the post-conviction hearing. To succeed on a claim of ineffective assistance of counsel for failure to call a witness, petitioner should present that witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of petitioner." *Id.* Because petitioner failed to present such expert testimony at the post-conviction hearing, he is not entitled to relief on this issue.

Petitioner also asserts that at the suppression hearing, trial counsel properly argued that witnesses should not be permitted to testify that they identified petitioner in the photo array but "improperly conceded that if witnesses who had been shown the photo spread identified Mr. Robinson in court there would be 'nothing' that trial counsel could do about it." "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). In determining the validity of a pretrial identification, the trial court must first determine whether the identification procedure was unduly suggestive. *See Neil v. Biggers*, 409 U.S. 188, 198 (1972). If the trial court determines that the identification was unduly suggestive, the court must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. *Id.* at 199. If the trial court determines that the identification procedure was not unduly suggestive, the court need not apply the totality of the circumstances test in *Biggers*. *See State v. Butler*, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990) (declining to apply the totality of the circumstances test when a lineup was not found to be unduly suggestive). Thus, even if trial counsel were deficient in arguing the implications of a unduly suggestive lineup, any deficiency did not result in prejudice because the trial court found the array was not unduly suggestive, and this court upheld the finding on direct appeal.

### 9. Failure to Request That Petitioner Be Allowed to Sit at Counsel Table and to Challenge the Local Rule

Petitioner submits that trial counsel were ineffective in failing to request that he be allowed to sit at counsel's table during trial. He also submits that trial counsel were

ineffective in failing to challenge Rule 8.05 of the Rules of Practice and Procedure for Shelby County Criminal Court, which provides that the defendant may sit at counsel table where space is available and with permission of the trial court. As a result, petitioner sat behind counsel during trial, which, he maintains, raised the same concerns as visible shackles and violated his due process rights under the United States and Tennessee constitutions.

Co-counsel testified that the seating arrangement did not affect trial counsel's communications with petitioner at trial. Furthermore, the Tennessee Supreme Court has upheld Local Rule 8.05 as constitutional. *See State v. Rice*, 184 S.W.3d 646, 674-75 (Tenn. 2006). This issue is without merit.

## 10. Failure to Object to the State's Vouching for Mr. Shipp and Mr. James During Closing Arguments

Petitioner contends that the prosecutor improperly vouched for Mr. Shipp and Mr. James during closing arguments by asserting that they were telling the truth and that Mr. Shipp did not have an agreement with the State in exchange for his testimony. He maintains that trial counsel's failure to object to the vouching constitutes ineffective assistance of counsel.

During closing arguments in the guilt phase, the prosecutor told the jury that Mr. James was a "simple man" and a "honest man" who did not have any motive in testifying but was "merely telling you the truth." The prosecutor stated that Mr. Shipp also "told you the truth." She further stated that Mr. Shipp

> didn't get a deal, but he told you the truth.
>
> . . . .
>
> But everything else, ladies and gentlemen, his involvement and all the other activities that went on in the room in the apartment and at the hill that night[,] he told you the truth. And he was very consistent about everything when he sat in that chair.

During rebuttal closing arguments, the prosecutor said with respect to Mr. Shipp:

> And, you know, if you know what someone can do, if you know the kind of orders they can give and you know what the consequences are, you make that decision to tell the truth and get up there, you know, maybe we

should cut him some slack. We haven't yet, but maybe we should. That took a lot of guts. And it took a lot of nerve.

And just ask yourself, who sat on that stand with the strongest convictions, with the calmest character and didn't know what his consequences would be and just told it like it was with the imperfections against himself as well as against everybody else?

This court has previously considered "whether the failure to object during a closing argument is generally sufficient for a showing of ineffective assistance of counsel." *Derek T. Payne v. State*, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan. 15, 2010), *perm. app. denied* (Tenn. May 10, 2010) (citation omitted); *see Lemar Brooks v. State*, No. M2010-02451-CCA-R3-PC, 2012 WL 112554, at *14 (Tenn. Crim. App. Jan. 11, 2012), *perm. app. denied* (Tenn. May 16, 2012). Trial counsel's decisions of whether to object to the arguments of opposing counsel "'are often primarily tactical decisions.'" *Lemar Brooks*, 2012 WL 112554, at *14 (quoting *Derek T. Payne*, 2010 WL 161493, at *15). Trial counsel could refrain from objecting for several valid tactical reasons, including not wanting to emphasize unfavorable evidence. *Derek T. Payne*, 2010 WL 161493, at *15. As a result, "testimony from trial counsel as to why he or she did not object to the allegedly prejudicial remarks is essential to determine whether trial counsel was ineffective." *Lemar Brooks*, 2012 WL 112554, at *14. Absent testimony from trial counsel or evidence indicating that counsel's decision was not tactical, "we cannot determine that trial counsel provided anything other than effective assistance of counsel." *State v. Leroy Sexton*, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. Jan. 12, 2007), *perm. app. denied* (Tenn. May 14, 2007).

Petitioner did not present any evidence at the post-conviction hearing to suggest that trial counsel's failure to object to the prosecutor's remarks were anything but a tactical decision. Trial counsel were not questioned at the hearing regarding why they did not object to the prosecutor's statements. We, therefore, must conclude that trial counsel were not ineffective.

We note that even if trial counsel were deficient in failing to object to the prosecutor's statements, any deficiency did not result in prejudice. The post-conviction court found no prejudice based upon "the entire argument by the State, the final jury instructions provided by the Court, and the proof submitted for the jury's consideration." **(Vol. 6, p. 991)** We agree with the findings of the post-conviction court.

**11. Failure to Object to the Prosecutor's References to Petitioner's Decision Not to Testify**

Petitioner avers that during closing arguments, the prosecutor improperly referred to petitioner's decision not to testify and that trial counsel's failure to object constituted ineffective assistance of counsel. Petitioner focuses upon the following statement of the prosecutor during closing arguments:

> And you know what [Mr. Shipp] closed his statement with, ladies and gentlemen? He said, I'm doing this, I'm telling you the truth to help me, but I'm also doing this to help the victim's family. Did you hear that from anybody else?–anybody else who sat in this chair and said, I pled to this, you know, I was there?
>
> Did anyone else exhibit any remorse? Did anyone say, I want to do the right thing. I want to do–I want to assist this family in the grief that they're exhibiting, that they're feeling in this matter. No one else did.

Trial counsel were not questioned at the post-conviction hearing about why they did not object to the prosecutor's statements. Petitioner failed to present any other proof suggesting that the lack of an objection was anything but a tactical decision. Moreover, this court addressed the propriety of the prosecutor's statements on direct appeal. *See Gregory Robinson*, 2003 WL 21946735, at *33. While this court held that petitioner waived the issue by not objecting to the statements at trial, we also noted that "these statements appear to properly relate to an attack on gang members who testified for the defense." *Id.* Therefore, had trial counsel objected to the prosecutor's statements, the trial court would have overruled the objection. Petitioner is not entitled to relief with regard to this issue.

**12. Failure to Object to the Prosecutor's References to Facts Not in Evidence**

Petitioner argues that during closing arguments, the prosecutor referred to facts not in evidence when she stated that Mr. James and Mr. Shipp had not conferred about their testimony and suggested that the defense witnesses had conferred with each other prior to testifying. He further argues that trial counsel were ineffective in failing to object. The statements about which petitioner complains are as follows:

> [Mr. James] and [Mr. Shipp] haven't conferred. Remember that[,] ladies and gentlemen. They haven't talked. They haven't met. And yet their testimony was item per item the same regarding that man's involvement and where that man was in the house and what that man did, he went upstairs, and

-96-

who[m] he talked to. These men have not conferred in their testimony in any way. Remember that.

Petitioner also takes issue with the following statement from the prosecutor:

> And you heard from [Sepacus Triplett] that he said he made a statement to the police, but he didn't tell the truth. He didn't tell the police the truth back long ago. But now, now that he is in the realm of confinement with other people who are involved in the Gangster Disciples organization[,] all of the sudden now he has a clear memory about his involvement. And he clearly remembers he's not seen this guy, it's not him.

Again, petitioner did not question trial counsel at the post-conviction hearing about their failure to object or present any other evidence establishing that their failure to object was anything other than a tactical decision. This court addressed the issue of the prosecutor's statements on direct appeal and concluded that while the issue was waived due to trial counsel's failure to object, the statements were reasonable inferences from the evidence. *Gregory Robinson*, 2003 WL 21946735, at *32. Because the prosecutor's statements were proper, trial counsel were not ineffective in declining to object to them.

### 13. Failure to Object to the Accomplice Instruction That Did Not Include Shaun Washington and Mr. Shipp

Petitioner contends that trial counsel were ineffective in failing to object to the trial court's jury instruction on accomplices that did not include Shaun Washington and Mr. Shipp. An accomplice is a person who "knowingly, voluntarily and with common intent unites with the principle offender in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). To fall within the definition of an accomplice, it is not sufficient that the witness merely possessed guilty knowledge, is morally delinquent, or participated in a distinct but related offense. *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004) (citing *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990)). Rather, the test for determining accomplice status is whether the witness could have been indicted for the offense. *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992); *Lawson*, 784 S.W.2d at 369.

The only testimony presented at trial relating to Shaun Washington was that of Sergeant Ashton who testified on cross-examination that Mr. Washington identified petitioner from a photograph array as being present at the apartment on the night of the murder. While Mr. James referred to "Shaun" in his statement to police, he identified petitioner in a photograph array as "Shaun" and clarified at trial that petitioner was the

"Shaun" to whom he was referring in his statement. Based upon this evidence, we cannot conclude that Mr. Washington fell within the definition of an accomplice. Accordingly, trial counsel were not deficient in not objecting to the trial court's jury instruction on accomplices that did not include Mr. Washington.

The trial court instructed the jury that they were to determine as a question of fact whether Mr. Shipp was an accomplice to the crime. On direct appeal, the Tennessee Supreme Court held that the trial court should have instructed the jury to consider Mr. Shipp as an accomplice as a matter of law. *Robinson*, 146 S.W.3d at 489. While concluding that petitioner waived the issue by failing to object, the court held that the trial court's error was harmless because "James's testimony and Dr. Deering's testimony sufficiently corroborated Shipp's description of the events so that the evidence is sufficient to support the jury's verdict of first degree murder." *Id.* Thus, while trial counsel should have objected to the jury instruction, the deficiency did not result in prejudice.

### 14. Failure to Object to the Accomplice Instruction Requiring the Testimony of Petitioner's Witnesses Be Corroborated

Petitioner faults trial counsel for not objecting to the trial court's instructing the jury that the testimony of his witnesses also had to be corroborated. The State concedes that trial counsel were deficient in failing to object to the instruction but contends that the deficiency did not result in prejudice.

The trial court instructed the jury as follows:

> Accomplice. An accomplice is a person who knowingly, voluntarily, and with common intent with the principal offender unites with him or her in the commission of the crime.

> If a witness is an accomplice in the crime, then his or her testimony must be corroborated. Corroborating evidence is that evidence, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference not only that a crime has been committed but also that the defendant was implicated in it. The independent corroborative testimony must include some fact or circumstance that affects the defendant's identity.

> Corroborative evidence may be direct or entirely circumstantial and it need not be adequate, in and of itself, to support a conviction. It is sufficient if the corroborative evidence fairly and legitimately tends to connect the

defendant with the crime charged. It is a question for the jury to determine whether an accomplice's testimony has been sufficiently corroborated.

In this case it is a question for the jury to determine whether the witnesses, Jarvis Shipp, James Lee White Caradine, Sepacus Triplett or Steve Hardin, was an accomplice in this alleged crime. If you find from the proof that the witness was an accomplice, then the defendant cannot be convicted upon the uncorroborated testimony of this witness. If you find that the witness was not an accomplice, then you will judge the weight to be given to his testimony just as you do that of the other witnesses in the case.

We agree with the post-conviction court's finding that trial counsel should have objected to the accomplice instruction that included defense witnesses Mr. Hardin, Mr. Carradine, and Mr. Triplett. Trial counsel's deficiency, however, did not result in prejudice. The trial court's instruction stated that petitioner could not be convicted based upon the uncorroborated testimony of an accomplice. Therefore, the instruction only addressed those witnesses who inculpated petitioner. The trial court did not instruct the jury that accomplice testimony that is exculpatory must also be corroborated. The testimony of Mr. Hardin, Mr. Carradine, and Mr. Triplett did not inculpate petitioner. Thus, even if the jury concluded that these witnesses were accomplices, the jury was not required to determine whether their testimony was corroborated in order to give their testimony any weight. Moreover, the testimony of these witnesses that petitioner was not at the apartment on the night of the murder was corroborated at trial by April Black and Frederico Mason. Accordingly, we cannot conclude that a reasonable probability exists that the verdict would have been different had trial counsel objected to the instruction.

### C. Penalty Phase

Petitioner maintains trial counsel were ineffective with regard to the penalty phase of the trial in failing to (1) retain a neuropsychologist and have neuropsychological testing conducted; (2) supervise unqualified mitigation specialists, prepare an adequate mitigation report, and present a rational mitigation theory; (3) prepare mitigation witnesses; and (4) object to the prosecution's "improperly overtaking the role of the jury." Petitioner further maintains that his right to counsel was violated when the trial court allowed trial counsel to continue representing him after a conflict of interest arose.

Counsel does not have a constitutional duty to present mitigation evidence at the penalty phase of a capital trial but has a duty to investigate and prepare for both the guilt and penalty phases. *See Goad*, 938 S.W.2d at 369. Counsel does not have an absolute duty to investigate particular facts or a certain line of defense; however, counsel has a duty to make

a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. *Strickland*, 466 U.S. at 691. In determining whether counsel breached this duty, this court reviews counsel's performance for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as viewed from counsel's prospective at that time. *Wiggins*, 539 U.S. at 523 (citations omitted).

Counsel is not required to investigate every conceivable line of mitigation evidence regardless of how unlikely the effort would be to assist the defendant at sentencing. *Id.* at 533. Likewise, counsel is not required to interview every conceivable witness. *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995). This court will not conclude that counsel's performance was deficient for failing to discover all mitigating evidence, if, after a reasonable investigation, counsel has not been put on notice that such evidence exists. *See Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (citation omitted). In addition, the United States Supreme Court has held that

> no particular set of detailed rules can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

*Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

We review the following factors in determining whether trial counsel were ineffective in failing to present mitigating evidence: (1) the nature and extent of the mitigating evidence that was available but not presented by trial counsel; (2) whether trial counsel presented substantially similar mitigation evidence to the jury in either the guilt or penalty phase of the proceedings; and (3) whether the evidence of applicable aggravating factors was so strong that mitigating evidence would not have affected the jury's determination. *Goad*, 938 S.W.2d at 371 (citations omitted).

### 1. Failure to Retain a Neuropsychologist to Conduct Neuropsychological Testing

Petitioner contends that trial counsel were ineffective in failing to retain a neuropsychologist to conduct neuropsychological testing. The post-conviction court found that trial counsel would have been unable to show a particularized need for neuropsychological testing and that as a result, the trial court would have denied any request for funding to retain a neuropsychologist. *See State v. Barnett*, 909 S.W.2d 423, 426-28 (Tenn. 1995). The Tennessee Supreme Court has held that "while a State need not provide

an indigent defendant with all the assistance his wealthier counterpart might buy . . . fundamental fairness requires a State to provide an indigent defendant with the 'basic tools for an adequate defense on appeal.'" *Id.* at 426 (quoting *Ake v. Oklahoma*, 470 U.S. 68, 66 (1985)).

The trial court's obligation to afford an indigent defendant with the benefit of expert assistance does not arise unless the defendant makes a threshold showing of a "particularized need" for the expert assistance. *See* Tenn. Sup. Ct. R. 13, § 5(c)(1); *Barnett*, 909 S.W.2d at 430-31. Particularized need is established:

> When a defendant shows by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the requested services are necessary to protect the defendant's right to a fair trial.

Tenn. Sup. Ct. R. 13, § 5(c)(2). Particularized need cannot be established and the trial court should deny requests for funding when the motion for funding includes only:

(A)  undeveloped or conclusory assertions that such services would be beneficial;

(B)  assertions establishing only the mere hope or suspicion that favorable evidence may be obtained;

(C)  information indicating that the requested services relate to factual issues or matters within the province or understanding of the jury; or

(D)  information indicating that the requested services fall within the capability and expertise of appointed counsel.

*Id.* at (c)(4). Unsupported assertions that an expert is necessary to counter proof offered by the State is not sufficient to establish particularized need. *Barnett*, 909 S.W.2d at 431. The defendant must reference facts and circumstances of the particular case and demonstrate that the appointment of the expert is necessary to ensure a fair trial. *Id.* The issue of whether a defendant has made the threshold showing is to be determined on a case-by-case basis. *Id.*

Trial counsel obtained approval of funds from the trial court to retain Dr. Little-Hendren, a clinical psychologist, to evaluate petitioner. Dr. Little-Hendren interviewed petitioner, reviewed the mitigation report, and administered an intelligence test and an achievement test. According to her report, Dr. Little-Hendren concluded that petitioner's I.Q. fell within the low average range. She noted a significant difference between petitioner's verbal I.Q., which was within the borderline range, and his non-verbal I.Q., which was within the average range. Dr. Little-Hendren reviewed petitioner's school records

and noted that he failed the fourth and seventh grades, was diagnosed with a learning disability in math, and dropped out of high school.

Dr. Little-Hendren noted that petitioner suffered a closed-head injury in 1991 and was hospitalized for approximately four days. Petitioner reported a loss of consciousness following the injury. The doctor noted that the follow-up CT scan was unremarkable and that petitioner failed to attend a follow-up neurological appointment. According to Dr. Little-Hendren's report, "[t]here was no suggestion of complications from this injury." Based upon her evaluation, she did not recommend further neurological or neuropsychological assessments.

Petitioner submits that Dr. Little-Hendren conducted the evaluation only for purposes of competency and, as a result, faults counsel for relying upon her report in determining whether to request neuropsychological testing for purposes of mitigation. Lead counsel, however, testified that he believed Dr. Little-Hendren's report was not limited to competency because she addressed whether a neuropsychological assessment was necessary. Lead counsel said he did not instruct Dr. Little-Hendren as to what tests to administer but relied upon her to make that decision. Lead counsel also said that because the doctor did not recommend neuropsychological testing, he assumed the doctor did not believe such testing was necessary based upon her assessment and testing of petitioner. Trial counsel were "not required to question a diagnosis put forth by a professional expert in the field" and cannot be faulted for relying upon an expert's assessment of petitioner. *Christa Gail Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *54 (Tenn. Crim. App. Apr. 25, 2011), *perm. app. denied* (Tenn. Nov. 15, 2011). The facts and circumstances as they existed prior to petitioner's trial demonstrated that any funding for neuropsychological testing would have been sought in the mere "hope or suspicion" that favorable evidence could be obtained from such testing. Such "hope or suspicion" does not constitute particularized need.

Dr. Little-Hendren testified that she was unaware that petitioner had two prior head injuries. The doctor, however, acknowledged in both her report and during the post-conviction hearing that she reviewed the mitigation report prepared by Ms. Taylor and Ms. Hill in evaluating petitioner. The mitigation report was entered as an exhibit at the post-conviction hearing. **(Vol. 9, Exh. 30)** In describing petitioner's medical history, the report stated:

> On November 29, 1991, Greg was admitted to The Med for a blunt trauma injury to the forehead sustained by a baseball bat when Greg was the victim of a robbery. He had a 4 cm. laceration to the left forehead which was sutured. He had cervical spine and head CT scans which showed a sliver left frontal subdural hematoma without mass effect. The cervical spine was

-102-

normal. Greg was admitted for close neurological observation and a follow[-]up CT scan[,] which was unremarkable. He was discharged on December 3, 1991, with instructions to report to the Neurosurgery Clinic on January 14, 1992.

On March 6, 1992, Greg was admitted to the Emergency Room at The Med complaining of intermittent nausea [and] sharp pain in the left forehead and top of head secondary to a motor vehicle accident two weeks prior. A CT scan was performed and the findings were normal.

Thus, contrary to petitioner's assertions and Dr. Little-Hendren's testimony, the doctor had the information regarding both prior head injuries. Trial counsel cannot be faulted for the failure of Dr. Little-Hendren to consider this second head injury in her assessment of petitioner. *See Bryon Lewis Black v. State*, No. 01C01-9709-CR-00422, 1999 WL 19522, at *15 (Tenn. Crim. App. Apr. 8, 1999) ("The attorneys are not guarantors of the validity of an expert's results."). As noted in the mitigation report, the results from the CT scan performed following petitioner's second head injury were normal. In light of the results of the CT scans, the denial from petitioner and his family that he had any mental health issues, and Dr. Little-Hendren's conclusions as outlined in her report, we conclude trial counsel were not deficient in declining to seek funds for neuropsychological testing.

## 2. Failure to Supervise Mitigation Specialists and Present a Rational Mitigation Theory

Petitioner submits that trial counsel failed to develop and prepare an adequate mitigation report and, as a result, were unable to make an informed decision regarding mitigation strategy. He further submits that the mitigation investigators did not spend the time necessary to develop a sufficient report. Petitioner also maintains that trial counsel were ineffective in failing to present mitigation evidence regarding "the abuse, violence, drugs, gambling, and poverty" that he had endured. According to petitioner, trial counsel's presentation of a "shallow and misleading story about a boy with a loving mother who taught him right from wrong and grew up in almost idyllic family environment" was based upon an inadequate mitigation investigation.

The mitigation specialists available to petitioner were limited as the case involved multiple co-defendants who also retained mitigation specialists. Trial counsel wanted to hire someone who was based in Memphis and was familiar with the area. While Ms. Taylor had no prior experience as a mitigation specialist in capital cases, a mitigation specialist "is not the exclusive means through which defense counsel can throughly investigate a petitioner's background." *Andre Bland v. State*, No. W2007-00020-CCA-R3-PD, 2009 WL 910197, at

*58 (Tenn. Crim. App. Apr. 3, 2009). While the United States Supreme Court has adopted standards such as those provided by the American Bar Association as guidelines for reasonableness, the Court has declined to adopt a rigid checklist of tasks that trial counsel must perform in every case because "'[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.'" *Id.* at *57 (quoting *Strickland*, 466 U.S. at 688-89). Based upon this fact and the "'constitutionally protected independence of counsel,'" trial counsel is granted broad discretion concerning whether the retention of an expert will serve the client's interests. *Id.* at *57 (quoting *Wiggins*, 539 U.S. at 533).

As noted by the post-conviction court, Ms. Taylor had a degree in sociology and a minor in psychology and had a basic understanding of psychiatric, psychological, and neuropsychological problems that may affect criminal defendants. She had experience recognizing inappropriate emotions and poor decision-making and coping skills. She also had training and experience in reviewing records of medical and social history and recognizing the potential for brain damage and other developmental difficulties. Ms. Taylor was trained in the concepts of parental modeling and the effect of environmental factors on child development. She was provided with an example of a mitigation report, which she used in her mitigation investigation in petitioner's case. She believed she sufficiently understood what records needed to be obtained and how the investigation should be conducted.

Ms. Taylor and Ms. Hill interviewed petitioner on multiple occasions. They obtained petitioner's medical records, birth records, school records, school health records, and criminal records. They also obtained the criminal records of petitioner's father. They interviewed petitioner's mother and sisters, his friends, and the minister at the jail. They were aware of petitioner's difficulties at school, his prior head injuries, the drug-selling history of him and his father, and his father's incarceration. Petitioner denied abusing drugs or alcohol. According to the mitigation report prepared by Ms. Taylor and Ms. Hill and their notes, which were entered as an exhibit at the post-conviction hearing, the investigators also gathered information regarding petitioner's gambling problems, the effect of his father's incarceration on petitioner, his family's card-playing, his and Stacey Robinson's expulsion from school for fighting, petitioner's association with the "wrong crowd" that led to selling drugs, and his living with his sisters at some point.

Many of petitioner's family members were reluctant to cooperate, and the mothers of his children refused to be interviewed. Before Ms. Taylor interviewed any witnesses, petitioner required that he give his approval. Those family members who agreed to be interviewed portrayed themselves as a "very close-knit happy family." Petitioner's sisters admitted to spoiling him. His family and friends denied that he had any mental deficiencies.

Co-counsel testified that trial counsel sought to present a mitigation theory that petitioner was not the "worst of the worst" and that as a result, the death penalty was not an appropriate punishment. Trial counsel presented petitioner's sisters, his mother, his friend Ronald McDowell, and Ms. Taylor as witnesses during the penalty phase of the trial. These witnesses testified that his family shared a close bond; that petitioner loved his children, nieces, and nephews and purchased items for them; that he attended church; that he was working at Exxon when arrested and once worked at a steel factory; that he failed multiple grades in school and did not graduate from high school; that he was diagnosed with a learning disability; and that his father taught him how to weld. Petitioner also testified and asked the jury to spare his life.

The post-conviction court found that many of these witnesses provided additional testimony at the post-conviction hearing relating to the family's financial problems, the incarceration of petitioner's father for selling drugs, and petitioner's drug sales. The court further found that trial counsel and the mitigation investigators were aware of this information. However, the information would not have supported trial counsel's objective of portraying petitioner as being loved by his family and leading a life worth saving.

The United States Supreme Court has recently reiterated "'the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions.'" *Cullen*, 131 S.Ct. at 1406 (quoting *Strickland*, 466 U.S. at 689). *Strickland* rejected the idea that the same investigation will be required in every case. *Id.* (citing *Strickland*, 466 U.S. at 691). Constitutionally competent representation will rarely employ one specific technique or approach. *Id.*

The Court in *Cullen* also reiterated "the strong presumption of competence that *Strickland* mandates." *Id.* A court "'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Id.* (quoting *Strickland*, 466 U.S. at 689-90). We are not simply required to give trial counsel the benefit of the doubt, but we must affirmatively entertain the range of possible reasons trial counsel may have had for proceeding as they did. *See id.*

This is not a case in which trial counsel did not conduct any inquiry into petitioner's background and social history. *See Williams v. Taylor*, 529 U.S. 362, 396 (2000). Rather, based on their investigation, trial counsel determined that their mitigation strategy should be to show that petitioner had a life worth saving and did not deserve the death penalty. Trial counsel based their strategy upon information provided by petitioner and his family and information obtained from his records. Trial counsel then presented evidence during the penalty phase to support the mitigation theory.

Petitioner contends that trial counsel should have presented all evidence of the negative attributes of him and his family to assist the jury in understanding his personality traits. The Court in *Cullen*, however, rejected the idea that the only reasonable mitigation strategy in capital cases is to assist the jury in understanding the defendant. *See Cullen*, 131 S.Ct. at 1407. Rather, it was reasonable for trial counsel to conclude that focusing upon petitioner's positive attributes and family life would be a more effective mitigation strategy. Petitioner has failed to present evidence sufficient to overcome the "strong presumption" of adequate assistance.

Even if trial counsel had performed deficiently, the deficiency would not have resulted in prejudice. In addition to the mitigating evidence presented by trial counsel, the State presented evidence at trial of aggravating factors. The State relied upon, and the jury found, two aggravating circumstances to support the death penalty: the murder was especially "heinous, atrocious, or cruel" and the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit a kidnapping. *See* Tenn. Code Ann. § 39-13-204(i)(5), (7) (1997).

The Tennessee Supreme Court summarized the evidence supporting the (i)(5) aggravating circumstance as follows:

> Green was "arrested" and held at an apartment where numerous armed gang members, led by the defendant, beat and threatened him. Testimony indicated that Green asked his captors for release and relief, that he appeared very frightened, that he defecated during the ordeal and was ridiculed for doing so, and that he begged his captors to let him go, promising that he would not report their crimes. Witnesses indicated that Green became even more frightened upon arriving at the park where he was murdered. There, Green's captors physically carried and dropped him on the hilltop where he was murdered. Before Green was repeatedly shot in the head, Green begged for his life. Green continued to beg for his life and cry out after being shot in the buttocks and the back. Dr. Deering opined that the gunshot wounds to Green's buttocks would have been very painful. Dr. Deering also opined that the first gunshot wound to Green's head would have been fatal.

*Robinson*, 146 S.W.3d at 500-01. The court also concluded that the record was "clearly" sufficient to support the jury's finding of the (i)(7) aggravating circumstance in that the victim's murder was knowingly directed by the defendant while the defendant had a substantial role in committing the victim's kidnapping. *Id.* at 501.

Moreover, petitioner exhibited "an inappropriate attitude" when he testified during the penalty phase of the trial. Co-counsel said that petitioner exhibited a "certain swagger that was just dissident with what our message was going to be." Co-counsel expressed concern about petitioner's attitude because the jury had heard evidence that petitioner was a high-ranking member of the Gangster Disciples.

The evidence that petitioner asserts that trial counsel should have also presented is of questionable mitigating value. The evidence relating to petitioner and his family regarding gambling, violence, and criminal activity was not "clearly mitigating" as the jury could have concluded that petitioner was "simply beyond rehabilitation." *See Cullen*, 131 S.Ct. at 1410 (holding that evidence regarding serious substance abuse, mental illness, and criminal problems was not "clearly mitigating" because the jury might have concluded that the defendant was beyond rehabilitation); *see also Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (noting that mitigating evidence can be a "two-edged sword" that juries might find to show future dangerousness).

Evidence of petitioner's and his father's drug dealing and his father's arrests and infidelity would likely have undercut the mitigating value advanced by petitioner and his family that petitioner came from a good home and had a close-knit family. Accordingly, based upon the mitigating evidence presented and the strong evidence supporting the aggravating circumstances, petitioner has failed to show a "substantial" likelihood that the presentation of the additional evidence would have resulted in a different sentence.

### 3. Failure to Prepare Mitigation Witnesses to Testify

Petitioner avers that trial counsel failed to prepare mitigation witnesses and that as a result, the witnesses were vulnerable to assaults on their credibility. While petitioner asserts that trial counsel should have better prepared him to testify, petitioner did not testify at the post-conviction hearing and did not specify what additional testimony that trial counsel should have prepared him to present.

Petitioner also asserts that multiple witnesses offered incorrect testimony that he was a good student. He specifically cites to the testimony of Anita Robinson and Stacy Robinson. Anita, petitioner's mother, testified that he was a good student in that he attended school and got along with his teachers. While Anita stated petitioner "liked" ROTC, she did not state he made good grades in ROTC. Rather, she testified that petitioner failed multiple grades, was diagnosed with a learning disability, and dropped out of school.

Stacy Robinson testified that petitioner was an average student who made A's and B's. Trial counsel, however, presented proof of petitioner's poor grades and learning

disability through multiple witnesses. In light of this evidence, there is no reasonable probability that absent Stacy's inconsistent testimony of petitioner's grades, the jury would have altered its verdict of death.

## 4. Prejudice

Petitioner submits that trial counsel's multiple failures during the penalty phase resulted in prejudice. We conclude that any deficiencies by trial counsel did not result in prejudice when considered either individually or cumulatively in light of the mitigation evidence presented at the penalty phase of the trial and the strength of the evidence supporting the aggravating circumstances. Petitioner is not entitled to relief with regard to this issue.

## 5. Failure to Object to the Prosecution Improperly Overtaking the Role of the Jury

Petitioner submits that during closing arguments in the penalty phase, the prosecution instructed the jury that by convicting him of especially aggravated kidnapping, they had already found that one aggravating circumstance existed. He further submits that by doing so, the prosecutor relieved the jury of its responsibility of finding that the State proved one of the aggravating circumstances beyond a reasonable doubt. According to petitioner, trial counsel were ineffective in failing to object to the prosecutor's statement.

During the closing arguments in the penalty phase, the prosecutor told the jury:

I'll draw your attention to the two aggravators that the Judge will tell you that you can consider. And that is that we have this murder while committing another felony, and that was the kidnapping. We have defendant's participation in the snatching, bringing in Mr. Green, beating, and then taking him away to the park where the actual execution occurred.

You've heard all the facts on that. You've already deliberated on those facts, and whether those facts that those actual occurrences did happen. And you've already come to this determination that there was, indeed, an especially aggravated kidnapping that there was, indeed a murder.

Trial counsel were not questioned at the post-conviction hearing about why they did not object to the prosecutor's statements. Petitioner did not present any other evidence suggesting that the lack of an objection was anything but a tactical decision. *See Lemar Brooks*, 2012 WL 112554, at *14. Moreover, the post-conviction court held that the prosecutor's statements were not improper. We agree. The prosecutor merely argued that

because the jury had convicted petitioner of especially aggravated kidnapping, the jury should also find that the aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(7) applied. Petitioner is not entitled to relief on this issue.

### 6. Conflict of Interest

Following the penalty phase but prior to the sentencing hearing for the especially aggravated kidnapping conviction, petitioner expressed his intentions to present a claim of ineffective assistance of counsel on direct appeal. The trial court thereafter permitted trial counsel to withdraw for purposes of appeal but asked that they continue to represent petitioner at the sentencing hearing for the especially aggravated kidnapping conviction. At the conclusion of the sentencing hearing, the trial court imposed a twenty-five-year sentence to be served consecutively to petitioner's sentence of death. On direct appeal, petitioner challenged the trial court's imposition of consecutive sentences, and this court upheld the sentence. *See Gregory Robinson*, 2003 WL 21946735, at *42.

Petitioner argues that trial counsel had an actual conflict of interest and that as a result, he was denied effective assistance of counsel. He further argues that the trial court erred in refusing to permit trial counsel to withdraw. He maintains that the trial court's error and the ineffective assistance of counsel due to the conflict necessitate a new trial.

We first note that even if petitioner's argument of a conflict of interest is correct, he would not be entitled to a new trial. The alleged conflict of interest did not arise until petitioner expressed his intentions to seek a claim of ineffective assistance of counsel on direct appeal. He expressed these intentions after the imposition of the death sentence but before the sentencing hearing on the especially aggravated kidnapping conviction. Therefore, the only form of relief to which petitioner would be entitled would be a new sentencing hearing on the especially aggravated kidnapping conviction.

Petitioner did not challenge the trial court's order requiring trial counsel to continue to represent him at the sentencing hearing on direct appeal. Therefore, petitioner's argument regarding the propriety of the trial court's order is waived. *See* Tenn. Code Ann. § 40-30-106(g).

Petitioner submits that trial counsel had an actual conflict of interest and that, therefore, prejudice is presumed. "[A]n actual conflict of interest includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.'" *State v. White*, 114 S.W.3d 469, 476 (Tenn. 2003) (quoting *State v. Culbreath*, 30 S.W.3d 309, 312-13 (Tenn. 2000)). "[I]f an attorney actively represents conflicting interests, prejudice is presumed." *Netters v. State*, 957 S.W.2d 844,

847 (Tenn. Crim. App. 1997). However, unless petitioner proves that trial counsel was burdened by an actual conflict of interest, he must establish that trial counsel's performance was deficient and that he was prejudiced by this deficiency. *Strickland*, 466 U.S. at 692.

At the time of the sentencing hearing, Disciplinary Rule 5-101(A) provided:

Except with the consent of the client after full disclosure, a lawyer shall not accept employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests.

Petitioner's expression of his intention to seek a claim of ineffective assistance of counsel on direct appeal created a conflict of interest with regard to trial counsel's representation of petitioner on direct appeal. *See, e.g. Frazier v. State*, 303 S.W.3d 674 (Tenn. 2010). The issue before this court, however, is whether petitioner's complaints about trial counsel's performance created an actual conflict of interest as to prevent trial counsel from continuing to represent petitioner at the sentencing hearing. We conclude it did not.

Similar to those situations in which a defendant files a complaint against trial counsel with the Board of Professional Responsibility ("the Board"), trial counsel is not required to withdraw representation merely because a client complains about counsel's representation to the trial court. *See Shaun Alexander Hodge v. State*, No. E2009-02508-CCA-R3-PC, 2011 WL 3793503, at *5 (Tenn. Crim. App. Aug. 26, 2011) (holding trial counsel was not ineffective in failing to withdraw after petitioner wrote a letter to the Board and multiple letters to the trial court complaining about counsel's representation prior to trial), *perm. app. denied* (Tenn. Feb. 15, 2012); *Quentin Lewis v. State*, No. W1998-00793-CCA-R3-PC, 2001 WL 55635, at *4 (Tenn. Crim. App. Jan. 23, 2001) (concluding that trial counsel's performance was not constitutionally deficient when counsel failed to request to withdraw after the defendant filed a complaint against counsel with the Board); *See also State v. Richard Higgs*, No. W2000-02588-CCA-MR3-CD, 2002 WL 1841697, at *3 (Tenn. Crim. App. Aug. 5, 2002) (holding that although the defendant had filed three complaints against trial counsel with the Board at the time of trial, the defendant had "not provided this Court with sufficient information to determine that there existed a conflict of interest requiring defense counsel's withdrawal"). "Any rule that would essentially permit a defendant to automatically discharge his appointed counsel simply by raising written complaints would inevitably become the subject to delaying tactics and abuse." *Shaun Alexander Hodge*, 2011 WL 1841697, at *3.

In the present case, petitioner has failed to show that an actual conflict existed that prevented trial counsel from continuing to represent petitioner at his sentencing hearing on

his especially aggravated kidnapping conviction. Furthermore, petitioner has presented no facts establishing that trial counsel were deficient during the sentencing hearing or that any deficiency resulted in prejudice.

### D. On Appeal

Petitioner contends that appellate counsel were ineffective in failing to challenge on appeal (1) the Tennessee Supreme Court's holding that the medical examiner's testimony corroborated Mr. Shipp's testimony in either a petition to rehear or in the United States Supreme Court; (2) a jury instruction requiring corroboration of the testimony of his witnesses if they were found to be accomplices; (3) the trial court's ruling regarding the admissibility of lack of flight evidence; (4) the local rule requiring permission from the trial court for defendants to sit at the table with counsel; and (5) the trial court's ruling allowing trial counsel to continue to represent him after a conflict of interest arose.

The post-conviction court described appellate counsel's representation as "exemplary." The court noted that appellate counsel presented multiple witnesses at the hearing on the motion for new trial and raised twenty-seven issues on direct appeal. This court granted petitioner relief, reversing his convictions and sentence of death. *See Gregory Robinson*, 2003 WL 21946735, at *54. The Tennessee Supreme Court reversed the judgment of this court and upheld petitioner's convictions and sentence of death. *See Robinson*, 146 S.W.3d at 469.

To determine whether appellate counsel were constitutionally effective, we apply the two-prong test of *Strickland*, the same test used to evaluate claims of ineffective assistance of trial counsel. *Carpenter*, 126 S.W.3d at 886. This court has held:

> There are two approaches to appellate advocacy, known generally as the "rifle shot" approach and the "shotgun" approach. Under the rifle shot procedure, counsel presents only those issues which arguably have merit. Under the "shotgun" approach, every conceivable issue is raised in hope, albeit slim, that the appellate court will see merit in some arcane issue. The choice of which method to use and the choice as to which issues to present under either approach obviously requires strategic and tactical decisions by appellate counsel. Of course, those decisions are judged by the same standards as all other decisions of counsel.

*Hanson Lee Davis, Jr. v. State*, No. 02C01-9104-CC-00064, 1992 WL 69655, at *1 (Tenn. Crim. App. Apr. 8, 1992) (internal citations and footnote omitted). We will not fault appellate counsel for not raising every possible issue on appeal. *Carpenter*, 126 S.W.3d at

-111-

887 (citing *King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999); *Campbell v. State*, 904 S.W.2d 594, 596-97 (Tenn. 1995)).  Experienced appellate advocates have long "emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues." *Cooper v. State*, 849 S.W.2d 744, 747 (Tenn. 1993) (quoting *Jones v. Barnes*, 463 U.S. 745, 751 (1983)).  Determination of the issues to raise on appeal is a matter left to appellate counsel's sound discretion. *Carpenter*, 126 S.W.2d at 887 (citing *Jones*, 463 U.S. at 751).  We accord appellate counsel's professional judgment considerable deference with regard to which issues he believes to be meritorious on appeal. *Id.*  As in a review of ineffective assistance of trial counsel, we should not second-guess appellate counsel's decisions and must avoid the distorting effects of hindsight.  *Id.* However, we will only defer to counsel's tactical choices if such choices are within the range of competence required of attorneys in criminal cases.  *Id.* (citing *Campbell*, 904 S.W.2d at 597).

Moreover,

> [i]f a claim of ineffective assistance of counsel is based on the failure to raise a particular issue, as it is in this case, then the reviewing court must determine the merits of the issue.  Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it.  Likewise, unless the omitted issue has some merit, petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal.  When an omitted issue is without merit, petitioner cannot prevail on an ineffective assistance of counsel claim.

*Carpenter,* 126 S.W.2d at 887-88.

### 1. Failure to Challenge the Tennessee Supreme Court's Holding That the Medical Examiner's Testimony Corroborated Mr. Shipp's Testimony

On direct appeal, petitioner argued that the trial court erred in failing to instruct the jury that Mr. Shipp was an accomplice as a matter of law.  The Tennessee Supreme Court agreed that the trial court should have given the instruction but held that petitioner waived the issue by failing to object to the instruction at trial. *Robinson*, 146 S.W.3d at 489.  The court further held that regardless of waiver, "the error is harmless because James's testimony and Dr. Deering's testimony sufficiently corroborated Shipp's description of the events so that the evidence is sufficient to support the jury's verdict of first degree murder." *Id.*

Petitioner avers that appellate counsel were ineffective in failing to challenge the Tennessee Supreme Court's holding that Dr. Deering's testimony corroborated Dr. Shipp's

testimony in either a petition to rehear or a petition for writ of certiorari to the United States Supreme Court. The record, however, demonstrates that Dr. Deering's testimony sufficiently corroborated Mr. Shipp's testimony about the events surrounding the shooting of the victim at the park. Moreover, in light of the Tennessee Supreme Court's holding that petitioner waived the issue by failing to object to the jury instruction at trial, there is no reasonable probability that a petition to rehear or a petition for writ of certiorari would have been granted had appellate counsel challenged the court's ruling regarding Dr. Deering's testimony.

### 2. Failure to Challenge an Accomplice Instruction Requiring Corroboration of Petitioner's Witnesses

Petitioner asserts that appellate counsel were ineffective in failing to challenge on appeal the trial court's instruction regarding the requirement of corroboration for accomplice testimony that included defense witnesses Mr. Carradine, Mr. Tripplett, and Mr. Hardin. Had appellate counsel raised the issue on direct appeal, petitioner would not have been entitled to relief because trial counsel waived the issue by failing to object to the instruction at trial. *See* Tenn. R. App. P. 36(a). Regardless, just as petitioner was not prejudiced by trial counsel's failure to object to the instruction, he is not prejudiced by appellate counsel's failure to raise the issue on direct appeal.

### 3. Failure to Challenge the Trial Court's Ruling Regarding the Admissibility of Lack of Flight Evidence

Petitioner maintains that appellate counsel were ineffective in failing to challenge the trial court's ruling excluding testimony from a trial court clerk that according to court documents, petitioner was present in court on other charges on May 7 and September 9, 1997, after the victim's death and before petitioner's arrest for murder. Based upon our review of the record, we conclude that the trial court did not abuse its discretion in excluding the evidence as irrelevant. *See State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008) (noting appellate courts review a trial court's decision regarding the admissibility of evidence for an abuse of discretion). Furthermore, any error in the trial court's ruling was harmless in light of the evidence of lack of flight that petitioner presented and the jury rejected and the evidence presented establishing petitioner's guilt.

### 4. Failure to Challenge the Local Rule Requiring the Trial Court's Permission for Defendants to Sit at Counsel Table

Petitioner faults appellate counsel for failing to challenge Local Rule 8.05 on direct appeal. Because trial counsel did not challenge the rule at trial, the issue would have been

deemed waived on direct appeal. *See* Tenn. R. App. P. 36(a). Moreover, the Tennessee Supreme Court has upheld Local Rule 8.05 as constitutional. *See Rice*, 184 S.W.3d at 674-75. Petitioner is not entitled to relief regarding this issue.

### 5. Failure to Challenge the Trial Court's Ruling Allowing Trial Counsel to Continue Representing Petitioner After a Conflict of Interest Arose

Finally, petitioner contends that appellate counsel were ineffective in failing to challenge the trial court's ruling allowing trial counsel to continue to represent petitioner at the sentencing hearing after he complained of trial counsel's performance and expressed his intention to raise a claim of ineffective assistance of counsel on direct appeal. The decision to allow counsel to withdraw lies within the trial court's discretion. *See State v. Branam*, 855 S.W.2d 563, 566 (Tenn. 1993); *State v. Gilmore*, 823 S.W.2d 566, 569 (Tenn. Crim. App. 1991). As we have stated, trial counsel did not have an actual conflict of interest that prevented them from representing petitioner at the sentencing hearing for his especially aggravated kidnapping conviction. Therefore, the trial court did not abuse its discretion in requiring trial counsel to continue to represent petitioner at the sentencing hearing. Petitioner would not have been entitled to relief had appellate counsel raised the issue on direct appeal.

### III.  CONSTITUTIONALITY OF THE TRIAL PROCESS AND THE DEATH PENALTY

Petitioner raises various challenges to the constitutionality of his trial and the death penalty. The free-standing claims raised by petitioner should have been raised in prior proceedings. Therefore, the issues are waived. *See* Tenn. Code Ann. § 40-30-106(g). Regardless of waiver, petitioner is not entitled to relief.

Petitioner first submits that women were systemically excluded and under-represented as forepersons on the grand jury. He also submits that such discrimination violates the equal protection clause of the Fourteenth Amendment to the United States Constitution and his rights to a grand jury drawn from a fair cross-section of the community under the Sixth and Fourteenth Amendments. He argues that trial counsel and appellate counsel were ineffective in failing to challenge his indictments, conviction, and sentences on these grounds.

In *State v. Bondurant*, 4 S.W.3d 662, 675 (Tenn. 1999), the Tennessee Supreme Court held that the role of the grand juror foreperson was ministerial and administrative and that to be entitled to relief, the defendant must demonstrate discrimination in the selection of the entire grand jury panel. While petitioner contends that *Bondurant* was wrongly decided, we are bound by the holding of the Tennessee Supreme Court. Furthermore, as noted by the post-conviction court, petitioner presented no evidence at the post-conviction hearing

establishing that women had been systematically excluded from the role of grand jury foreperson in Shelby County. Petitioner is not entitled to relief concerning this issue.

Petitioner asserts that the State failed to ensure the availability of adequate trial counsel and defense resources and that, as a result, he was denied his right to a fair trial. Because this issue should have been raised in prior proceedings, the issue is waived. Petitioner cites to studies that he maintains establishes that Tennessee has failed to comply with the capital defense guidelines of the American Bar Association ("ABA"). He also maintains that Tennessee Supreme Court Rule 12, as revised in 2004, improperly limited defense access to resources, and he challenges the lack of a right to effective assistance of counsel on post-conviction. The ABA guidelines, however, are not constitutionally compelled. *See Bland* 2009 WL 910197, at *58. Moreover, petitioner has failed to establish that he was subjected to an unfair trial or unfair post-conviction proceedings based upon inadequate defense resources. While petitioner claims that trial counsel was left with no choice but to retain PMG to conduct the mitigation investigation because experienced mitigation investigators had conflicts, petitioner argued at the post-conviction hearing that other mitigation investigators were available and could have been retained by trial counsel. We have also concluded that trial counsel's performance was not ineffective. This claim is without merit.

Petitioner submits that the discretion of Tennessee's district attorneys general to seek the death penalty violates his rights under the Tennessee and United States constitutions. This claim, however, has been rejected by the Tennessee Supreme Court. *See, e.g. State v. Hines*, 919 S.W.2d 573, 582 (Tenn. 1995).

Petitioner argues that the imposition of the death penalty violates his right to life under the Tennessee and United States constitutions. The Tennessee Supreme Court has also rejected this argument. *See Cauthern v. State*, 145 S.W.3d 571, 629 (Tenn. 2004).

Petitioner asserts that the imposition of the death penalty violates his rights under international law. Arguments that the death penalty is unconstitutional under international laws and treaties have been systematically rejected. *See, e.g. State v. Odom*, 137 S.W.3d 572, 600 (Tenn. 2004).

Petitioner maintains that execution by lethal injection constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution. Petitioner raised this issue on direct appeal, and this court rejected the claim. *See Gregory Robinson*, 2003 WL 21946735, at *49.

Finally, petitioner contends that Tennessee's proportionality review is not a meaningful system of review and violates his due process rights. Petitioner's argument is contrary to established precedent. *See, e.g. State v. Cazes*, 875 S.W.2d 253, 270-71 (Tenn. 1994). "While important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." *State v. Bland*, 958 S.W.2d 651, 663 (Tenn. 1997).

## IV. CUMULATIVE ERROR

Petitioner asserts that the cumulative effect of the errors at trial and on appeal rendered both the guilt and penalty phases of his trial fundamentally unfair. With regard to the guilt phase of the trial, we have concluded that co-counsel was deficient in failing to provide lead counsel with a copy of the transcript of the meeting between the prosecutors and Mr. Shipp to use in lead counsel's cross-examination of Mr. Shipp. We have also concluded that trial counsel were deficient in the guilt phase for failing to object to the trial court's instruction that did not include Mr. Shipp as an accomplice as a matter of law and to the trial court's accomplice/corroboration instruction that included defense witnesses. These deficiencies, when considered both individually and cumulatively, did not result in prejudice. Petitioner is not entitled to post-conviction relief.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the post-conviction court.

_____
ROGER A. PAGE, JUDGE